CASE NO. 23-4110

IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

| | |
|---|---|
| **LAURA A. GADDY**, **LYLE D.** | ) |
| **SMALL, LEANNE R. HARRIS,** | ) |
| Individually, and on behalf of | ) |
| all others similarly situated, | ) |
| | ) |
| *Appellants,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CORPORATION of the PRESIDENT** | ) |
| **of the CHURCH of JESUS CHRIST** | ) |
| **of LATTER-DAY SAINTS,** | ) |
| a Utah corporation sole and DOES 1-50 | ) |
| | ) |
| *Appellee.* | ) |

_____

On Appeal from the United States District Court for the District of Utah

The Honorable Judge Robert J. Shelby, District Court Case No: 2:19-cv-00554

_____

**APPELLANTS' OPENING BRIEF**
_____

Respectfully submitted,

Kay Burningham, Attorney at Law
299 S. Main St. #1375, Wells Fargo Bank Bldg.
Salt Lake City, Utah 84111
kay@kayburningham.com
(888) 234-3706

Date: December 10, 2023          Oral Argument is requested.

**I. There are no prior or related appeals.** ........................................................ 9

**II Jurisdictional Statement** ............................................................................. 9

**III Issues on Appeal to the Tenth Circuit, including Standard of Review.** ................. 10

    A. Is church autonomy a defense to misrepresentations of fact about a church's history that the church's leaders do not sincerely believe? ............................................. 10

    B. Was the RICO claim wrongly dismissed? ........................................................ 12

**IV Statement of the Case.** ................................................................................. 14

    A. Overview of three complaints against the Church. ............................................ 14

    B. The OC was based on recent admissions of fact that had been misrepresented. ................. 15

    C. The AC added allegations of misrepresentations about tithing use. Ms. Gaddy also preserved issues of: Free Exercise, consent, and sincerity, which apply to the 2AC. ............. 16

        1.   Misrepresentations based on tithing were added and RICO issues were preserved. ..... 16

        2.   The fact v. belief distinction was preserved. ............................................ 16

        3.   The admission by President Nelson subsequent to filing the 1AC was preserved. ....... 17

        4.   A Free Exercise analysis and consent issues were preserved. ......................... 17

        5.   Gaddy argued sincerity as a threshold requirement for the CAD. ..................... 18

        6.   Plaintiff Gaddy distinguished the analogous qualified immunity defense. ............ 18

    D. The DC refused to consider President Nelson's admission, now included in the 2AC. It also dismissed all affirmative misrepresentations, omissions and acts of concealment based on tithing use. ................................................................................................... 18

        1. President Nelson's admission was added to the 2AC. ..................................... 19

        2. The DC dismissed the tithing claims apparently due to failure to allege reliance, any indictable act, and a sufficient number of acts to constitute a RICO scheme. ................. 20

**V Summary of Argument.** ................................................................................. 21

**VI. Argument Regarding Fact v. Belief and Sincerity of Belief.** ............................... 22

    A. The "religious" v. "secular" fact distinction is unjust, particularly where Defendant has admitted the truth of the facts in dispute. ............................................................ 24

    B. A church that had concealed material evidence about its history, ipso facto lacked a sincere belief in representations that are contradictory to that evidence. To protect such deception under the aegis of religious freedom would be manifestly unjust. ............................... 26

        1.   Though the CAD survives Employment Div. v. Smith, its application has not expanded to bar fraud claims based on insincere representations. ......................................... 27

        2.   Like Wisconsin, Bryce was a decision based on *sincerely held* religious beliefs. ......... 28

3.    COP never believed the representations in their correlated artwork. ............................. 29

C. The application of doctrine, rather than the interpretation thereof, is a matter to be addressed as a defense under the Free Exercise Clause. ................................................. 30

1.    Intentionally tortious conduct based on an insincere belief, is no defense to fraud. ....... 30

2.    Defendant did not just profess beliefs, it acted to induce Appellants to act based on representations untethered to its archival contents. But the First Amendment does not protect "knowing falsehoods" that harm others. ................................................. 31

3. Protecting the public from fraud is a valid governmental interest. Even if heightened scrutiny is applied, any Free Exercise burden would be minimal. ..................................... 32

4.    Consent defines the limits of church autonomy. Appellants would not have consented to join or remain in the Church had they known the truth behind Defendant's misrepresentations or that the Brethren did not sincerely believe the facts they promulgated. ........ 33

D. The Church's conduct was not "rooted" in a *sincerely held* religious belief, thus dismissal was improper. ..................................................................................................... 34

E. Bifurcation regarding whether Defendant sincerely believed its correlated representations is proper. ....................................................................................................... 35

1. Sincerity is litigated in Religious Freedom Restoration Act (RFRA) cases. Likewise, it can be litigated where the complaint alleges insincerity based on numerous specific facts. 35

2. Utah has recognized the sincerity requirement in Free Exercise claims. ....................... 36

3. If the MTD does not sufficiently allege facts in support of CAD application, a 12(b)(6) motion should be denied. ......................................................................................... 38

F. Defendant's corporate status is no bar to sincerity adjudication; COP acted as one. ........... 39

**VII Argument that the DC erred in dismissing the RICO claim based on misrepresentations about tithing use: Allegations were not conclusory. Falsity was in fact alleged. Though not an element of the predicate crimes, reliance was specifically pleaded. Additionally, material omissions satisfy the elements of either crime, even absent a duty to disclose.** ....................................................................................... 40

A. Neither the mail and wire fraud crimes, nor a RICO scheme built upon those predicate acts, need comply with common law elements of fraud – concealment is enough. ....................... 42

B. Appellants' RICO claim was not conclusory; it complied with Rule 9 by alleging facts in support of the affirmative misrepresentations and concealment of how the tithing was used with intent to deceive. ............................................................................................. 44

C.    Ps identified the association-in-fact entities and how they carried out the scheme. ...... 45

D. Appellants had alleged that the City Creek representations were false. ............................. 47

E. Reliance on the tithing misrepresentations was specifically alleged. ................................. 47

F.    Regardless of the foregoing, reliance is not an element of the predicate crimes. .............. 48

G. Material Omissions, even absent a duty, can support the predicate crimes. However, material omissions about tithing use were not considered by the DC in its Order. .................. 49

   1. A partial misleading statement gives rise to a duty to provide additional information..... 49

   2.   Duty is not required in cases of concealment with intent to deceive. ........................... 50

   3.   Facts exclusively within Defendant's control cannot be alleged with specificity. The use of the mails or wires need only be incidental to the fraud alleged. ...................................... 51

G. The RICO scheme continues. The Church continues to collect tithing based on teachings and representations that it has admitted are false........................................................................ 51

**VIII. Misrepresentations made in the context of LDS history, including the Brethren's mispresented state of mind as to that history, should be part of the RICO claim.** ................................................................................................................................ 52

   A.   Appellants reasonably inferred that the Brethren believed their correlated material; Defendant cultivated that inference as part of its deceptive scheme. ....................................... 53

   B.   In addition to the false Book of Mormon translation process, Plaintiffs also alleged misrepresentations about Smith as a happy monogamist and concealment of Smith's criminal history. These representations are also a basis for the predicate crimes, and threfore should be part of the RICO claim.................................................................................................................. 54

**IX Short Conclusion Including the Precise Relief Sought.** ........................................... 57

**X Statement concerning Oral Argument.** .................................................................... 57

**XI Attachment One – 133 Memorandum and Decision**.................................................. 60

**XII Attachment Two – 134 Judgment** ......................................................................... 117

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bridge v. Phoenix Bond & Indem. Co.,
  553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) .....................................38, 47
Bryce v. Episcopal Church in the Diocese of Colorado,
  289 F.3d 648 (10th Cir. 2002) .....................................11, 21, 22, 25, 26
Burwell v. Hobby Lobby Stores, Inc.,
  573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) .......................................31, 37
CAD. 118 ...............................................................................................................................22
Carpenter v. United States,
  484 U.S. 19, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987) ..................................................39
Childs v. Miller,
  713 F.3d 1262 (10th Cir. 2013) ....................................................................................13
Clinton v. Sec. Benefit Life Ins. Co.,
  63 F.4th 1264 (10th Cir. 2023) .........................................................................13, 39, 49
Cortez v. McCauley,
  478 F.3d 1108 (10th Cir. 2007).....................................................................................37
Curtis Ambulance of Fla., Inc. v. Bd. of Cnty. Comm'rs of Shawnee Cnty., Kan.,
  811 F.2d 1371 (10th Cir. 1987).....................................................................................12
Emp. Div., Dep't of Hum. Res. of Oregon v. Smith,
  494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) ..........................25, 29, 30, 33
Fernandez v. Clean House, LLC,
  883 F.3d 1296 (10th Cir. 2018) ...............................................................................10, 33
George v. Urb. Settlement Servs.,
  833 F.3d 1242 (10th Cir. 2016) ...............................................................................12, 13
Gonzalez v. Roman Cath. Archbishop of Manila,
  280 U.S. 1, 50 S. Ct. 5, 74 L. Ed. 131 (1929) ..............................................................31
Grace United Methodist Church v. City Of Cheyenne,
  451 F.3d 643 (10th Cir. 2006) .......................................................................................30
Hemry v. Ross,
  62 F.4th 1248 (10th Cir. 2023) ......................................................................................36
Lucas v. Turn Key Health Clinics, LLC,
  58 F.4th 1127 (10th Cir. 2023).......................................................................................11
McDougal v. Weed,
  945 P.2d 175 (Utah Ct. App. 1997) ...............................................................................41
Neder v. United States,
  527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) ..................................................42
Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,
  575 U.S. 175, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015) ............................................52

Our Lady of Guadalupe Sch. v. Morrissey-Berru,
  140 S. Ct. 2049 .................................................................................28
Reynolds v. United States,
  98 U.S. 145, 25 L. Ed. 244 (1878) ..................................................29
Serbian Eastern Orthodox Diocese for U. S. of America and Canada,
  426 U.S. ...........................................................................................31
Smith v. United States,
  561 F.3d 1090 (10th Cir. 2009) ..................................................43, 44
Snyder v. Murray City Corp.,
  124 F.3d 1349 (10th Cir. 1997) .......................................................34
Sorensen v. Polukoff,
  784 F. App'x 572 (10th Cir. 2019) ...................................................50
Tal v. Hogan,
  453 F.3d 1244 (10th Cir. 2006) ..................................................43, 47
United States v. Allen,
  554 F.2d 398 (10th Cir. 1977) .........................................................48
United States v. Alvarez,
  567 U.S. 709, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012) ..........29, 30
United States v. Ballard,
  322 U.S. 78, 64 S. Ct. 882, 88 L. Ed. 1148 (1944) ..........11, 22, 23, 24
United States v. Jeffs,
  2016 WL 6745951 (D. Utah Nov. 15, 2016) ..................................35, 36
United States v. Kieffer,
  681 F.3d 1143 (10th Cir. 2012)........................................................39
United States v. Quaintance,
  608 F.3d 717 (10th Cir. 2010) .........................................................34
United States v. Rasheed,
  663 F.2d 843 (9th Cir. 1981) ...........................................................11
United States v. Stewart,
  872 F.2d 957 (10th Cir. 1989) .........................................................38
Watson v. Jones,
  80 U.S. 679, 20 L. Ed. 666 (1871) ...................................................32
Wisconsin v. Yoder,
  406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ............21, 25, 26

**Statutes**

18 U.S.C.A. § 1341 ...............................................................................38
18 U.S.C.A. § 1343 ...............................................................................38
42 U.S.C.A. § 1983................................................................................34

**Rules**

Fed. R. App. P. 4(a)(4)(vi) ............................................................................ 9

Fed. R. Civ. P. 9(b) ............................................................................... 13, 43

Fed. R. Civ. P. 12(b)(6) ......................................................................... 13, 14

## GLOSSARY OF TERMS AND ABBREVIATIONS

**Anti-Mormon**: term used by LDS leaders, both paid and lay, and members to describe any non-correlated information, especially facts that contradict the correlated narrative of LDS history.  Also used to label individuals who don't agree with LDS doctrine.

**Book of Abraham**. LDS scripture, part of the canonized Pearl of Great Price, taught as written by the Hebrew Prophet Abraham in reformed Egyptian, upon papyri. Joseph Smith translated the papyri into the Book of Abraham, which also contains three facsimiles; the figures therein are taught as depicting Abraham interacting with men.

**Book of Mormon:** The Book of Mormon is believed by the LDS Church to be the translated record of Hebrews who migrated to America in 600 B.C. Over the years, the Hebrew emigrants devolved into two main warring factions, the lighter skinned Nephites, and the dark-skinned Lamanites. The Nephite prophets kept a record of their history and the teachings of their leaders for the latter-days which was inscribed in "reformed Egyptian" on gold plates and then buried in a hill near Smith's upstate New York home.

**Brethren:** Defendants full time paid corporate leaders. The Quorum of the Twelve (12 men) and three members of the First Presidency – a total of 15 members. AV3:2 n.2.

**CAD:** Church Autonomy Doctrine

**Church:** Church of Jesus Christ of Latter-day Saints

**COJCOLDS: "**Church of Jesus Christ of Latter-day Saints," a COP-owned trademark.

**COP:** Corporation of the President of the Church of Jesus Christ of Latter-day Saints, Defendant in this case. Name of Defendant at the time the original complaint was filed defendant was the Corporation of the President of the Church of Jesus Christ of Latter-day Saints, doing business as [T]he Church of Jesus Christ of Latter-day Saints®, a registered trademark of Intellectual Reserve, Inc. It is believed to have since changed its name since the original complaint was filed. Therefore, Appellants will refer to the entity as "the Church," though prior references in pleadings refer to "COP," or "COJCOLDS."

**Correlation Department**: A department within the Church that was created in 1961 whereby the First Presidency approves all communication to its members, including publications, General Conference speeches, artwork, teaching, and missionary manuals.

**Correlated**: rhetoric that has been approved by Correlation. The only type of material approved for teaching to all lay members in the Church.

**COP:** Corporation of the President of the LDS Church, Defendant in this case.

**Ensign Peak Advisors** (**EPA**): investment fund wholly owned and operated by COP.

**FLDS:** The Fundamentalist Church of Jesus Christ of Latter-day Saints (FLDS). A religion that also finds its roots in the Book of Mormon.

**First Presidency:** a trio of men leading the Church, consisting of the President (who is also the LDS prophet), and his two counselors.

**General Authorities:** LDS Men who serve full time in paid Church leadership positions.

**General Conference:** Biannual global meetings held in April and October over two days on a weekend, several hours each day, whereby GAs speak to all members of the church. The priesthood session is held Saturday evening and only men are allowed to attend. The sessions are televised (streamed via satellite and the internet) for the general membership, with the exception of the priesthood meeting. As of 2014, the priesthood session is now available electronically, but women are still barred from attending.

**Institute:** Organization where college age members are taught LDS doctrine.

**Joseph Smith (Jr.)** Early 19th Century founder of Mormonism,

**LDS:** short for Latter-day Saint, deemed less offensive than the word "Mormon," which President Nelson has discouraged. Also used to refer to members of the LDS Church.

**Mormon**: religious groups ideologically similar to the LDS Church, founded based on the writings of Joseph Smith as contained in the Book of Mormon.

**Seer stone(s):** Stone or stones used by Jospeh Smith to translate the Book of Mormon.

**Seminary:** Organization where high school age members are taught LDS doctrine.

**Tithing:** 10% of one's income. A full tithe is required for LDS members to participate in the temple ordinances, required for families to be together in eternity. AV3:149-150¶343

**I. There are no prior or related appeals.**

**II Jurisdictional Statement**

The Second Amended Complaint (2AC) dismissal with prejudice 133, and

judgment for Defendant 134, were entered on 03/28/23. Appellants filed a 60(b) motion

for relief from judgment on 04.25.23, within 28 days. Denial of the Motion to Vacate was

entered on 07/26/23.141. Notice of Appeal was filed on 08/23/23 142. Therefore, the time

to appeal was extended under Fed. R. App. P. 4(a)(4)(vi), until 30 days after denial of the

60(b) Motion to Vacate. For filing dates see AV1:18-19 (Appendix, Volume 1, pages 18-19.) Note: All citations to the Appendices, Volumes 1-4, will be formatted like the citation above. Citations to the Appendices page numbers are those located at the bottom right of each page; *they are not the green ECF stamped number, which differ by 2-3 numbers from those at the bottom.*

**III** **Issues on Appeal to the Tenth Circuit, including Standard of Review.**

This case is on appeal from the District Court's (DC) grant of 12(b)(6) dismissal with prejudice of the Second Amended Complaint (2AC). Two issues are appealed; A) whether the church autonomy doctrine (CAD) is a defense to a corporate church's correlated misrepresentations of fact about its foundational history that the church leaders do not sincerely believe; and B) whether the DC improperly dismissed the Civil RICO claim based on based on two types of misrepresentations: 1) misrepresentations, omissions and concealment of material of facts about religious history; and 2) misrepresentations, omissions and concealment about the church's use of tithing.

The Court's decision with respect to Issue "A" significantly affects determination of Issue "B". The Standard of Review is arguably de novo. All issues are a question of law.

A. Is church autonomy a defense to misrepresentations of fact about a church's history that the church's leaders do not sincerely believe?

The church autonomy doctrine (CAD) is an affirmative defense. Unless a complaint unequivocally admits what is necessary to support that defense, 12(b)(6)

dismissal is improper.[1] Where a complaint alleges that a church concealed evidence directly contradictory to the representations it made about the process used to create its key scripture,[2] and omitted and concealed information about its founding prophet's character, is it proper to dismiss fraud claims based on the CAD? [3] Meaning, is church autonomy a defense to representations that are not sincerely believed?

Standard of review for this issue is de novo.

Laura Gaddy argued a religious belief must be sincerely held before the CAD applies in opposition to the Church's Motion to Dismiss the 1AC, AV1:216-217 §B, arguing that Defendant did not sincerely believe what it represented about LDS history, AV1:231-235. At the DC's invitation, Ms. Gaddy suggested how it might litigate sincerity, AV2:128:8-134:20.

Appellants cited the Amish belief as an example of a threshold determination of sincerity before the Free Exercise Clause applies AV4:175. Appellants distinguished COPs concealment of key evidence, i.e. conduct, while making representations directly contrary to that evidence, from a discussion of the religious belief that ministers should not be homosexuals AV4:180-182. Appellants compared a discussion of normative standards, inappropriate for civil review, to Brigham Young's doctrine of blood atonement AV4:81 n.5.

---

[1] Fernandez v. Clean House, LLC, 883 F.3d 1296, 1299 (10th Cir. 2018)
[2] The *Book of Mormon* is the keystone scripture of the LDS Church AV3:10 n.4.
[3] COP president and LDS prophet, Russell M. Nelson recently admitted the true process by which the Book of Mormon was created. AV3:71¶167, AV4:115-117, and AV3:60-61¶147-148.

However, Appellants did not expressly argue that Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 656–657 (10th Cir. 2002) was a de facto application of a sincerely held belief as they now argue. Nevertheless, Appellants argued that sincerity was a prerequisite to application of the CAD based on conduct "rooted in religious belief".

Lucas v. Turn Key Health Clinics, LLC, 58 F.4th 1127, 1144 (10th Cir. 2023) presented a similar issue, where Lucas did not refer to a specific case name that supported her argument about a systemic injury, but made the argument at the court below and provided examples.

Appellants have similarly preserved the sincerity argument. They gave examples of why the Church's misrepresentations were insincere, cited controlling case law that left the sincerity argument open (United States v. Ballard, 322 U.S. 78, 64 S. Ct. 882, 88 L. Ed. 1148 (1944), distinguished Bryce, 289 F.3d 648, and argued that United States v. Rasheed, 663 F.2d 843, 847–48 (9th Cir. 1981) was persuasive. They argued RFRA cases adjudicated sincerity, and suggested how the issue could be tried in this case. Since whether sincerity is necessary for CAD application is a question of law, Appellants respectfully request that the Court employ de novo review of the issue.

B. Was the RICO claim wrongly dismissed?

Dismissal under 12(b)(6) is improper if Appellants have pleaded facts that allow the Court to draw the reasonable inference that Defendant is liable for the misconduct

alleged.[4] Where the complaint's allegations taken as a whole sufficiently apprise Defendant of its involvement in the alleged fraudulent conduct, Rule 9(b) specificity requirements are satisfied. The DC overlooked 2AC allegations of falsity, reliance, and material omissions, which can satisfy the elements of the mail and wire fraud statutes. Furthermore, 2AC allegations of misrepresentations made in the context of LDS history were ignored due to the DC's prior orders. [5] When all of the above is considered, was it improper to dismiss the RICO claim based on:

1.  Misrepresentations made about religious history and concealment of key evidence? And/or

2. Misrepresentations and concealment about tithing use?

Standard of review for this issue is de novo.

De novo review applies because it appears that the basis of the DC's RICO claim dismissal was an incorrect summation of the 2AC allegations and an incorrect application of the law: 1) It ignored 2AC allegations of falsity and reliance; and 2) it found no duty to disclose, despite the fact that partial statements were made, and the predicate crimes do not require a duty where material information is concealed. "The dismissal of a complaint [] for failing to satisfy the requirements of Fed. R. Civ. P. 9(b) is treated as a dismissal for

---

[4] George v. Urb. Settlement Servs., 833 F.3d 1242, 1247 (10th Cir. 2016). Dismissal of a complaint under Rule 12(b)(6) is reviewed de novo. And "In doing so, all facts alleged in the complaint are taken as true and all reasonable inferences are indulged in favor of the plaintiffs." Curtis Ambulance of Fla., Inc. v. Bd. of Cnty. Comm'rs of Shawnee Cnty., Kan., 811 F.2d 1371, 1374–75 (10th Cir. 1987).

[5] See Issue "A," supra.

failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6)." (citation omitted). Childs v. Miller, 713 F.3d 1262, 1264 (10th Cir. 2013).

See also Clinton v. Sec. Benefit Life Ins. Co., 63 F.4th 1264, 1283 (10th Cir. 2023) where this Court reversed 12(b)(6) dismissal finding that the district court had misconstrued the complaint's misrepresentations and omissions, and ignored other related allegations. When the complaint was read in its entirety, the Court found plaintiff had satisfied Fed. R. Civ. P. 9(b)'s requirements. Clinton, 63 F.4th at 1280.

When taken as a whole, the 2AC complies with Fed. R. Civ. P. 9(b) so that dismissal of the RICO claim was improper. Where the complaint's allegations "taken as a whole" sufficiently apprise Defendant of its involvement in the alleged fraudulent conduct, Fed. R. Civ. P. 9(b) specificity requirements are satisfied. George, 833 F.3d at 1257. Even where "…not *all* of the plaintiffs' allegations" are pleaded with particularity, a complaint may nonetheless satisfy Rule 9(b)'s requirements when its allegations are sufficiently particularized when "*taken as a whole*." Clinton, 63 F.4th at 1275. Wherefore, Appellants respectfully request that the Court employ a de novo standard of review.

**IV Statement of the Case.**

A. Overview of three complaints against the Church.[6]

The gravamen of the Original Complaint (OC) filed 08/05/19, was that for decades the Church, through a Correlation Department created in 1961, intentionally

---

[6] The original and 1AC were brought by Laura Gaddy. Mr. Small and Mrs. Harris, residents of Colorado and California, respectively, were added to the 2AC.

misrepresented key historical facts about LDS history. The [first] amended complaint (1AC), added new allegations of misrepresentations about tithing use based on the IRS Whistleblower Complaint, explained in  AV3:42¶89.

The 2AC included stills from President Nelson's video demonstration published after or near the date of 1AC filing which were submitted to the Court AV1:266-268 for hearing on the MTD held January 5, 2021, where the video was played AV2:149:19-142:13.

Each complaint was met with a 12(b)(6) motion to dismiss based on the Church Autonomy Doctrine (CAD). [7] Laura Gaddy argued that the CAD is an affirmative defense from the outset AV2:27:9-11 and at the second hearing, the DC conceded as much AV2:115:20-23. Nevertheless, Judge Shelby dismissed the entire 2AC with prejudice.

B. The OC was based on recent admissions of fact that had been misrepresented.

COP had recently written essays that admitted facts which materially, if not completely, contradict prior longstanding misrepresentations about LDS history, and its founding prophet's character AV1:54.

In response to the MTD the OC, Ms. Gaddy argued that the CAD is an affirmative defense, so that Defendant must demonstrate sincerity before the CAD applied.  The Church "induces and maintains in its members' beliefs based upon statements of fact that [they] do not believe," AV1:60-64.

---

[7] The initial MTD did not specify a 12(b) subsection. Laura Gaddy argued that the CAD was an aff. def., not jurisdictional; thereafter, MTDs were based on Fed. R. Civ. P. 12(b)(6).

At hearing, the DC acknowledged that Gaddy had made a distinction between the belief that the scripture was translated through the power of God, and the process by which that occurred AV2:18:18-19:14.  Yet the DC rejected Gaddy's distinction between facts and beliefs in favor of one between "religious facts," and "secular facts, "dismissing all fraud claims based on the former AV1:116. *But the definition of fact is independent of context.*

C. The AC added allegations of misrepresentations about tithing use. Ms. Gaddy also preserved issues of: Free Exercise, consent, and sincerity, which apply to the 2AC.

Ms. Gaddy also argued that the Church's conduct should be analyzed as a Free Exercise issue, especially since she alleged that she would not have consented to join the Church or continue to tithe had she known the truth of the correlated factual misrepresentations. Gaddy alternatively argued that if "religious facts" are a subset of ordinary facts, and entitled to special protection, then they are akin to beliefs which must be sincere for the CAD to apply.

1.  Misrepresentations based on tithing were added and RICO issues were preserved.

The 1AC alleged that the Church's agents represented that no tithing was used for City Creek Mall, though it was AV1:148-149¶79.  At hearing, support for the RICO claim was briefly argued indicating that mail and wire fraud predicate acts do not require reliance AV2:114:2-115:9. Copies of the Tenth Circuit's mail and wire fraud instructions were filed AV1:260-264. The DC granted the MTD the 1AC except for the RICO claim AV2:202-206.

2.  The fact v. belief distinction was preserved.

Gaddy maintained the fact v. belief distinction with re: misrepresentations made in a religious context AV1:215-216 n.1. The DC refused to revisit its prior ruling rejecting that distinction, AV2:189.

3. The admission by President Nelson subsequent to filing the 1AC was preserved.[8]

Due to the timing of President Nelson's video *vis a vis* filing of the 1AC, Ms. Gaddy did not incorporate it into the 1AC, thus Defendant did not raise it in their MTD, AV1:190, and *a fortiori*, Ms. Gaddy did not address it in her opposition AV1:210.

The Order dismissing 2AC claims based on "religious facts," incorporated the DC's prior order AV4:262 n.179 (referencing AV2:200.) Therefore below, Appellants now cite the record where the issue was preserved in the context of the MTD the 1AC.

4. A Free Exercise analysis and consent issues were preserved.

Ms. Gaddy argued that a claim of religious belief is no defense to reprehensible conduct AV1:218-219, and that she joined the Church without informed consent, AV1:173-174¶160-162. Since consent defines the limits of church autonomy, the CAD is inapplicable to her case AV1:219-224. The rationale for autonomy is to protect internal church decisions without granting privilege to ignore neutral laws except where church members have consented to be bound by ecclesiastical decisions AV1:224-225. Neutral fraud laws are subject to rational basis scrutiny AV1:219-220. But even assuming fraud laws unduly burdened free exercise, a neutral law enacted for a compelling state interest

---

[8] AV3:71¶167, AV4:115-117,-AV3:60-61¶147-148.

may yet be upheld AV1:225-227. Finally, protecting the public from fraud is a legitimate recognized governmental interest AV1:227-230.

5. Gaddy argued sincerity as a threshold requirement for the CAD.

Laura Gaddy argued that "COP did not sincerely believe key facts that it taught about LDS origins," AV1:216-217§B. Like the Ballards and Rasheed, AV1:231-234 the First Amendment is an affirmative defense. Per the Free Exercise Clause, Defendant must demonstrate that a sincerely held religious belief is substantially burdened by neutral fraud laws. Otherwise, the case can be tried as any other AV1:231.

Because the 1AC places sincerity at issue, dismissal on the pleadings is inappropriate AV1:230-235§V(b). At hearing, when the DC asked how he would litigate sincerity, Gaddy explained AV2:128:8-134:20.

She argued sincerity was easily tested as accomplished in RFRA cases AV1:231-232, and AV2:128:8-134:20. The DC refused to apply the rationale of RFRA cases. AV2:193, granted the MTD on misrepresentations of fact made in the context of LDS history AV2:192§B.

6. Plaintiff Gaddy distinguished the analogous qualified immunity defense.

Gaddy distinguished application of the CAD from the qualified immunity defense. The application of the CAD is not just a question of law where "…the sincerity of LDS leaders [is] in dispute," and therefore it is a question of fact for the jury AV1:235.

D. The DC refused to consider President Nelson's admission, now included in the 2AC. It also dismissed all affirmative misrepresentations, omissions and acts of concealment based on tithing use.

In ruling on the MTD the 2AC, the Judge Shelby refused to consider his prior orders denying representations made in the context of LDS history. AV4:262 n.179 (re: AV2:200). Thus, the 2AC was only considered with respect to tithing allegations.

1. President Nelson's admission was added to the 2AC.

Subsequent to filing the 1AC on May 18, 2020, on an unknown date in May 2020, the Church's website published a demonstrative video where its president and LDS prophet, Russel M. Nelson, admitted the truth of the process by which the *Book of Mormon* was created, reenacting Joseph Smith peering at a seer stone[s] buried in a hat, with gold pates "usually covered," AV3:65-69¶159-162.  The admission contradicted decades of representations in the Church's correlated art that depicted Smith looking at open gold plates, appearing to translate directly from them in the literal sense of the word, no stone(s) buried in a hat, AV3:71¶167 and AV4:115-117. [9]  Indeed, these correlated false representations were the *only* type of artwork promulgated by the Church based on a survey conducted by BYU history professor Arthur Sweat, AV3:60-61¶147-148.

Occasionally, the Urim and Thummim, a biblical reference, always described as spectacles attached to a breast plate found with the gold plates, was also depicted, AV3:64¶157. The 2AC alleged that the brown opaque stone Smith used to dictate the *Book of Mormon* (which looks nothing like the Urim and Thummim), had been kept hidden in the Church vault for over a century until August 2015,  AV3:63¶154. And that

---

[9] The *Ensign* is a COP controlled publication, AV3:108-109¶248 text under translation art.

the Church had concealed eyewitness accounts from Smith's scribes of the stone-in-the-hat translation process with gold plates hidden since the 19th Century, AV3:32-34¶68 table.

The 2AC demonstrates the over half century long fraudulent scheme, through the concealment of artifacts, stones, original manuscripts, affidavits, documents, and information material to Appellants' decision to commit the Church, while representing a radically different and factually inaccurate version of LDS history.  AV4:203, AV3:63¶154, AV3:165-168 table at ¶404, and AV3:186¶482.

Appellants argued that President Nelson's admission "…means that the decades of [correlated] art in AV4:115-117 are false statements," AV4:191-192. Yet, the DC wrongly concluded: "In their Opposition, Plaintiffs point to no… changes in circumstance that would require the court to revisit these conclusions," referring to Appellants' argument that the CAD does not apply where the religious belief is insincere, AV4:261-262.

2. The DC dismissed the tithing claims apparently due to failure to allege reliance, any indictable act, and a sufficient number of acts to constitute a RICO scheme. [10]

Appellants preserved the MTD the 2AC challenge to their RICO claim at AV4:200-204. For the argument against dismissal of Appellants' RICO claim.

The DC took nearly a year to decide the case. Appellants requested a hearing on the MTD and attached the SEC Order of February 2023 fining the Church and EPA a

---

[10] Since the DC had previously ruled that "religious facts" could not be litigated, the 2AC MTD dealt only with tithing use allegations.

combined $5 million for "violations of Section 13(f)(1) of the Exchange Act and Rule 13(f)-1 thereunder," AV4:227-235.

The DC ruled without a hearing. It declined to consider the fraud claims based on religious history, limiting the claims to those based on tithing use. It found that the RICO claimed failed because it did not comply with elements for common law fraud, AV4:284. and in particular did not allege reliance nor "…a single predicate act…" AV4:286. Wherefore this appeal was filed within 30 days of the denial of the 60(b) Motion.

## V Summary of Argument.

Appellants ask the Court to define the limits of the Church Autonomy Doctrine as it relates to alleged factual misrepresentations, omissions, and concealment, based on mail and wire fraud, the predicate acts for their Civil RICO claim. These facts are about 1) LDS history; and 2) how the LDS Church used its tithing.

The representations at issue are facts, not beliefs, made in the context of LDS history. Specifically: 1) the Church misrepresented the process by which the Book of Mormon was created as one where Joseph Smith appeared to translate directly from gold plates. However, for over a century, until it was revealed in 2015, Defendant had concealed the brown opaque stone that it's President and LDS Prophet now admits Smith used to translate the Book of Mormon while he peered at the stone buried in a hat, "gold plates usually covered." Since the 19th Century the Church had also concealed eyewitness statements from scribes who confirm the stone-in-the-hat method of translation.

Defendant also concealed the criminal history of founding prophet, Joseph Smith. His crimes included sexual relations with multiple women, including young teens and other men's

wives. Smith was convicted in 1826 of fraud when he was hired but failed to find buried treasure with the same brown stone used to translate the gold plates.

With respect to tithing use, the RICO claim is based on affirmative misrepresentations that no tithing was used for City Creek Mall. Defendant also made misleading partial statements about what tithing was used for, while it omitted other uses, such as the bailout of Beneficial Life Insurance Co. The Church concealed that it annually deposited $1-2 billion dollars of excess tithes directly into its investment fund, Ensign Peak Advisors, while spending just $1.3 billion over 25 years for humanitarian aid. The Church also created 13 shell LLCs to hide another $32 billion dollars of its accumulated wealth, and it has violated provisions of the SEC Act.

When the two types of misrepresentations are combined, Defendant has used unwitting LDS lay members to effect a longstanding fraudulent scheme, sufficient under the RICO Act.

## VI. Argument Regarding Fact v. Belief and Sincerity of Belief.

In balancing the rights of a church with those of the government, there is a point where a church must be accountable to secular laws; at minimum, intentionally tortious conduct, unrooted in a sincere religious belief, is where the line must be drawn.

Facts do not change character based on context. However, from the Order dismissing the OC through the 2AC dismissal with prejudice, the DC ruled that some facts cannot be the subject of a fraud claim because contextually they are associated with a religious belief. The DC created a legal fiction when it designated these type of facts "religious facts," to which the CAD applies. It rejected Laura Gaddy's distinction

22

between fact and belief, reasoning that the better way to determine whether fraud claims can proceed against a church is to decide whether the representation is a "secular" or "religious" one AV1:116-117. *This distinction would allow for the protection of all fraudulent conduct so long as that conduct relates in any way to religion.*

Appellants seek to litigate facts, not beliefs. But even when those facts are part of religious history, to be protected they must be sincerely believed. The DC ruled as a matter of law that the CAD applied whenever the speech or conduct is "rooted in religious belief," without limiting those beliefs to those that are *sincerely held*.

The sincerely held Amish belief in a short public education for Amish teens is where the phrase was coined, Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). The Supreme Court referenced Amish sincerity about this belief throughout the case.

Similarly, the Tenth Circuit used the phrase "rooted in religious belief," in Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 656–657 (10th Cir. 2002), applying the phrase to conduct that was rooted in a *sincerely held* religious belief. Bryce, Id. at 652 where the 1998 Langham Resolution is discussed.

Beliefs involve an inherently different analysis from facts, but even "religious facts" should be litigated in a court of law. Alternatively, if misrepresentations of facts made in the context of religious history are somehow a subset of facts entitled to special treatment, then those facts are akin to beliefs, which must be sincerely held before the CAD applies. If they are not sincere, religious fraud claims should be tried as ordinary fraud claims.

A. The "religious" v. "secular" fact distinction is unjust, particularly where Defendant has admitted the truth of the facts in dispute.

Notwithstanding the DC's interpretation of Bryce, 289 F.3d 648, that the CAD gives churches an almost *carte blanche* immunity from tort actions where ecclesiastical activity is concerned, no binding authority has held that intentional misrepresentations regarding known material facts is protected by the CAD, AV4:180 n.4.

Ms. Gaddy did not challenge the LDS belief that the Book of Mormon is the word of God, nor that God inspired Jospeh Smith's translation, only the process by which translation occurred. Judge Shelby initially described what Laura Gaddy alleged as beliefs, but later conceded that it was the process by which the *Book of Mormon* was translated that she claimed was misrepresented, AV2:19:2-20. All witnesses to Smith's dictation, the statements of whom the Church has concealed, attest that he peered at a stone placed in a hat, and that the gold plates were not directly used, just as President Nelson admitted, AV3:32-34¶68 table.

The Supreme Court addressed the conviction of defendant leaders of the "I AM" Church based upon their lack of "good faith" in the representations they made. Ballard, 322 U.S. 78, was decided in the context of the Ballards' defense to mail fraud, testifying that he had seen St. Germain, who anointed him his representative to among other things, heal the sick.

The sole issue submitted to the jury was whether the Ballards believed their representations. Ballard, 322 U.S. at 84. The jury could not determine the truth of Ballards' beliefs. However, it could ascertain whether the Ballards believed in their

experience, i.e. whether representations that they had seen St. Germain were made in good faith. Indeed, the term "good faith" is used thirteen times in the opinion.

In dissent, Chief Justice Stone posited a hypothetical where the fact of the Ballards' presence in San Francisco on a particular day could surely be adjudicated, thus separating fact from belief, even though in a religious context. Ballard, 322 U.S. at 89, AV1:233 including n.13.

Thus, Ballard, 322 U.S. 78 only forbade litigation of the truth of religious beliefs; it implicitly allowed the sincerity issue.

Although Justice Douglas, writing for the majority, gave examples of "religious belief," he failed to define the term. However, *the examples he provided were all transcendent experiences,* as Appellants argued, AV4:182-184. A careful reading of Ballard, 322 U.S. at 86–87 demonstrates that a prohibition against requiring proof of religious beliefs only applies to the transcendent, not that which is empirically provable. Thus, the distinction is actually between what is transcendent - religious beliefs, and what can be empirically proven - facts. Only the transcendent is *beyond the ken* of mortals and therefore the court.

Facts and beliefs are fundamentally different. Caleb Mason posits that "[t]he Ballard rule cannot be construed as a blanket prohibition on all factfinding on questions about which a party has a religious belief." [11] Mason argues that "[a]s a matter of positive constitutional law [ ] there *must* be a domain of propositions which can be asserted and

---

[11] Caleb E. Mason, "What is Truth? Setting the Bounds of Justiciability In Religiously-Inflected Fact Disputes," *Journal of Law and Religion*, Vol. 26 No. 1 (2010-2011) pp. 91-139. Cambridge University Press.

proved in courts, and a domain of "properly religious" beliefs which are epistemically off limits to the courts. [12] [Emphasis Original]. Because it is the transcendent which are "beyond the ken" of civil courts. Id.

B. A church that had concealed material evidence about its history, ipso facto lacked a sincere belief in representations that are contradictory to that evidence. To protect such deception under the aegis of religious freedom would be manifestly unjust.

President Nelson's admission is a fair representation based on Smith's brown opaque stone and the statements of eyewitnesses to the Book of Mormon translation process. The stone and the eyewitness statements were concealed for over a century. Thus, Defendant knew that all of its commissioned and correlated artwork depicting that process from the 1970s up until publication of the photograph of the brown stone in August of 2015 were false representations. AV3:65¶161 and AV3:78-80¶191-193.

A review of the characterization of the seer stone is helpful to show the Church's ongoing intent to deceive. Two articles published in the Church's *Ensign* magazine in the 1990s characterize the seer stone as clear stones in a breastplate, instead of an accurate description of the brown opaque stone which had been concealed in Defendant's vault for almost a century. The articles failed to reference the fact that Smith dictated the scripture while burying his head in a hat with the gold plates "usually covered," as witnesses said, and as has now been admitted. Instead, there is the same misleading artwork published along with the articles, AV3:94-96¶225-227.

---

[12] Id. at 103.

1. Though the CAD survives Employment Div. v. Smith, its application has not expanded to bar fraud claims based on insincere representations.

Throughout its history, the Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate" Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 878–79, 110 S. Ct. 1595, 1600, 108 L. Ed. 2d 876 (1990). There, the Court held that the Free Exercise Clause permitted the state to prohibit sacramental peyote use, and thus to deny unemployment benefits to persons discharged for that use.

The Court reasoned that allowing exceptions to every state law or regulation affecting religion "would open the prospect of constitutionally required exemptions from civic obligations of almost every conceivable kind." Emp. Div. 494 U.S. at 888. The standard violated by commission of a crime [or arguably an intentional tort] applies to all regardless of one's religious identity or motive, AV4:184.

Expanding the rationale of three out-of-circuit decisions based on the ministerial exception, this Court held that the CAD remains viable after Employment Div., Dept. of Human Resources of Oregon, 494 U.S. 872. However, before the CAD is implicated, a threshold inquiry is whether the alleged misconduct is 'rooted in religious belief.'" Bryce, 289 F.3d 648, citing Wisconsin, 406 U.S. at 215.

A free exercise analysis was applied to a sincerely held Amish belief that children over age sixteen are better spiritually served working at home than attending public school, AV4:175. The phrase "rooted in religious belief," originated in the context of

Wisconsin's Free Exercise analysis, AV1:222 and AV4:180-182. The religious belief at issue was not challenged as insincere – it was a core Amish teaching.

Though the Wisconsin Court did not include "sincere" to limit the "rooted in religious belief" phrase, that the belief must be sincere is clear from the facts of the case. These were rights that "[the Amish] forbears have adhered to for almost three centuries." Wisconsin, Id. at 215. And although difficult "…[a] determination of what is a 'religious' belief or practice [] may present a most delicate question, the very concept of ordered liberty precludes *216 allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." Wisconsin, Id. at 215–216.

However, the DC ruling suggests that virtually any utterance made in a religious context is "rooted in religious belief," and is thus protected by the CAD. That overly broad interpretation of the phrase goes against the rationale for the autonomy defense.

2. Like Wisconsin, Bryce was a decision based on *sincerely held* religious beliefs.

A church minister and her partner brought sexual harassment claims against the church based on an internal church discussion about the propriety of retaining a female minister who had recently married another woman.  The Church raised the CAD as a defense. Bryce, 289 F.3d 648. The facts upon which Bryce was decided demonstrated that the harassment claims centered around the Episcopal Church's sincerely held belief set forth in the 1998 Lambeth Resolution Bryce, 289 F.3d at 652. The remarks serving as a basis for the harassment claims were made as part of ecclesiastical discussions on church policy towards homosexuals. Any alleged harassment was due to the content of that discussion, which Bryce and her partner voluntarily attended, AV1:222.

3. COP never believed the representations in their correlated artwork.

Here, there is no evidence that the misrepresentations in the correlated artwork before 2017 were ever sincerely believed by Defendant. On the contrary, the *only* pictorial representations in the art (AV4:191-192, referencing AV3:60¶148, and AV3:118¶263) directly contradict the reasonable conclusions that Appellants would have drawn had they been privy to the concealed opaque brown stone and statements from eyewitness to the process of Book of Mormon translation.

Defendant had recently written essays that admitted facts which materially, if not completely, contradict its prior longstanding misrepresentations about LDS history, AV3:10-12¶16-18.  The LDS Personal Faith Crisis Report (LDSPFCR), a noncommissioned survey by LDS professionals, concluded that thousands of LDS members suffer extreme distress over Defendant's correlated misrepresentations. The report was provided to one or more of the Brethren in about 2013, AV4:1-71. In response, the Church made a weak effort to acknowledge what they had formerly concealed by drafting essays with additional information omitted from the prior misleading representations. However, even then, the essays were made intentionally hard to find, as LDS historian Snow admitted, thus, demonstrating the Church's ongoing fraudulent scheme, AV3:73-76¶175-181.

Furthermore, despite acknowledgment of the practice by a former employee, AV3:108¶247, the Church has disavowed a belief in "Lying for the Lord" AV3:96¶228. Therefore, since neither the longstanding representations about their history, nor a

practice of "Lying for the Lord" were or are sincerely held religious beliefs, no Free Exercise right is jeopardized by subjecting the Church to neutral fraud laws.

C. The application of doctrine, rather than the interpretation thereof, is a matter to be addressed as a defense under the Free Exercise Clause.

It is axiomatic that the Free Exercise and Establishment Clauses of the First Amendment are the source for the CAD. However, Defendant seeks to expand the CAD beyond what binding authority has implicitly, if not explicitly allowed.

However, the Church's claim to Establishment protection is weak, AV1:226. "Properly understood, the Establishment Clause proscribes governmental "'…coercion of religious orthodoxy and of financial support by force of law and threat of penalty.'" (Citations omitted.) Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2071 n.2, 207 L. Ed. 2d 870 (2020). That's not what's involved in applying the Establishment Clause to the facts of this case.

This case is one of Free Exercise because the *determination* of doctrine is a separate matter from the *application* of doctrine. The former is covered by the CAD, whereas the latter requires balancing. Many activities could be said to be an application of religious doctrine, but that does not make them a matter of church autonomy. Instead, Appellants submit that the 2AC fraudulent conduct alleged is beyond the CAD and that a Free Exercise analysis is proper.

1. Intentionally tortious conduct based on an insincere belief, is no defense to fraud.

George Reynolds' conviction under a federal bigamy law was upheld because practices due to religious belief cannot be superior to secular laws. Reynolds v. United

States, 98 U.S. 145, 166–67, 25 L. Ed. 244 (1878). The Supreme Court later reasoned that religious convictions have not "relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs." 494 U.S. at 879.

Like the crimes in these cases, the 2AC alleges intentionally tortious conduct, with mens rea. It is not a case of negligence. Therefore, given the state's interest in protecting the public against fraud, Defendant's conduct should not be exempt from neutral fraud laws due to the CAD.

2. Defendant did not just profess beliefs, it acted to induce Appellants to act based on representations untethered to its archival contents. But the First Amendment does not protect "knowing falsehoods" that harm others.[13]

It is the act of scheming to induce Appellants' belief in the Church, by misrepresenting the process by which its key scripture was created as well as concealing material facts about its founding prophet that is at issue. Defendant represented LDS founder Joseph Smith to be a faithful monogamist, when he was an adulterer, who only later was characterized as polygamist. The Church lied to get devoted members like Appellants to commit as young adults (and remain committed) to the Church and to tithe. They would not have done so had they known what is now known to be the truth of the *Book of Mormon* translation process (church origins) and the misrepresentations about Smith's character. AV3:147¶334, and at AV3:148¶339 and at AV3:150¶344.  Nor would

---

[13] United States v. Alvarez, 567 U.S. 709, 734, 132 S. Ct. 2537, 2554, 183 L. Ed. 2d 574 (2012).

they have tithed throughout the decades of their committed membership AV3:170-172¶415-417.

A Free Exercise analysis was argued as appropriate for this case below, AV1:225-230. It is Defendant's conduct in inducing others to join the Church or members to remain dedicated to it by promulgating facts about LDS history that it does not believe. That conduct is distinguishable from merely lying. It constitutes fraud, which is not protected speech. "Fraud statutes…require proof of a misrepresentations that is material, upon which the victim relied, and which caused actual injury." Alvarez, 567 U.S. at 734.

3. Protecting the public from fraud is a valid governmental interest. Even if heightened scrutiny is applied, any Free Exercise burden would be minimal.

Employment Div., Dept. of Human Resources of Oregon, 494 U.S. 872, held that the Free Exercise Clause protects religious beliefs, but does not insulate religiously motivated actions, unless the laws single out religion for disfavored treatment. "[A] law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." Grace United Methodist Church v. City Of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006) AV1:219-220§II. Furthermore, a substantial burden on Free Exercise must be shown before the burden of proof shifts to demonstrate that the law is the least restrictive means of accomplishing its compelling interest, AV1:229.

The Supreme Court has never applied the CAD to fraud cases AV4:178-182. Instead, it has historically exempted fraudulent conduct. From Gonzalez v. Roman Cath. Archbishop of Manila, 280 U.S. 1, 16, 50 S. Ct. 5, 7, 74 L. Ed. 131 (1929), abrogated by

Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich, 426 U.S. 696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976)[14] to Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 717, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014), it exempted fraud. "…whether or not there is room for "marginal civil court review "under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes…" the arbitrary exemption is no longer valid." Serbian Eastern Orthodox Diocese for U. S. of America and Canada, 426 U.S. at 713. Although Justice Brennan's limit of fraud cases to "secular purposes," was dictum since no claim of fraud had been made in the case, secular *purposes,* not secular *misrepresentations* are what he wrote were exempted. [15]

4. Consent defines the limits of church autonomy. Appellants would not have consented to join or remain in the Church had they known the truth behind Defendant's misrepresentations or that the Brethren did not sincerely believe the facts they promulgated.

In order to fall within the autonomy exception, church actions must be free from fraud and applied to those who have consented to be governed by that authority AV1:243. Fraudulent representations used to induce belief in a church vitiates any consent to be bound by that church's rules, and thus defines the limits of church autonomy, AV1:64-68§A and AV4:180-184.

Watson v. Jones, 80 U.S. 679, 20 L. Ed. 666 (1871), generally cited as the origin of the CAD, acknowledges that consent defines its limits, AV4:178. "All who unite

---

[14] Serbian Eastern Orthodox Diocese for U. S. of America and Canada, 426 U.S. at 713 abrogated Gonzalez, 280 U.S. 1 only with respect to the arbitrariness exception.
[15] Utah ranks as the U.S. leader in Ponzi Schemes for 2008-2018. These schemes are mostly based in LDS affinity fraud. AV1:227-230. And AV4:198, citing AV3:13¶22-23.

themselves to such a body do so with an implied consent to this government, and are bound to submit to it." Watson, 80 U.S. at 729.

Appellants would not have committed to the Church as young adults had they known of the misrepresentations alleged in the 2AC about church origins and the character of Jospeh Smith, AV3:147¶334 (Gaddy), and AV3:148¶339 (Small), and at AV3:150¶344 (Harris). There was no *informed* consent. Neither would they have tithed throughout the decades of their committed membership AV3:170-172¶415-417, had they known that their tithes were used for commercial development, and that the Church had a pattern of stockpiling billions, with so little spent for humanitarian aid, AV3:145-146¶331 (Gaddy), AV3:149¶341 (Small), and  AV3:150¶345 (Harris). Appellants joined the Church without informed consent; since consent defines the limits of church autonomy, the doctrine is inapplicable to this case, AV1:219-225§II and AV3:163¶395.

D. The Church's conduct was not "rooted" in a *sincerely held* religious belief, thus dismissal was improper.

The DC acknowledged that the CAD is an affirmative defense, "…incumbent on the defendant invoking the defense to show its application" AV2:115:18-23. If the Court agrees with Appellants that "religious facts" must be sincerely believed, then the 2AC allegations have not pleaded Appellants' claims made in a religious context out of court. To the contrary, there is a plethora of allegations that the Defendant's beliefs are insincerely held and in fact that the narrative it promulgated up until a few years ago was directly contrary to what had actually occurred, as evidenced by its archival contents.

This Court has held "…on occasion it is proper to dismiss a claim on the pleadings based on an affirmative defense but only when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." Fernandez v. Clean House, LLC, 883 F.3d 1296, 1299 (10th Cir. 2018). The court in Fernandez found that he had sufficiently alleged willfulness so that the statute of limitations for his claim was three, instead of two years (which is the statute for a negligence-based claim).

Likewise, Appellants have not pleaded themselves out of court by admitting that their claim is based on misrepresentations about which D had a *sincerely* held religious belief. Therefore, if the Court determines that sincerity of belief is a prerequisite for the CAD to apply, then dismissal was improper.

E. Bifurcation regarding whether Defendant sincerely believed its correlated representations is proper.

1. Sincerity is litigated in Religious Freedom Restoration Act (RFRA) cases. Likewise, it can be litigated where the complaint alleges insincerity based on numerous specific facts.

RFRA was enacted in 1993 in response to Emp. Div, 494 U.S. 872, Gaddy argued that adjudication of sincerity in an RFRA context served as a guideline to similar treatment where specific fact allegations demonstrate that a church does not believe what it preaches. Certainly, litigating sincerity here is no different than what is done in RFRA cases. See AV1:230-232 and at hearing, AV2:128:16-17. For example, Justice Gorsuch found no issue with the trial court's three-day evidentiary hearing in an RFRA case.

United States v. Quaintance, 608 F.3d 717, 720 (10th Cir. 2010). Likewise, litigation of the Brethren's sincerity, as reflected in their correlated doctrine, could be easily determined given the contradictory contents of their archives, when compared with their representations, AV2:134:1-20.

2. Utah has recognized the sincerity requirement in Free Exercise claims.

The Utah Supreme Court has reasoned that sincerity of religious belief is a threshold to a Free Exercise defense. "The first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held." Snyder v. Murray City Corp., 124 F.3d 1349, 1352 (10th Cir. 1997), opinion vacated in part on reh'g en banc, 159 F.3d 1227 (10th Cir. 1998), [16] Snyder challenged the law restricting the type of prayer he could offer as a burden to his Free Exercise rights; there, sincerity of belief was part of his prima facie case.

Additionally, a Utah district court applied a sincerity analysis denying a MTD the indictment brought by FLDS leaders Jeffs and Wayman under both RFRA and the Free Exercise Clause. The indictment alleged that they unlawfully used church member Supplemental Nutrition Assistance Program (SNAP) benefits. The defense was based on a claimed religious belief in the law of consecration. As applied, it directed FLDS members to divert their SNAP benefits to the bishop's storehouse. The indictment alleged that food items were provided to FLDS members who did not qualify to receive SNAP benefits and that converted proceeds were used to purchase non-eligible items.

---

[16] Snyder brought a 42 U.S.C.A. § 1983 claim where he had to establish that defendants, acting under color of state law, deprived him of a right, privilege, or immunity secured by the U.S. Constitution, a *free exercise* right.

Defendants were charged with conspiracy to commit SNAP benefits fraud and money laundering. United States v. Jeffs, No. 2:16-CR-82 TS, 2016 WL 6745951, at *2 (D. Utah Nov. 15, 2016) (unpublished).

Jeffs brought a MTD the indictment. Facts presumably alleged in opposition to the motion were that Jeffs did not eat the kind of food in the communal warehouse that was purchased with SNAP benefits. Instead, he ate high quality food unavailable to the common FLDS member, thereby receiving preferential treatment. These facts were not disputed.

The Court denied the motion, concluding that it could not "…conclude that [] Jeffs has a sincerely held belief in the Law of Consecration," because he "*acted inconsistently with the Law of Consecration* and materially benefitted from others' adherence." Jeffs, 2016 WL 6745951, at *5. [Emphasis added.] The Court reasoned: "*[A]n adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief, or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine.*" [Emphasis added.] Jeffs, 2016 WL 6745951, at *4 . Laura Gaddy used this case as an example in oral argument, AV2:121:17-122:17, and AV2:131:10-133:17. [17] The DC asked how a determination of sincerity would work and she explained, AV2:133:23-134:20.

---

[17] The Jeffs, 2016 WL 6745951 case was provided as supplemental authority prior to the hearing AV1:256-257.

### 3. If the MTD does not sufficiently allege facts in support of CAD application, a 12(b)(6) motion should be denied.[18]

The rationale provided by this Court in reversing the trial court's denial of the government's 12(b)(6) MTD based on the qualified immunity defense was that: "plaintiffs have not met their burden of demonstrating that the law clearly established the rangers acted with excessive force as to either Hemry [victim]." Hemry v. Ross, 62 F.4th 1248, 1260 (10th Cir. 2023).

> Asserting a qualified immunity defense via a Rule 12(b)(6) motion [] subjects defendant to a more challenging standard of review than would apply on summary judgment…because 'at [the motion to dismiss] stage, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness.' [Emphasis original]

Hemry, Id. at 1253.

The Hemry complaint alleged that the qualified immunity defense should apply. Gaddy argued that that if sincerity is a threshold requirement, Defendant has not argued that its representations were rooted in a sincerely held belief. On the contrary, the 2AC alleges numerous factual bases for insincerity so that application of the CAD as a matter of law was improper, AV1:235.

Discovery and a bifurcated trial concerning application of the CAD as an affirmative defense is proper to determine whether the case will proceed on the merits. [19] In Cortez v. McCauley, 478 F.3d 1108 (10th Cir. 2007) the Court denied the sheriffs' motion for summary judgment finding that appellant had alleged sufficient facts to

---

[18] Citing Bryce, the DC compared the CAD to a defense of qualified immunity AV4:259.
[19] Esbeck, supra at 267.

overcome their qualified immunity defense. In dissent, Judge Hartz suggested bifurcation of trial on what information was known to the officers as an alternative solution. Cortez, id at 1135. In this case on appeal, bifurcation would be proper since the Corporate Defendant's sincerity (the entity who correlated), is a jury question, AV1:231-232.

F. Defendant's corporate status is no bar to sincerity adjudication; COP acted as one.

Defendant acted with one mind by correlating General Conference (GC) speeches, church published magazine, news articles, and instructional manuals AV3:52¶126, as well as all artwork AV3:71¶167. *Any* communication between the Brethren and lay LDS members was correlated.

All of the foregoing types of communication constitute the fraudulent representations alleged in the 2AC; thus, Defendant's sincerity is easily tested. Though the sincerity of Defendant's religious beliefs was not disputed, "a corporation's pretextual assertion of a religious belief in order to obtain an exemption under RFRA for financial reasons would fail." Burwell, 573 U.S. at 717.

As will be argued in the next section, the DC erred in limiting the basis of the 2AC RICO claim to affirmative misrepresentations about tithing (ignoring intentional omissions and concealment about tithing use). It also erred because it ignored both misrepresentations and intentional omissions made in the context of LDS history.

2AC allegations include concealment of the opaque brown stone and eyewitness statements regarding the manner in which the Book of Mormon was translated, while all artwork represented something completely contrary. Defendant also omitted important facts about Smith's marital status, giving members the false impression that he was a

faithful monogamist. And, importantly, it concealed his criminal history. All of the foregoing misrepresentations support the argument that all are appropriately considered part of Defendant's fraudulent scheme.

**VII** **Argument that the DC erred in dismissing the RICO claim based on misrepresentations about tithing use: Allegations were not conclusory. Falsity was in fact alleged. Though not an element of the predicate crimes, reliance was specifically pleaded. Additionally, material omissions satisfy the elements of either crime, even absent a duty to disclose.**

Appellants brought a civil RICO claim based on violation of the federal mail and wire fraud statutes, the predicate acts. Mail fraud under 18 U.S.C.A. § 1341, occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice." §1341. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S. Ct. 2131, 2133, 170 L. Ed. 2d 1012 (2008). A §1341 offense, unlike common law fraud, does not require the successful completion of the scheme to defraud. (Citation omitted) United States v. Stewart, 872 F.2d 957, 960 (10th Cir. 1989). Wire fraud, 18 U.S.C.A. § 1343 requires that Defendant (1) use interstate wire or radio (wireless) communications (2) for the purpose of executing a scheme to defraud. United States v. Kieffer, 681 F.3d 1143, 1152 (10th Cir. 2012).

"A 'scheme or artifice to defraud' 'connotes a plan or pattern of conduct which is intended to or is reasonably calculated to deceive persons of ordinary prudence and comprehension.'" (internal citations omitted) Clinton v. Sec. Benefit Life Ins. Co., 63

F.4th 1264, 1282 (10th Cir. 2023). The fraudulent aspect of the scheme to defraud is

measured by nontechnical standards and is not restricted by any common-law definition

of false pretenses.

> [T]he words 'to defraud' in the mail fraud statute have the 'common
> understanding' of '"wrongdoing one in his property rights by dishonest
> methods or schemes," and "usually signify the deprivation of something of
> value by trick, chicane, or Overreaching." (Citation omitted)

Carpenter v. United States, 484 U.S. 19, 27, 108 S. Ct. 316, 321, 98 L. Ed. 2d 275 (1987).

Although the DC's final order acknowledges that "Plaintiffs, in alleging the

Church engaged in mail fraud and wire fraud, broadly incorporate all preceding

allegations in the Second Amended Complaint," AV4:283, the DC solely addressed

misrepresentations about tithing use; all claims based on misrepresentations of fact or

concealment in the context of LDS history had previously been denied AV4:262 n.179.

Appellants argue that the misrepresentations about, and concealment of material evidence

with respect to LDS history are at the core of the RICO scheme. Alternatively, Appellants

argue that the RICO claim survives based solely on misrepresentations and concealment

about tithing use. The RICO tithing claims will be argued first.

Appellants sufficiently identified a scheme of tithing misrepresentations. Those

included: the three different City Creek affirmative misrepresentations where COP used

$1.4 billion in tithing, AV4:106¶9 and AV4:200. Plaintiffs argued that omissions and,

"…deceitful concealment of material facts may constitute actual fraud." These were

identified as the 2009 bailout of Beneficial Life using $600 million, and "the 2016

Creation of 13 companies to deceive its members and others about the amount of tithing

it had accumulated and how LDS tithing is used." These LLCs had a combined value of $32,769,914,000 in 2017 and did not refer to the Church but were named for COP employees in order to "…deceive its members and others about the amount of tithing it had accumulated and how LDS tithing is used" AV4:201-203, referencing AV3:119-120¶266.[20]

"A scheme to defraud by false representations may be accomplished by patently false statements or statements made with a reckless indifference as to their truth or falsity, and *deceitful concealment of material facts* may constitute actual fraud" AV4:201, and AV3:40¶86 and n.30.

A. Neither the mail and wire fraud crimes, nor a RICO scheme built upon those predicate acts, need comply with common law elements of fraud – concealment is enough.

To satisfy the mail and wire fraud statutes, deceitful concealment is enough.[21]

Gaddy argued that determination of what is material in an omissions or concealment context did not require a determination of truth or falsity. "Gaddy maintains that because these claims are based on material omissions instead of affirmative misrepresentations, the court may adjudicate the claims without examining the truth or falsity of the statements" AV2:190. [Even] Utah law recognizes concealment as a type of fraud. "Making use of a device that misleads, some trick or contrivance that is intended to exclude suspicion and prevent inquiry, may also amount to fraudulent concealment."

---

[20] 1959 (for the year 1958) was the last time Church expenditures were disclosed, AV4:195 and AV3:31¶65.

[21] Judge Shelby commented that he wasn't sure that the representations had to be false, AV2:69:1-73:7.

McDougal v. Weed, 945 P.2d 175, 179 (Utah Ct. App. 1997). This is exactly what COP has done for over half a century" AV1:237.

But the DC did not agree with that argument. Judge Shelby wrote that he would be unable to proceed with the omission theory because he would first have to determine certain religious truths before deciding whether a person would think the omitted (or concealed) information was material, AV2:199-200. However, one need not determine the truth of information omitted or concealed for the act of concealment to constitute violation of either predicate act in this RICO claim.

Plaintiffs' RICO (Sixth Cause of Action) incorporates all prior allegations at AV3:186 ¶481. This includes the Third Cause of Action for Fraudulent Concealment (Intentional) of material evidence. V3:173-179¶424-450. The facts in support of those claims are incorporated by reference into Appellants' RICO claim.

Defendant concealed from its members that it did not believe what it represented with respect to the process of Book of Mormon translation as one where Smith appeared to literally translate from open gold plates and that Smith was a faithful monogamist. It also concealed the fact that Smith used the stone now admittedly used in Book of Mormon translation to search for buried treasure and was convicted of what would be considered fraud today in 1826. The Brethren are all charged with knowledge of the damming evidence in their archives that contradicts their correlated representations, AV3:157¶370.

Additionally, *the fact that the Defendant concealed evidence regarding foundational LDS history, is, in and of itself, a deceptive scheme.* It is even more so,

when it makes representations contradicting the concealed artifacts, stones, original manuscripts, affidavits, documents, and other information material to reasonable persons' (similar to Appellants') decision to commit the Church.

Concealment (as opposed to negligent omission) may not be recognized in Utah as a tort, but the facts alleged in Appellants' cause of action for fraudulent concealment certainly serve as the factual basis when incorporated by referenced into the "Mail and Wire Fraud Allegations" AV3:135¶291, and the Sixth (RICO) Cause of Action to constitute a scheme of fraud by concealment. "At the time of the mail fraud statute's enactment in 1872 and the later enactments of the wire fraud and bank fraud statutes, the well-settled, common-law meaning of "fraud" required a misrepresentation *or concealment of material* fact." [Emphasis added] Neder v. United States, 527 U.S. 1, 3, 119 S. Ct. 1827, 1831, 144 L. Ed. 2d 35 (1999).

**B.** Appellants' RICO claim was not conclusory; it complied with Rule 9 by alleging facts in support of the affirmative misrepresentations and concealment of how the tithing was used with intent to deceive.

Information from the Whistleblower Complaint exposed the fraud of the Church's prior representations about tithing use, AV3:42¶89.

As noted by Defendant, RICO elements are: "(1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006). A "racketeering activity" is defined by statute as "any act which is indictable under federal law and specifically includes mail

fraud, wire fraud and racketeering." *Id.* (internal quotation marks and citation omitted) (AV4:118).

However, the DC found Appellants' RICO allegations lacked specificity (AV4:284 and AV4:286 n.314), where the DC questions the Church's control of its publications and doubted that Appellants could show intent to deceive. Yet, contrary to note 314, the 2AC alleges ownership of both publications.[22]

Neither intent to deceive nor ownership and control of the publications were argued in the MTD. Additionally, David Nielsen attests that Roger Clarke, head of Ensign Peak Advisors (EPA), was adamant that "people [would] not know EPA was the source of this funding to City Creek Mall and Beneficial Life" AV4:106-107¶9-10[23] and  AV3:165-168¶404 table, last row, last column. See AV4:202. This statement shows intent to deceive. Additionally, "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Furthermore, "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence…." (Citation and internal quotation omitted). Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).

  C. Ps identified the association-in-fact entities and how they carried out the scheme.

The lay members, bishops, branch presidents and stake presidents are all lay members who teach local members weekly form the scriptures and from the correlated

---

[22] The *Deseret News* and *Ensign* magazine are COP-owned publications AV3:55¶136 and AV3:108-109¶248 respectively. (Text under translation art.)

[23] In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint but attached exhibits. Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).

material. The lay leaders interview potential members to determine if they are worthy to

join the Church, serve a mission and/or marry in the temple AV3:133-135¶286-290.

AV3:190-192¶500-507 contain allegations about the Mormon Educational

Enterprise. Local unpaid "lay" leaders teach only correlated instructional materials to

LDS members over whom they preside. LDS members are taught from the gospel art kit

at each chapel. The only picture of Smith's translation of the Book of Mormon in the kit

is one where he studies the strange language on the gold plates and dictates directly from

them to his scribe AV3:99¶232. Local unpaid leaders cultivate commitments to free

service by LDS members, whether at weekly meetings or as missionaries and ensure

tithes are collected and remitted to Church headquarters, AV3:50¶120. They taught from

the 2004 and 2007 Sunday School Manuals where Smith was represented as the faithful

husband of just one wife, Emma Hale. They failed to teach anything about Smith's

criminal history AV3:157¶368 and AV3:102¶239 and AV3:106-108¶246(b) and (c)

The DC acknowledged that the 2AC alleged how tithing was collected, AV4:270-

271. "The members of the Mormon Collection Enterprise, defined in AV3:192¶508,

shared the common purpose(s) of (among other things) collecting tithing from Appellants

and remitting all of that tithing collection to Defendant COP without disclosing how that

tithing would be used apart from disclosures listed in ¶¶ 229-230, 233, 237-238, 244-245,

258, 260, 239, 273 & 283-284 above," AV3:193¶512. The foregoing paragraphs related

to misleading statements about tithing were referenced in opposition to the MTD the

2AC, AV4:197.

D. Appellants had alleged that the City Creek representations were false.

COP argued that Appellants had failed to allege that tithing use representations.

were false AV4:142[24]. But Appellants "did in fact allege City Creek statements were

false" AV4:192, citing AV3:160¶381-382. The explanation provided by Roger Clarke

about transferring money from EPA to other Church owned entities as justification for the

statements that "no tithing was used" is at least a material omission if not an outright

untrue statement.

E. Reliance on the tithing misrepresentations was specifically alleged.

Though not argued, *because reliance was not raised by Defendant with respect to

the RICO claim* (see AV4:141-142), the DC wrote: "Plaintiffs do not allege any specific

instances in which Plaintiffs relied on the Church's representations concerning tithing"

AV4:284.  But Appellants *did* allege reliance on the City Creek misrepresentations to

continue paying tithing as they had in the past. They heard or read (and relied upon) LDS

President Hinckley say that no tithing was used for City Creek Mall. AV4:202,

referencing AV3:101-102¶237 and AV3:163¶393-397. Due in part to Hinckley's

statement, Appellants continued to believe that tithing was or would be used for the

purposes that had always been represented. AV3:158¶375.

Specifically, Ms. Gaddy had been taught that tithing was used for church purposes.

"…like missionary and educational funds, temples, *Book of Mormon* publication, and

humanitarian aid" AV3:144¶324. When confronted with a friend's claim that tithing was

used for the Mall, her husband checked LDS publications that denied the claim. She then

---

[24] Pages in Defendant's MTD refer to the ECF stamp at top of page.

"dismissed her friend's claim as another example of Anti-Mormon propaganda"

AV3:145¶331. She continued to tithe and paid until [her resignation] in 2018,

AV3:140¶308.

Mrs. Harris also relied on the denials about in COP's publications to continue to

tithe, AV3:150¶345. Additionally, Mr. Small relied on reps. that tithing was not used for

commercial activities [which reasonably included those for City Creek mall].

AV3:148¶340; he tithed for 51 years until he resigned in 2019, AV3:148¶337. As

committed members of the LDS Church, all Appellants tithed for decades during their

membership in the Church.

It was only when Appellants heard about the Whistleblower Complaint in

December 2019 did they realize that the historic statements about tithing were either false

or had omitted significant facts that would have made those partial statements not

misleading, AV3:12-13¶21.

F.    Regardless of the foregoing, reliance is not an element of the predicate crimes.

Laura Gaddy argued at hearing on the MTD the OC that reliance is not an element

of the federal mail and wire fraud statutes  AV2:69:3-10[25].  She argued the same in

opposition to the MTD the 1AC. AV1:241, citing Bridge v. Phoenix Bond & Indem. Co.,

553 U.S. 639, 655–57, 128 S. Ct. 2131, 2142–44, 170 L. Ed. 2d 1012 (2008), which held

that "…a plaintiff asserting a RICO claim predicated on mail fraud need not show, either

as an element of its claim or as a prerequisite to establishing proximate causation, that it

relied on the defendant's alleged misrepresentations. Bridge, 553 U.S. at 661

---

[25] The word "causation" was misspoken.

48

Although Defendant did not argue reliance with re the RICO claim (AV4:141-142) and thus Appellants did not respond to the nonexistent argument, the DC dismissed the claim for failure to allege reliance, AV4:284-286. Judge Shelby appeared to rely on dicta in Tal v. Hogan, 453 F.3d 1244, 1263 (10th Cir. 2006) indicating that the elements of mail and wire fraud were similar to those of common law fraud, which includes reliance, AV4:283-284.

Apparently, the failure to allege reliance was the basis for its claim that Appellants had failed to allege an indictable act. "Plaintiffs fail to allege any single predicate act of mail or wire fraud because they fail to allege that they acted in reliance on any particular false statement in choosing to donate tithing" AV4:286.

G. Material Omissions, even absent a duty, can support the predicate crimes. However, material omissions about tithing use were not considered by the DC in its Order.

   1. A partial misleading statement gives rise to a duty to provide additional information.

Appellants pleaded duty based on several factors in support of its Second Cause of Action, breach of a duty to disclose, AV4:192-193. See also AV3:164-172¶399-423. Relevant to their RICO claim are "partial representations" or disclosures AV3:164¶402. Appellants then incorporated those allegations into their RICO claim, AV3:186¶481.

The DC has previously ruled that: "The Church can be liable for fraud under an omission theory only if it has made a material statement that is misleading unless additional facts are supplied" AV2:200. Appellants argued that partial statements gave rise to a duty to disclose additional facts so as not to make the prior statements misleading AV4:192-193, and AV4:200.

Appellants alleged specific references to statements that were misleading absent additional disclosures about tithing as part of the RICO claim, AV3:193¶512.

2.    Duty is not required in cases of concealment with intent to deceive.

In the context of the RICO claim, Appellants alleged that the Church concealed "the fact that tithing [not merely interest] was used for commercial purposes" AV3:186¶484. Ms. Gaddy had also argued in response to the prior MTD that concealment may be a basis for a "scheme to defraud" AV1:241. See United States v. Allen, 554 F.2d 398, 410 (10th Cir. 1977).

Appellants argued that material omissions are a basis for finding predicate act violations even absent a duty AV4:201. See also Clinton, 63 F.4th at 1283. ("If omissions are intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled," affirmative misrepresentations. are not an essential in all cases. ... [F]raudulent representations ... may be effected by deceitful statements of half-truths *or the concealment of material facts* ...." [Emphasis Added].)

Appellants alleged that Defendant annually collects $6-8 billion dollars of tithes, and that $1-2 billion[26] of this excess tithing (principal), was annually deposited in the EPA account AV4:195, referencing AV4:110, last line. Defendant donated just $1.3 billion in humanitarian aid from 1985 to 2010,  AV4:195  AV3:9¶9 and AV3:136-137¶293. The $2 billion used to fund City Creek Mall and Beneficial Life were intentionally concealed as explained by EPA's Clarke, AV4:202, referencing AV4:106-107¶10.

---

[26] The $2 billion dollar amount was from a source not cited in the 2AC.

3. Facts exclusively within Defendant's control cannot be alleged with specificity. The use of the mails or wires need only be incidental to the fraud alleged.

The DC acknowledged that pleading deficiencies can be excused where information is within Defendant's exclusive control, AV4:284. Appellants provided examples of how the mail and wires were used, but explained it was not possible to allege all ways because how the fraud was committed was exclusively within Defendant's control, AV3:187-188¶489. If the DC meant that the conclusory allegations were about the use of mails and wires, Appellants were not required to allege that mailings or wire communications themselves were fraudulent in order to plead their predicate acts with particularity. Sorensen v. Polukoff, 784 F. App'x 572, 577–78 (10th Cir. 2019) (unpublished).

G. The RICO scheme continues. The Church continues to collect tithing based on teachings and representations that it has admitted are false.

The DC ruled that Appellants had not shown enough predicate acts or a continuing violation sufficient to constitute a scheme under RICO. But, the financial deceit continues as evidenced in the 2023 SEC fine, and as of 2021, a misleading statement about how tithing is used, AV3:132¶283. The Church pressures its members to tithe. But they would not have tithed, had they not believed in LDS doctrine. The belief in the doctrine was based, at least in substantial part, on misrepresentations about material facts that had they been known, surely would have changed their belief and practice with respect to the LDS Church.

256. <u>2011, Tithing Cited as Protection against Burning</u>. In Apostle Russel M. Nelson's April 2011 General Conference speech, he states: "… [T]ithing will keep your name enrolled among the people of God and protect you in "the day of vengeance and burning." His speech is printed in the May 2011 *Ensign*. Once again, there is fear among LDS members, including Plaintiffs herein about the consequences of paying less than a full tithe. Tithing increases as a result of the 2010 and 2011 references to a full tithe as protection from burning at the Second Coming.

AV3:113¶256 (Tithing as extortion is referenced in AV4:255 and AV4:266.)

Appellants relied on all of the correlated representations in the 2AC. However, only minimal argument was made with respect to reliance on LDS history misrepresentations in opposition to the MTD the 2AC because that Motion was limited to fraud claims based on tithing use.

But when the decades of misrepresentations and omissions about LDS history are considered, there are surely sufficient predicate act violations to constitute a scheme. Furthermore, those predicate acts continue.

**VIII. Misrepresentations made in the context of LDS history, including the Brethren's mispresented state of mind as to that history, should be part of the RICO claim.**

None of the 2AC allegations of misrepresentations related to LDS history were considered due to the DC's prior orders. Therefore, Appellants did not thoroughly argue how those type of misrepresentations would apply to their RICO claim. Should the Court agree that the Appellants have sufficiently alleged that the representations, omissions, and concealment of facts about LDS history that must be sincerely believed, then that type of conduct should also be part of the RICO claim.

A. Appellants reasonably inferred that the Brethren believed their correlated material; Defendant cultivated that inference as part of its deceptive scheme.

Appellants' RICO (Sixth Cause of Action) incorporates all prior allegations at AV3:186¶481. This includes the First Cause of Action for Fraud in the Inducement to Enter into an Oral Contract AV3:155-164¶360-398, where they alleged that they reasonably inferred that the Brethren believed their correlated material.

As faithful LDS Church members, Appellants took their leaders' invitation to trust seriously, believing they would never lead them astray, AV4:199 referencing AV3:57-60¶144 table. Non correlated material was not to be used, AV4:111-114. Non-correlated information was dismissed as Anti-Mormon, AV1:217-218 and AV3:96¶227.

Gaddy previously argued that a statement of one's belief can be misleading, AV1:223 citing Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 184–85, 135 S. Ct. 1318, 1326, 191 L. Ed. 2d 253 (2015). Thus, because the Church's rhetoric was correlated, and the Brethren constantly promised that they would never lead LDS members astray, AV4:190-192 referencing the table at AV3:165-168¶404. Appellants reasonably inferred that the Brethren believed what they taught. Defendant's fostering of that belief certainly constitutes a deceptive scheme. They concealed form lay members and Appellants that they did not believe their own teachings. How could they when Church archives demonstrated the falsity of the Book of Mormon translation process and Joseph Smith's character?

B. In addition to the false Book of Mormon translation process, Plaintiffs also alleged misrepresentations about Smith as a happy monogamist and concealment of Smith's criminal history. These representations are also a basis for the predicate crimes, and therefore should be part of the RICO claim.

During his 1972-1981 tenure, official LDS historian Leonard J. Arrington who wanted to write a true LDS history was censored and ultimately demoted. The year Arrington was demoted, Apostle Boyd K. Packer told the Church's educators that, "Some things that are true are not very useful"  AV4:194. Packer explained they were required to tell the truth, but not the "whole truth" AV3:89-90¶214. Yet, the Church teaches that even a look can be dishonest.

> We can also intentionally deceive others by a gesture or a look, by silence or by telling only part of the truth, which is what they've done. Whenever we lead people in any way to believe something that is not true we are not being honest…A lie is any communication given to another with intent to deceive, unquote.

AV2:121:14-16 and AV1:265.

Richard L. Bushman, former BYU professor and one of three editors for Defendant's *Joseph Smith Papers* (JSP) recently admitted that the "dominant narrative [of LDS history] is not true" AV1:218 and AV3:120-121¶267-268.

Besides relying on a false process by which the *Book of Mormon* was created, Plaintiffs relied on Church teachings that their founding prophet Joseph Smith was a man of good character who denied that he practiced polygamy at the same time that he had multiple wives, AV4:193, referencing AV3:119¶265.

Smith was convicted of many crimes, AV3:17-20¶35-36. In 1826 he was convicted of what would be considered fraud today, by using the same brown stone the Church has now admitted that he used to translate the *Book of Mormon*, to find buried treasure, AV4:72-77. Fawn Brodie wrote of the conviction as early as 1945, when she included it in her unauthorized biography of Joseph Smith, "No Man knows my History" AV3:81¶196. COP's scheme included "…key omissions and concealment as described in the preceding paragraphs" AV3:186-187¶485. COP concealed Smith's crimes, AV3:169¶407. Appellants would not have paid tithing had they known about his crimes, AV3:178¶443. Appellants would not have joined/committed had they known the truth of Smith's character, AV3:147¶334, and at AV3:148¶339 and at AV3:150¶344. Appellants argued concealment of Smith's legal history demonstrating an immoral character, as a type of predicate act AV4:203.

The DC acknowledged that the 2AC provided a chart of alleged crimes and civil frauds that Smith had committed, and alleged the Church concealed this history, AV4:253, but it refused to consider those as a basis of the 2AC fraud claims because they are "religious facts." "Joseph Smith's alleged criminal history fail for the same reason the 1AC allegations concerning his practice of polygamy failed: religious teachings concerning details of religious events "may not be severed from beliefs about the events themselves" AV4:262-263. This is not the law. The *determination* of doctrine is a separate matter from the *application* of doctrine, which is conduct that can be regulated.

Appellants relied on partial representations that Smith was a faithful husband of one wife, Emma. As alleged, the 2004 and 2007 LDS Sunday School manuals used by all

LDS members including Appellants, reference Smith as happily married to one wife Emma Hale, with no mention of his adulterous relationships that were only later characterized as polygamy or that he had sexual relationships with young teens that he had taken into his marital home, at least one of whom was as young as age 14, AV4:193 (referencing  AV3:112-113¶255 and at AV3:157 ¶368). The Temple Lot case affidavits AV3:165-168¶404 top row of table, demonstrate that Defendant has known the facts about these crimes for over a century. Apostle Dallin Oaks swore to suppress Emma's biography written by two LDS women, which revealed the horrors she suffered during her marriage to Joseph Smith AV3:90-91¶216-217.

Appellants' discovery that the Church had lied about Smith's monogamy was a significant cause of their disaffection, AV3:144-145¶325-330, and AV3:148¶338. They would not have joined or stayed in the Church and tithed had they known of his crimes, including his adultery/polygamy and polyandry AV3:23.

Lay LDS teachers, as part of the Educational Enterprise, used the painting of Smith translating directly from gold plates, no stone in sight, to teach others, AV3:108-109¶248. This type painting was hung in the halls of chapels, where Laura Gaddy performed free janitorial services for the Church AV3:139-140¶304. The local lay teachers taught from the Book of Mormon that was translated from a stone in a hat. They taught from the 2004 and 2007 Sunday School manuals dedicated to Smith's life, which omitted material information about his character. They were likely unwitting participants in Defendant's fraudulent scheme.

## IX Short Conclusion Including the Precise Relief Sought.

Appellants respectfully request that the Court reverse the DC's Order and Judgment dismissing the 2AC as to the Sixth Cause of Action, Civil RICO, as to both types of misrepresentations, and concealment: those made in the context of LDS history and those made about tithing use, and order that the Judge Shelby proceed with discovery and trial of the RICO claim on all misrepresentations, omissions and concealment of material facts related to LDS history, as well as those misrepresentations, omissions and concealment of material facts related to tithing use heretofore argued in this brief.

Alternatively, Appellants request that the Court reverse Judge Shelby's Order and Judgment dismissing the 2AC's Sixth Cause of Action, Civil RICO, as to the affirmative misrepresentations, misleading partial disclosures, and the concealment of facts about how tithing is used as heretofore referenced in this brief, as well as facts that have come to light since the record on appeal was designated, and order that the DC proceed to discovery and trial regarding all 2AC tithing use claims.

## X Statement concerning Oral Argument.

This case presents an important question about sincerity of religious belief which should be addressed if the public is to have confidence in the judiciary as a branch of government to whom they can seek accountability for a longstanding religious fraud. The Court is likely concerned that a ruling requiring sincerity of belief may open the floodgates for similar litigation by disaffected members of many religions. However, if permitted, counsel could explain why this case against the LDS Church is unique.

Dated: December 10, 2023,                    Respectfully,

/s/ Kay Burningham

Kay Burningham, Attorney at Law
*Attorney for Laura Gaddy, Lyle Small*
*and Leanne Harris*
299 S. Main St. #1375
Salt Lake City, Utah 84111
kay@kayburningham.com
888.234-3706

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32 (7)(B)(i) because excluding the parts of the document exempted by Fed. R. App. P. 32(f) and the Glossary (except for two links), and adding in the text, "XI Attachment One – 133 Memorandum and Decision," and "XII Attachment Two – 134 Judgment," yet excluding the documents referenced therein, Appellants' Brief contains **12,684 words**.

Dated: December 10, 2023.            /s/ Kay Burningham

Kay Burningham, Attorney at Law
*Attorney for Laura Gaddy, Lyle Small*
*and Leanne Harris*
299 S. Main St. #1375
Salt Lake City, Utah 84111
kay@kayburningham.com
888.234-3706

## XI Attachment One – 133 Memorandum and Decision

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| LAURA A. GADDY, LYLE D. SMALL, and LEANNE R. HARRIS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, and DOES 1-50, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND** <br><br> Case No. 2:19-cv-00554-RJS-DBP <br><br> Chief District Judge Robert J. Shelby Chief <br><br> Magistrate Judge Dustin B. Pead |

This case stems from the history, founding, and teachings of the Church of Jesus Christ of Latter-Day Saints, commonly known as the Mormon Church. Plaintiffs Laura Gaddy, Lyle D. Small, and Leanne R. Harris were members of that religion for most of their lives. They bring this putative class action lawsuit against the Church's religious corporation, Defendant Corporation of the President of the Church of Jesus Christ of Latter-day Saints (the Church).

Asserting numerous fraud-related claims, Plaintiffs generally allege the Church has intentionally misrepresented its founding to induce the faith of its members, even as its leaders hold no sincere religious belief in the versions of events they promote.

In two prior Orders, the court dismissed all or part of the first two complaints brought by Gaddy. Specifically, in the first prior Order (First Order), the court dismissed Gaddy's original Complaint primarily because litigating her claims would have required a legally impermissible inquiry into the truth of the Church's religious teachings and doctrines.[1] In the subsequent Order

---

[1] *See* Dkt. 33 (Memorandum Decision and Order Granting Motion to Dismiss) at 20. All citations to the docket refer to the page numbers in ECF.

(Second Order), the court granted in part and denied in part the Church's Motion to Dismiss
Gaddy's Amended Complaint.[2]  Again, the court found that litigating most of Gaddy's claims
would require an impermissible inquiry into the truth of the Church's doctrine.[3]  However, the
court did not dismiss Gaddy's revised civil Racketeer Influenced and Corrupt Organizations Act
(RICO) claim to the extent it was based on the Church's statements concerning the use of tithing
funds to construct a mall in downtown Salt Lake City.[4]

 Rather than proceed to discovery on the surviving claim, Gaddy, along with new Plaintiffs
Small and Harris, filed a Second Amended Complaint asserting seven claims against the Church,
many of which were asserted and previously dismissed in the court's two prior Orders.[5]  Now
before the court is the Church's Motion to Dismiss Plaintiffs' Second Amended Complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6).[6]  For the reasons explained below, the
Church's Motion is GRANTED.

**BACKGROUND AND PROCEDURAL HISTORY**[7]

 The court first provides a brief factual background concerning the named Plaintiffs before
turning to the lengthy procedural history of this case.[8]

---

[2] Dkt. 100 (Memorandum Decision and Order Granting in Part and Denying in Part Motion to Dismiss).

[3] *Id.* at 14–25.

[4] *Id.* at 25–29.

[5] *See* Dkt. 110 (Second Amended Complaint).

[6] Dkt. 111 (Motion to Dismiss Second Amended Complaint).  The Motion also moves in the alternative to strike allegations from the Second Amended Complaint that are non-secular in nature.  *See id.*  Because the court ultimately grants the Motion to Dismiss, it does not go on to consider the alternative requested relief.

[7] Because this case is before the court on a motion to dismiss, the court accepts as true all well-pleaded factual allegations in the Amended Complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[8] Because the court concludes that the First and Second Orders decide the outcome of most of Plaintiffs' repleaded claims, the court will recount, in some detail, allegations in previous complaints, arguments in previous motions to dismiss, and the court's prior rulings.

1. **Plaintiffs**

Laura Gaddy was raised in the Church and remained a member for most of her adult life.[9] In early 2018, she found online material concerning the Church's founding, history, and doctrine that she believed conflicted with the Church's own teachings.[10] Unable to reconcile what she discovered with her continued participation in the Church, Gaddy ultimately relinquished her membership.[11] Gaddy is now in counseling to help manage the emotional distress she experiences from her lost faith in the Church.[12]

Lyle Small was also a dedicated member of the Mormon Church for most of his life. He completed a two-year mission to Finland and paid tithing from age eight until his early fifties.[13] In 2019, he resigned from the Church after reading independent sources concerning Church history.[14]

Leanne Harris was also a lifelong member of the Church.[15] Personal tragedies in her life, including the untimely deaths of her son and oldest sister, led her to "double down" on her commitment to the Church.[16] Harris also discovered alleged misrepresentations concerning Church history, doctrine, and tithing payments in 2019, revelations she pleads "almost destroyed her."[17] She alleges she would not have donated tithing or dedicated herself to the Church had she been aware of the misrepresentations she discovered.[18]

---

[9] *See* Dkt. 110 ¶¶ 302–324.

[10] *Id.* ¶¶ 325–27.

[11] *Id.* ¶ 329.

[12] *Id.* ¶ 330.

[13] *Id.* ¶¶ 335–37.

[14] *Id.* ¶¶ 338–39.

[15] *Id.* ¶¶ 342–43.

[16] *Id.* ¶ 343.

[17] *Id.* ¶ 344–45.

[18] *Id.* ¶ 345.

## II.   Gaddy's Original Complaint

On August 5, 2019, Gaddy—then proceeding as the sole-named Plaintiff—filed this putative class action lawsuit against the Church.[19]  Her original Complaint centered on the theory that the Church intentionally misrepresents its history and founding to induce membership.[20] Gaddy compared the Church's "false official narrative" of several foundational events with what she alleged are the "historically accurate" accounts.[21]  Gaddy primarily focused on three of the Church's core teachings, alleging each was deliberately misrepresented: (1) a spiritual event when the founding prophet Joseph Smith saw God and Jesus Christ (known as the First Vision); (2) the origins of one of the Church's foundational books of scripture, the Book of Mormon; and (3) the translation of another canonical text known as the Book of Abraham.[22]

Based on these alleged misrepresentations, Gaddy brought six causes of action on behalf of herself and others similarly situated: (1) common law fraud, (2) fraudulent inducement, (3) fraudulent concealment, (4) civil RICO (18 U.S.C. § 1962(c)), (5) intentional infliction of emotional distress, and (6) breach of fiduciary duty.[23]  Gaddy's original civil RICO claim rested on her theory that the Church had engaged in both mail and wire fraud by communicating these false teachings.[24]  Gaddy's intentional infliction of emotional distress claim was also based on the Church's alleged doctrinal misrepresentations.  To support this claim, Gaddy alleged the Church's pattern of "knowingly and repeatedly misrepresenting foundational facts of its organization" was outrageous and intolerable.[25]  Finally, Gaddy brought a claim for breach of

---

[19] Dkt. 2 (Original Complaint).

[20] *See id.* ¶ 2.

[21] *See, e.g.*, *id.* ¶¶ 64–75.

[22] *See id.* ¶¶ 64–75 (First Vision), 76–91 (Book of Mormon), 92–101 (Book of Abraham).

[23] *See id.* ¶¶ 183–248.

[24] *See id.* ¶¶ 175–77.

[25] *Id.* ¶ 242.

fiduciary duty.  She alleged a fiduciary relationship arose between Church leaders and its

members for "all matters spiritual," because of the "extraordinary influence" the Church

exercised over its members.[26]  Gaddy maintained the Church breached that duty by failing to

"fully disclose the truth" concerning the Church's historical foundation.[27]

**III**          **The Church's Motion to Dismiss Gaddy's Original Complaint**

On August 27, 2019, the Church moved to dismiss Gaddy's original Complaint.[28]  The

Church argued the Free Exercise and Establishment Clauses of the First Amendment (the

Religion Clauses) barred Gaddy's claims because each necessarily implicated the Church's

fundamental religious doctrines and teachings.[29]  The Church argued Gaddy's three fraud-based

claims—common law fraud, fraudulent inducement, and fraudulent concealment—should be

dismissed because adjudicating the claims would require the court to make an impermissible

inquiry into the truth or falsity of the Church's religious beliefs.[30]  Because Gaddy's remaining

claims for civil RICO, intentional infliction of emotional distress, and breach of fiduciary duty

were also dependent on an inquiry into the truth or falsity of the Church's teachings, the Church

argued those claims should similarly be dismissed.[31]

Gaddy opposed the motion, arguing the Religion Clauses did not apply to the claims in her

Complaint.[32]  Gaddy contended her fraud-based claims survived the motion for three

---

[26] *Id.* ¶¶ 206, 208–10.

[27] *Id.* ¶¶ 218–19.

[28] Dkt. 6 (Motion to Dismiss Original Complaint).

[29] *See id.* at 12.

[30] *Id.* at 19 ("Ms. Gaddy's fraud claims would require an adjudication of whether the Church's teachings about Joseph Smith and its canonical scriptures are true.").

[31] *Id.* at 21–22, 25.

[32] *See* Dkt. 23 (Opposition to Motion to Dismiss) at 10.

reasons.  First, she disagreed that her claims challenged the Church's religious beliefs.[33]  Instead, she insisted her claims challenged only the facts underlying the Church's beliefs about its founding, not the religious beliefs themselves.[34]  Gaddy asked the court to distinguish between facts and beliefs, arguing, "[f]acts are susceptible to proof.  Beliefs are not; if proven, beliefs become facts."[35]  Second, Gaddy argued her fraud-based claims survived because the Church's proselytizing constituted conduct rather than belief.[36]  Third, Gaddy cursorily argued that even if the court could not determine the truth or falsity of the Church's beliefs, it may nevertheless assess whether those beliefs are sincerely held.[37]

## IV.        First Order Granting the Church's First Motion to Dismiss

On March 31, 2020, in the First Order, the court granted the Church's motion and dismissed Gaddy's original Complaint without prejudice, concluding the Religion Clauses barred each of Gaddy's claims. [38]  The Religion Clauses provide in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"[39]  The court acknowledged "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."[40]  To effectuate these rights, "courts have long held that the truth or falsity of religious beliefs are beyond the scope of judicial review."[41]  The court's ruling relied upon "the fundamental right of churches to 'decide for themselves, free from

---

[33] *See id.* at 6–7.

[34] *Id.*

[35] *Id.* at 9.

[36] *Id.* at 15–16.

[37] *Id.* at 16–17.

[38] Dkt. 33.

[39] U.S. Const. amend. I.

[40] Dkt. 33 at 8 (citing *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)).

[41] *Id.* (citing *United States v. Ballard*, 322 U.S. 78, 86–87 (1944); *Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125, 1142 (D. Mass. 1982)).

state interference, matters of church government *as well as those of faith and doctrine*."[42] This is known as the church autonomy doctrine.

But the court also recognized in the First Order that the church autonomy doctrine "is not without limits."[43] Churches may not invoke the doctrine to shield purely secular decisions.[44] To determine whether the church autonomy doctrine applies in any given instance, courts must decide whether the dispute presented "is an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law, or whether it is a case in which we should hold religious organizations liable in civil courts for purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization."[45]

Applying these principles to Gaddy's original Complaint, the court concluded the Religion Clauses barred each of her claims.[46] The court dismissed Gaddy's three fraud-based claims because the falsity of religious beliefs was an essential element of each claim as pleaded.[47] Gaddy relied on three core religious teachings as the bases for her fraud-based claims: the First Vision, and the translations of both the Book of Mormon and Book of Abraham.[48] The court concluded the First Amendment required dismissal of the fraud-based claims because their adjudication would require an examination into the truth or falsity of these core religious teachings.[49]

---

[42] *Id.* at 9 (citing *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002) (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)) (emphasis in original)).

[43] *Id.* (quoting *Bryce*, 289 F.3d at 657).

[44] *Id.*

[45] *Id.* at 10 (citing *Bryce*, 289 F.3d at 657 (citations omitted)).

[46] *See id.* at 20.

[47] *Id.* at 11.

[48] *See id.*

[49] *Id.* at 11–12.

And each of Gaddy's arguments in opposition failed.  First, the court rejected Gaddy's proposed distinction between challenging religious facts and religious beliefs, concluding "if all a plaintiff had to do to get around the First Amendment was to challenge the facts underlying a church's religious beliefs, the Religion Clauses would offer little protection against de facto referenda on churches' faith and doctrines."[50]  Instead, the court relied on the distinction other courts use to determine whether it may adjudicate fraud claims against a church: whether the dispute is religious or secular.[51]  Because Gaddy based her claims on alleged misrepresentations implicating the Church's fundamental religious teachings, the court concluded the dispute was religious.[52]  The court also rejected Gaddy's argument that her claims challenged the Church's conduct, rather than its beliefs, recognizing "the Supreme Court has repeatedly confirmed that the free exercise of religion encompasses not only the freedom to believe, but also the right to profess those beliefs through proselytizing."[53]

The court also dismissed Gaddy's civil RICO and intentional infliction of emotional distress claims because, as pleaded, they necessarily implicated the veracity of the Church's teachings.[54]  Gaddy predicated her civil RICO claim on mail and wire fraud, relying on the Church's alleged misrepresentation of facts related to Joseph Smith's First Vision, the Book of Mormon, and the Book of Abraham.[55]  The court concluded the Church could be liable for these

---

[50] *Id.* at 14.

[51] *Id.* at 13.

[52] *Id.*

[53] *Id.* at 15 (citing *Smith*, 494 U.S. at 877 ("The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."); *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (noting that the Free Exercise Clause "unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions")).  The court declined to address Gaddy's argument concerning the sincerity of the Church's professed beliefs in its own teachings because, as Gaddy conceded at oral argument, the Complaint did not allege the Church's beliefs were insincerely held.  *Id.* at 16.

[54] *Id.* at 17–18.

[55] *See* Dkt. 2 ¶¶ 236–38.

predicate racketeering acts only if the statements communicated were false.[56]  Gaddy's intentional

infliction of emotional distress claim also relied on the alleged falsity of the Church's teachings

because her claim was based on the Church's alleged pattern of "knowingly and repeatedly

misrepresenting the foundational facts of the organization."[57]  For these reasons, the court

concluded these claims were barred by the First Amendment's Religion Clauses.[58]

Finally, the court dismissed Gaddy's claim for breach of fiduciary duty after concluding Utah

has not established a legally cognizable fiduciary duty arising from purely ecclesiastical

relationships.[59]  Even if Utah recognized such a relationship, the court reasoned it could not

define a standard of care that would apply to "a diversity of religions professing widely varying

beliefs" without violating the First Amendment's Establishment Clause.[60]

### V.  Gaddy's First Amended Complaint

Gaddy filed her Amended Complaint on May 18, 2020.[61]  Although more detailed than her

original Complaint, many of the claims, theories, and allegations in the Amended Complaint were

duplicative of her prior pleading.  Gaddy again brought claims against the Church for common

law fraud, fraudulent concealment, fraudulent inducement, civil RICO, and intentional infliction

of emotional distress.[62]  Those claims continued to rely primarily on alleged misrepresentations

concerning the First Vision, the Book of Mormon, and the Book of Abraham.[63]

---

[56] Dkt. 33 at 17.

[57] *Id.* at 18.

[58] *Id.*

[59] *Id.* at 19.

[60] *Id.* at 20.

[61] Dkt. 37 (Amended Complaint).

[62] *See id.*

[63] *See, e.g.*, *id.* ¶¶ 130–31, 133.

But the Amended Complaint contained a handful of differences, including new factual allegations to support her common law fraud claim. Gaddy alleged the Church also misled members about its history with polygamy and about locations of certain events described in the Book of Mormon. Specifically, Gaddy alleged the Church historically taught members that certain events in the Book of Mormon happened on Hill Cumorah in upstate New York.[64] Recently, however, the Church has stated it does not take a position on the specific geographic locations of Book of Mormon events.[65] Gaddy also alleged the Church previously taught members the prophet Joseph Smith had only one wife,[66] but that Smith, in fact, had multiple wives.[67]

In addition to these new factual allegations, Gaddy's Amended Complaint included a theory of liability she previously argued in response to the Church's Motion to Dismiss but which she had not pleaded: Gaddy argued the Church should be held liable on her common law fraud claim because its own leaders do not sincerely believe the versions of the Church's history, founding, and doctrines the Church teaches its members.[68]

In addition to the new factual allegations and alternative theory of fraud liability, the Amended Complaint also advanced a new cause of action under the Utah Charitable Solicitations Act (UCSA).[69] Finally, the Amended Complaint included a new alternative theory of liability

---

[64] *Id.* ¶ 132.

[65] *Id.* ¶ 138.

[66] *Id.* ¶ 134.

[67] *Id.* ¶ 140.

[68] *See, e.g.*, *id.* ¶¶ 2, 3, 141.

[69] *See id.* ¶¶ 150–66, 192–98. Gaddy also included a claim for "Breach of Duty of Disclosure" which was not included in her original Complaint. *See* Dkt. 2; Dkt. 37 ¶¶ 150–66. Gaddy argued the claim was distinguishable from her prior claim for breach of fiduciary duty. Dkt. 47 at 28. However, the court concluded that, as argued, this claim was indistinguishable from the repleaded fraudulent concealment claim, and the court did not separately address it. *See* Dkt. 100 at 13 n.80.

for Gaddy's civil RICO claim based on misrepresentations to members concerning the Church's use of tithing.[70]  Gaddy pleaded, as an independent basis for RICO liability, that the Church misleads its members by falsely assuring them tithing funds are used only for "Church expenses and humanitarian aid."[71]  For example, at the Church's semi-annual General Conference in April 2003, Gaddy alleged the Church's Prophet, Gordon B. Hinckley, made the following statement concerning the purchase and development of the for-profit commercial City Creek Mall in Salt Lake City, Utah:

> I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property [City Creek Mall].  Nor will they be used in developing it for commercial purposes.[72]

Gaddy contended this representation was false, as "[s]everal billion dollars of [the principal tithing] fund was used for affiliated profit-making business entity expenses, including but not limited to the development of Salt Lake's City Creek Mall."[73]  Gaddy alleged "[t]his lie was repeated at least twice over the years until City Creek [Mall] was opened."[74]

### VI.      The Church's Motion to Dismiss Gaddy's First Amended Complaint

In its Motion to Dismiss Gaddy's Amended Complaint,[75] the Church largely reiterated its previous arguments offered for dismissal of Gaddy's original Complaint, maintaining the Religion Clauses compelled dismissal of Gaddy's Amended Complaint for the reasons stated in the court's First Order.[76]  The Church also argued Gaddy's new factual allegations, related to locations of events in the Book of Mormon, its history with polygamy, and its use of tithing

---

[70] *See, e.g.*, *id.* ¶¶ 2, 5, 6, 79, 200(C).

[71] *Id.* ¶ 6.

[72] *Id.* ¶ 79.

[73] *Id.* ¶ 5.

[74] *Id.* ¶ 79.

[75] Dkt. 38 (Motion to Dismiss Amended Complaint).

[76] *See id.* at 3–5.

funds, failed to save her claims because adjudicating fraud-based claims on these facts also required the court to determine the truth or falsity of the Church's religious teachings and beliefs.[77]  Finally, the Church argued Gaddy's new claims, including the new civil RICO theory based on tithing use and the claim under the Utah Charitable Solicitations Act, required the same impermissible inquiry into the truth or falsity of the Church's religious beliefs.[78]

Gaddy opposed the Motion,[79] relying primarily on an argument she previously made in support of her original Complaint—that the Church's proselytizing constitutes conduct, not belief.[80]  In a footnote, Gaddy also asserted she "[did] not waive" her previously argued distinction between religious facts and religious beliefs.[81]

Gaddy's opposition raised two new arguments why her re-pleaded claims survived the Church's Motion to Dismiss.  First, to save her common law fraud claim, Gaddy argued her new allegations concerning the insincerity of the Church's expressed religious beliefs presented a threshold question of fact that could not be disposed of at the pleading stage.[82]  Second, she argued her remaining repleaded claims survived because they relied on fraudulent omissions rather than misrepresentations.[83]  Gaddy maintained that because her claims were based on material omissions instead of affirmative misrepresentations, the court could adjudicate the claims without examining the truth or falsity of the statements.[84]

---

[77] *Id.* at 13–14.

[78] *Id.* at 18–19.

[79] *See* Dkt. 47 (Opposition to Church's Motion to Dismiss Amended Complaint).

[80] *Id.* at 6–20.

[81] *Id.* at 6 n.1.

[82] *See* Dkt. 47 at 21–22.

[83] *Id.* at 27.

[84]   *Id.* at 28.

**VII.      Second Order Granting in Part and Denying in Part the Church's Motion to Dismiss the Amended Complaint**

On July 28, 2021, in the Second Order, the court granted in part the Church's Motion to Dismiss the Amended Complaint.[85]  First, the court dismissed Gaddy's fraud-based claims to the extent they were based on theories of fraud already rejected in the First Order—that is, allegations concerning the First Vision, and the Books of Mormon and Abraham.  Next, the court considered whether Gaddy's five repleaded causes of action—(1) common law fraud, (2) fraudulent inducement, (3) fraudulent concealment, (4) civil RICO, and (5) intentional infliction of emotional distress—survived, to the extent they were supported by new sets of factual allegations or new arguments.  The court concluded neither the new facts nor her new arguments cleared the Religion Clauses bar recognized in the court's First Order.[86]  Finally, the court considered the new USCA cause of action and the new theory undergirding the re-pleaded civil RICO claim—the Church's use of tithing funds.  The court concluded the UCSA claim failed because it also required an impermissible inquiry into the truth or falsity of the Church's statements based on religious facts and teachings.[87]  But the new theory of civil RICO liability survived because it implicated secular, rather than religious, representations.[88]

As to Gaddy's new factual allegations concerning Hill Cumorah and Joseph's Smith's marriages, the court concluded they directly implicated the Church's core religious teachings. The court found that by adding facts concerning these issues, Gaddy attempted to accomplish indirectly what she could not do directly: attack the veracity of the Church's teachings about the

---

[85] *See* Dkt. 100.

[86] *See* Dkt. 100 at 11–12 ("Because a statement's falsity is an essential element of fraud claims, adjudicating these claims would require the court to do exactly what the Supreme Court has forbidden—evaluate the truth or falsity of the Church's religious beliefs." (citing *Ballard*, 322 U.S. at 86–87)).

[87] *Id.* at 24–25.

[88] *Id.* at 25–29.

Book of Mormon and its doctrines by challenging the accuracy of certain facts contained in the

text. The court explained:

> [A] plaintiff may not, for example, challenge in a court of law religious beliefs that
> Noah built an ark, loaded it with his family and representative animals of the
> world, and was thereby saved from world-engulfing floods. Neither may a plaintiff
> circumvent this restriction by merely attacking religious accounts concerning the
> locations where Noah built the ark or where the ark came to rest. If religious
> events themselves sit beyond judicial purview, religious beliefs concerning the
> details of those events must enjoy the same protection. Religious beliefs
> concerning the details of events described in The Book of Mormon, the Church's
> foundational text, may not be severed from beliefs about the events themselves.
> And whether described as the doctrine of polygamy, plural marriage, celestial
> marriage, or by another name, the Church's teachings concerning the issue and its
> practice are fundamentally religious in nature. Adjudicating Gaddy's re-pled
> claims based on these two new sets of factual allegations would require the court to
> evaluate the truth or falsity of the Church's religious beliefs.[89]

The court concluded the Religion Clauses prohibited this examination, and dismissed the

claims based on these new factual theories.[90]

As to Gaddy's new argument, that her factual allegations presented a threshold question of

fact concerning the sincerity of the Church's professed beliefs in its own teachings,[91] the court

disagreed. While a showing of sincerity of religious belief is a threshold issue for litigants and

prisoners under the First Amendment and the Religious Freedom Restoration Act (RFRA),[92] the

court noted the sincerity inquiry is necessary only in cases in which litigants seek a religious

accommodation or an exception to a rule or law of general application.[93] The court found that

rationale inapplicable to Gaddy's Amended Complaint because the Church had not raised the

---

[89] *Id.* at 15.

[90] *Id.*

[91] *See* Dkt. 47 at 22–23.

[92] *See id.* at 22 (citing *United States v. Meyers*, 95 F.3d 1475, 1482–84 (10th Cir. 1996); *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1352 (10th Cir. 1997) *vacated in part on reh'g en banc*, 159 F.3d 1227 (10th Cir. 1998); *United States v. Quaintance*, 608 F.3d 717, 722–23 (10th Cir. 2010)).

[93] Dkt. 100 at 15–16.

First Amendment bar as part of an effort to obtain religious accommodation or special exemption.[94] Moreover, even if the court engaged in the threshold inquiry, the claims would still fail because they required adjudication of the truth or falsity of certain statements concerning religious beliefs.[95]

The court also rejected Gaddy's new fraudulent omissions theory.  Gaddy argued her re-pleaded claims should survive because liability could be based on the fraudulent omission of material facts, which did not require a determination of the truth or falsity of the underlying statements.[96]  The court found this argument ignored the analysis required to adjudicate a Utah fraud claim based on omissions—it still would require an impermissible examination of religious doctrines and teachings to determine whether they were false or misleading absent additional disclosure.[97]

The court next examined Gaddy's UCSA claim.[98]  Gaddy alleged the Church's solicitation of tithing violated the UCSA because the Church had intentionally concealed or omitted material facts about its history.[99]  The Church contended this new claim failed because the UCSA does not provide a private cause of action,[100] and Gaddy's UCSA claim, as pleaded, necessarily required an impermissible evaluation of the truth of the Church's statements based on

---

[94] *Id.* at 16.  The court also disagreed with Gaddy's argument that the reasoning in two criminal cases, in which defendants raised the First Amendment as a defense to fraud charges, required the court to engage in a threshold inquiry of sincerity before considering the church autonomy doctrine as a defense to civil fraud charges.  *See id.* at 17–19.

[95] *Id.* at 21.

[96] Dkt. 47 at 27–28.

[97] Dkt. 100 at 22–23.

[98] The Utah Charitable Solicitations Act prohibits "[i]n connection with any solicitation . . . making any untrue statement of a material fact or failing to state a material fact necessary to make statements made, in the context of the circumstances under which they are made, not misleading."  UTAH CODE ANN. § 13-22-13(3).

[99] Dkt. 47 at 30–31.

[100] Dkt. 38 at 18 n.7.

religious teachings and beliefs.[101]  Assuming without deciding the USCA created a private cause of action, the court agreed with the Church: Gaddy's UCSA claim would require evaluating the truth of the Church's religious teachings.[102]  The court noted the allegedly untrue or misleading facts Gaddy claimed the Church used to solicit tithing were related to Mormonism and the Church's key historical events.[103]  The court found those facts "directly implicate[d] the truth of the Church's teachings," and inquiry into their veracity was barred by the Religion Clauses.[104]

Finally, the court evaluated Gaddy's repleaded civil RICO claim, based on a new theory of liability using statements by Church leaders that tithing funds would not be used for commercial purposes.[105]  Gaddy alleged these statements were false because contrary to Church assurances, tithing funds were in fact used for commercial purposes, including for the development of the City Creek Mall in Salt Lake City, Utah.[106]  Gaddy further alleged the Church made those misstatements through mail and wire communications, implicating RICO.[107]  The Church contended the Religion Clauses barred Gaddy's tithing theory because "[t]ithing is rooted in the Bible," and therefore an examination of these teachings would entangle the court in an ecclesiastical dispute concerning the "proper use of the Lord's tithing funds."[108]  The Church did not present any further argument concerning the viability of Gaddy's civil RICO claim.[109]

---

[101] *Id.* at 18–19.

[102] Dkt. 100 at 24–25.

[103] *Id.* at 25 (citing Dkt. 37 ¶ 196).

[104] *Id.*

[105] *Id.* (citing Dkt. 37 ¶¶ 5, 6, 79, 200(c)).

[106] *Id.*

[107] *Id.* (citing Dkt. 37 ¶ 200(c)).

[108] Dkt. 38 at 16.

[109] *See id.*

The court, noting again that the church autonomy doctrine only applies as a defense to alleged misconduct "rooted in religious belief" not "purely secular decisions, even when made by churches," found that the tithing theory was based on a secular dispute.[110]  The court explained that the Amended Complaint did not challenge the Church's tithing doctrine, teachings or beliefs related to it.  Rather, the Amended Complaint identified "specific factual statements allegedly made by the Church through its representatives concerning the Church's use of tithing funds and allege[d] those statements are false."[111]  Therefore, to adjudicate the claim, the court would not be required to examine the truth or falsity of the Church's teachings concerning tithing, but instead whether the statements about the use of funds were true or false.[112]

Because the Church had not raised any challenge to the civil RICO claim other than its Religion Clauses argument, the court found the civil RICO claim survived, to the extent it was based on the tithing theory.[113]

### VIII.   Gaddy's Second Amended Complaint

Rather than proceed to discovery on her surviving claim, Gaddy again moved to amend her Complaint.[114]  The Church filed a response consenting to Gaddy's request, pursuant to Federal Rule of Civil Procedure 15(a)(2).[115]  On October 22, 2021, Plaintiffs filed the Second Amended Complaint.[116]

The Second Amended Complaint duplicates many of the claims, theories, and allegations from the prior pleadings.  Gaddy (joined now by Small and Harris) again brings claims for

---

[110] Dkt. 100 at 27–28 (quoting *Bryce*, 289 F.3d at 657).

[111] *Id.* at 28 (citing Dkt. 37 ¶ 79).

[112] *Id.* at 28–29.

[113] *Id.* at 29.

[114] Dkt. 105 (Motion for Leave to File Second Amended Complaint).

[115] Dkt. 107 (Response to Motion for Leave to File).

[116] Dkt. 110.

fraudulent inducement, fraudulent concealment, violations of UCSA and civil RICO, and intentional infliction of emotional distress.  The Second Amended Complaint also advances two new causes of action: fraudulent nondisclosure and "constructive fraud based on breach of promises of future performance."[117]  All the claims rely on the same alleged misrepresentations concerning the First Vision, the Book of Mormon, the Book of Abraham, the Church's history with polygamy, the location of events in the Book of Mormon, and the Church's use of tithing funds.[118]

Notably, the Second Amended Complaint significantly expands from the first two Complaints, describing in almost encyclopedic detail—using tables, charts, artwork, and translation comparisons—the allegations concerning, among other things, the translation of the Book of Mormon,[119] Joseph Smith's polygamy,[120] and the Book of Abraham.[121]  The Second Amended Complaint contains great detail about Church-commissioned artwork and films depicting the First Vision and the Translation of the Book of Mormon, including dozens of reproductions of such images.[122]  Plaintiffs also expand their allegations concerning Joseph Smith's life, providing a chart of alleged crimes and civil frauds he committed,[123] and alleging the Church concealed this history.[124]  Plaintiffs also provide more allegations concerning the

---

[117] *Id.* ¶¶ 399–423, 451–62.

[118] *See generally id.*

[119] *See, e.g.*, *id.* ¶¶ 33, 66, 68, 149.

[120] *See, e.g.* *id.* ¶¶ 40, 41, 216.

[121] *See, e.g.*, *id.* ¶¶ 37–39, 63, 73–78, 194–95.

[122] *See, e.g.*, *id.* ¶¶ 151, 156, 164, 213, 226, 232, 248, 253.

[123] *Id.* ¶ 36.

[124] *Id.* ¶ 272.

Church's history and governance.[125]  In providing these more detailed allegations, the Second

Amended Complaint has ballooned to 554 paragraphs over 203 pages.[126]

Plaintiffs also expanded their allegations concerning the Church's misrepresentations on

tithing.  Plaintiffs first lay out allegations concerning the Church's finances as they relate to

tithing.  Plaintiffs allege the Church's annual tithing receipts were "recently estimated to be $6–8

billion," and that a $1–2 billion surplus of funds "not needed for ecclesiastical expenses" "is

invested and then used for commercial real estate and business development."[127]  They provide a

table detailing the Church's purported commercial and real estate investments, and allege the

money for these projects came from "interest (if not principal) on tithing donations."[128]  They

further allege that tithing "was not used only for the Lord's or Church purposes (reasonably

interpreted as religious)[129] but a substantial portion of tithes, especially when compared to

humanitarian aid of $1.3 billion from 1985–2010, was used for investment and commercial

development purposes, including but not limited to City Creek Mall[,] bailing out Beneficial Life

Ins. Co., and likely for" other projects.[130]  Plaintiffs then include Church statements concerning

tithing usage.  They expand the allegation concerning Church President Gordon B. Hinckley's

statement at the 2003 General Conference explaining the use of tithing funds on City Creek  Mall:

> We have felt it imperative to do something to revitalize this area.  But I wish to give
> the entire Church the assurance that tithing funds have not and will not be used to
> acquire this property.  Nor will they be used in developing it for commercial
> purposes.  Funds for this have come and will come from those commercial entities

---

[125] *Id.* ¶¶ 44–46, 49, 59.

[126] *See id.*

[127] *Id.* ¶ 9.

[128] *Id.* ¶ 8.

[129] These parentheses appear as brackets in the Second Amended Complaint.  *Id.* ¶ 293.  To avoid confusion, the court has substituted parentheses.

[130] *Id*.  Paragraph 8 contains the table detailing the Church's alleged commercial and real estate investments.

owned by the Church.  These resources, together with the earnings of invested reserve funds, will accommodate this program.[131]

Plaintiffs allege a similar statement was printed in Church-owned *Ensign Magazine*: "[n]o tithing funds will be used in the redevelopment [of downtown Salt Lake City]."[132]  Plaintiffs further allege the Church-owned *Deseret News* printed a statement that "[m]oney for the project is not coming from [] Church members' tithing donations," but rather the money will come from the Church's "other real-estate ventures."[133]

Finally, Plaintiffs provide allegations linking tithing to the Church's religious beliefs and practices to illustrate the fraud and misrepresentation.  They allege "[t]he definition of invested reserve funds was unknown to [them]," and they "assumed that it meant interest on business profits" because "[they] had always been taught that tithing was used for religious purposes."[134]  Concerning Church teachings, Plaintiffs allege: "[d]ecisions to be baptized, remain a member of the organization and importantly for most, to further commit to the Church by serving as a full time mission[ary], and/or qualifying and renewing qualification for temple access and participation, are all conditioned upon paying a full 10% of one's income as tithing."[135]  Plaintiffs further allege the Church "extorted that tithing not only by promising eternal salvation, and 'forever families' but by characterizing payment of a full tithe as 'fire insurance' to ensure safety from apocalyptic burning at the Second Coming of Jesus Christ."[136]

---

[131] *Id.* ¶ 240.

[132] *Id.* ¶ 244.

[133] *Id.*

[134] *Id.* ¶ 237.

[135] *Id.* ¶ 10.

[136] *Id.*

IX.     **The Church's Motion to Dismiss Gaddy's Second Amended Complaint**

On November 12, 2021, the Church filed the presently pending Motion to Dismiss Plaintiffs' Second Amended Complaint.[137] The Church argues, first, to the extent Plaintiffs' claims are based on religious teachings and beliefs concerning Joseph Smith, the First Vision, the Books of Mormon and Abraham, and Church History, the claims must be dismissed under the church autonomy doctrine, as previously explained in the court's First and Second Orders.[138] Second, the Church argues that each of Plaintiffs' claims, to the extent they are supported by a theory concerning tithing, fail as a matter of law.[139] Finally, the Church argues the Second Amended Complaint should be dismissed with prejudice, as Plaintiffs have had multiple opportunities to amend but continue to plead claims that are barred by the First Amendment.[140]

With permission of the court,[141] and over the objection of the Church,[142] Plaintiffs filed an overlength Opposition Memorandum.[143] In it, Plaintiffs again argue that the church autonomy doctrine is "inapplicable" to the claims in the Second Amended Complaint.[144] Plaintiffs argue that the church autonomy doctrine "must be set in the context of an 'internal church dispute'" and the "conduct" at issue must be "rooted in religious belief."[145] Plaintiffs

---

[137] Dkt. 111.

[138] *Id.* at 12–13.

[139] *Id.* at 13–26.

[140] *Id.* at 26.

[141] Dkt. 117 (Order Granting Motion to File Overlength Memorandum).

[142] Dkt. 113 (Memorandum in Opposition re: Motion for Leave to File Overlength Memorandum).

[143] Dkt. 118 (Opposition to Motion to Dismiss the Second Amended Complaint).

[144] *Id.* at 6–23.

[145] *Id.* at 6; *see also id.* at 7–9 (citing *Paul v. Watchwoter Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987); *Guinn v. Church of Christ of Collinsville*, 75 P.2d 766, 773 (Okla. 1989); *Wollersheim v. Church of Scientology*, 212 Cal. App. 3d 872, 893–98 (Cal. Ct. App. 1989), *cert. granted, judgment vacated sub nom. Church of Scientology of California v. Wollersheim*, 499 U.S. 914 (1991)).

then provide an overview of "Relevant [church autonomy doctrine] Case Law,"[146] and argue the doctrine is inapplicable to the Second Amended Complaint because the alleged fraudulent acts are "not based on a voluntary internal church dispute," but rather on "[a]cts of concealment" that are not "interpretations of doctrine."[147]   Plaintiffs again recite extensive case law arising in tort or in the RFRA context—most from out of state or out of circuit—to argue that the court can evaluate the Second Amended Complaint using "neutral principles" gleaned from generally applicable laws without violating the Religion Clauses.[148]   Finally, Plaintiffs turn to a defense of the factual sufficiency of each claim in the Second Amended Complaint, focusing on the allegations concerning the Book of Mormon, Book of Abraham, Church history, and tithing.[149]

In its Reply Memorandum, the Church notes the Plaintiffs' church autonomy doctrine argument has already been ruled on twice.  The Church maintains Plaintiffs cite the same cases and arguments but seek a different outcome.[150]   The Church further argues the only new question is whether any of Plaintiffs' claims related to the tithing theory survive, and that because Plaintiffs fail to plead the required elements, those claims fail.[151]

## X.   Gaddy's Motion for Leave to File Proposed Third Amended Complaint

Before the court could rule on the Church's pending Motion to Dismiss the Second Amended Complaint, on January 28, 2022, Plaintiffs moved for leave to file a Third Amended Complaint.[152]   Plaintiffs argue the Proposed Third Amended Complaint corrects issues identified

---

[146] *Id.* at 9–13.

[147] *Id.* at 13–14.  Plaintiffs also return to *Ballard*, again arguing its holding does not bar their fraud claims.  *Id.* at 15– 16.

[148] *Id.* at 16–23.

[149] *Id.* at 23–37.

[150] Dkt. 121 (Reply Memorandum in Support of Motion to Dismiss) at 1–2 (summarizing argument).

[151] *See id.*

[152] Dkt. 122 (Motion for Leave to File Proposed Third Amended Complaint).

by the Church's Motion to Dismiss the Second Amended Complaint.[153]  Specifically, the

Proposed Third Amended Complaint: (1) adds the basis for allegations made upon information

and belief, (2) rewords the fourth cause of action as a claim for constructive fraud, (3) adds an

"affirmative misrepresentation" from a 2012 tithing form, (4) adds new factual allegations

supporting the claim Church leaders "do not believe what they teach," and (5) adds new

allegations comparing the percent of annual tithing used for investment funds with the percent of

tithing used for humanitarian aid.[154]

On February 25, 2022, the Church filed its Opposition to the Motion for Leave to Amend,

arguing that it is within the court's discretion to deny a motion to amend where a plaintiff has  had

multiple opportunities to plead and that amendment, in this case, would be futile.[155]  On March 14,

2022, Plaintiffs filed a Reply Memorandum, arguing the amendments were in  response to

continued discoveries concerning Church doctrine and tithing use, and that justice requires

granting leave to amend.[156]

The Motion to Dismiss the Second Amended Complaint and Motion for Leave to File a

Third Amended Complaint being fully briefed, the court resolves the issues based on the written

memoranda, finding oral argument unnecessary.[157]

## LEGAL STANDARDS

The Church moves to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil

Procedure 12(b)(6).[158]  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must

---

[153] *Id.* at 2.

[154] *Id.* at 3–8.

[155] Dkt. 126 (Opposition to Motion for Leave) at 3–10.

[156] Dkt. 128 (Reply in Support of Motion for Leave).

[157] *See* DUCivR 7-1(g).  Accordingly, Plaintiffs' Request for Oral Argument, Dkt. 132, is denied.

[158] Dkt. 111 at 10.

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[159] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[160] In determining whether a complaint satisfies these criteria, the court will "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."[161]

When fraud is alleged, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard.  Under this standard, "a party must state with particularity the circumstances constituting [the] fraud or mistake."[162]  Thus, Rule 9(b) generally requires a plaintiff "to identify the time, place, and content of each allegedly fraudulent representation or omission, to identify the particular defendant responsible for it, and to identify the consequence thereof."[163]

Additionally, claims implicating church doctrines may be barred by the First Amendment's Religion Clauses.[164]  The Tenth Circuit analogizes such an argument to a government official's defense of qualified immunity.[165]  That is, if the Religion Clauses apply "to the statements and materials on which plaintiffs have based their claims, then the plaintiffs have no claim for which relief may be granted."[166]

---

[159] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[160] *Id.* (citing *Twombly*, 550 U.S. at 556).

[161] *Albers v. Bd. of Cnty. Com'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 699 (10th Cir. 2014).

[162] Fed. R. Civ. P. 9(b).

[163] *Hafen v. Strebeck*, 338 F. Supp. 2d 1257, 1263 (D. Utah 2004) (citation omitted).

[164] *See generally* Dkt. 111.

[165] *See Bryce*, 289 F.3d at 654.

[166] *Id.*

Finally, Rule 15 states that leave to amend a complaint "should freely [be given] when justice so requires."[167]  Justice requires leave to amend "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief."[168]  "However, justice does not require leave to amend when amendment would be futile."[169]  An amendment is futile when the complaint, as amended, "would be subject to dismissal."[170]

## ANALYSIS

First, the court addresses the Church's Motion to Dismiss the Second Amended Complaint. Second, the court turns to Plaintiffs' Motion for Leave to File Third Amended Complaint.

### I.      Motion to Dismiss the Second Amended Complaint

The court first assesses Plaintiffs' seven claims to the extent they are based on repeated theories concerning the First Vision, Book of Mormon translation, Book of Abraham, Joseph Smith's history and practice of polygamy, and Church history.  Next, the court assesses Plaintiffs' claims to the extent they are based on a theory of the Church's representations concerning the use of tithing funds.

### A.  Repeated Theories Concerning the Church's Religious History and Teachings

The Church again moves to dismiss Plaintiffs' claims "based on allegations regarding Joseph Smith's First Vision, the Book of Mormon, the Book of Abraham, and Church history."[171]  The Church notes that Plaintiffs have again alleged that the Church's religious

---

[167] Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

[168] *Foman*, 371 U.S. at 182.

[169] *Prisbry v. Barnes*, No. 2:17-cv-00723-DN-PMW, 2018 WL 1508559, at *3 (D. Utah Mar. 27, 2018) (citing *Castleglen, Inc. v. Resolution Tr. Corp.*, 984 F.2d 1571 (10th Cir. 1993)).

[170] *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Invs. Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999).

[171] Dkt. 111 at 12.

teachings concerning Joseph Smith, the Book of Abraham, and the Book of Mormon "are false," and that Plaintiffs have merely "continued to add more allegations about these topics."[172]  Citing the court's prior Orders, the Church argues that because the Religion Clauses prohibit inquiries into religious teaching, this includes challenges based on "the First Vision, translations of the Book of Mormon and Book of Abraham, locations of events described in the Book of Mormon, and the Church's history with polygamy."[173]  Accordingly, the repleaded claims, to the extent they are based on these theories, must be dismissed.[174]

As noted, Plaintiffs' Opposition Memorandum discusses the church autonomy doctrine and argues it is not applicable to the claims in the Second Amended Complaint because those claims require only the application of "neutral principles of law" to the Church's alleged "acts of concealment."[175]

The court has twice considered and rejected Plaintiffs' arguments that fraud-based claims directed towards the Church's alleged misrepresentations and omissions concerning the First Vision, Church History, translations of the Books of Mormon and Abraham, and locations of events in the Book of Mormon are not subject to the church autonomy doctrine.[176]  The court also previously rejected Plaintiffs' theory that they can avoid the church autonomy doctrine by arguing the sincerity of the Church's beliefs or basing their claims on a theory of fraudulent omissions.[177]  In their Opposition, Plaintiffs point to no newly decided case law or changes in

---

[172] *Id.*

[173] *Id.* (citing Dkt. 100 at 23).

[174] *Id.* (citing Dkt. 100 at 23).

[175] *See* Dkt. 118.

[176] *See* Dkt. 100 at 12 (incorporating First Order and rejecting repeated claims and arguments).

[177] *Id.* at 15–23.

circumstance that would require the court to revisit these conclusions.[178]  Accordingly, to the

extent the Second Amended Complaint and the parties' arguments concerning the sufficiency of

that pleading overlap with factual allegations, arguments, and legal issues previously addressed,

the court relies on and incorporates its prior Orders.[179]  As such, the court grants the Church's

Motion to Dismiss each claim to the extent Plaintiffs' theories arise from the Church's teachings

and representations concerning the First Vision, translations of the Books of Mormon and

Abraham, and Church history.[180]

The court will briefly address the Second Amended Complaint's expanded factual

allegations concerning Joseph Smith's character, including his alleged history of lawsuits and

prosecutions for fraud.  As to these allegations, the Church argues, "[i]n light of this Court's

previous orders, Plaintiffs and their counsel know perfectly well that such claims are barred by the

First Amendment[.]"[181]  Plaintiffs do not separately address these new allegations in their

Opposition, instead focusing their argument on a general defense of the claims related to the

Church's religious teachings and beliefs.[182]

The court concludes that allegations concerning Joseph Smith's alleged criminal history

fail for the same reason the Amended Complaint's allegations concerning his practice of

---

[178] Moreover, nowhere in their extensive re-litigation of the church autonomy doctrine do Plaintiffs address a central point of the court's prior Orders—namely, that falsity is a necessary element of each fraud-based claim Plaintiffs plead.  To adjudicate those claims as Plaintiffs have pleaded them would require the court to determine whether the religious teachings, beliefs, and facts surrounding them that Plaintiffs allege are misrepresentations are, in fact, false. For reasons this court has explained, that inquiry is barred by the Religion Clauses.  The court's prior Orders do not stand for the proposition that churches are generally immune from tort claims; rather, the court has been clear that the church autonomy doctrine "is not without limits."  *See, e.g.*, Dkt. 33 at 9.  But here, the claims fall well within those limits.

[179] *See* Dkt. 100 at 23 (adopting First Order).

[180] This disposition also applies to Plaintiffs' expanded allegations concerning the Church's commission of artwork depicting the First Vision and translation of the Book of Mormon, as those allegations are entwined with the Church's teachings about the events themselves.

[181] Dkt. 111 at 13 n.3.

[182] *See generally* Dkt. 118.

polygamy failed: religious teachings concerning details of religious events "may not be severed from beliefs about the events themselves."[183]  By pleading even more facts concerning Joseph Smith, Plaintiffs seek to have the court adjudicate the truth or falsity of the Church's beliefs and teachings concerning its founder by challenging the accuracy of facts surrounding those beliefs.  But again, "[i]f religious events themselves sit beyond judicial purview, religious beliefs concerning the details of those events must enjoy the same protection."[184]  Accordingly, to the extent Plaintiffs' claims rely on the Church's alleged misrepresentations concerning the life of Joseph Smith, those claims fail for the reasons already explained in the court's prior Orders.

**B.  Expanded Allegations Concerning Tithing**

Next, the court turns to Plaintiffs' expanded theory of the Church's alleged misrepresentations concerning tithing funds.  While the Amended Complaint contained the tithing theory only in the civil RICO claim, Plaintiffs' Second Amended Complaint incorporates the tithing theory into six of Plaintiffs' seven claims: fraudulent inducement, fraudulent nondisclosure, fraudulent concealment, constructive fraud based on breach of promise of future performance, violation of the UCSA, and civil RICO.[185]  Plaintiffs do not include the tithing

---

[183] Dkt. 100 at 15.

[184] *Id.*

[185] *See, e.g.*, Dkt. 110 ¶¶ 385, 408, 428, 455, 470, 484.

theory in their seventh claim for intentional infliction of emotional distress,[186] and accordingly

that claim is dismissed in its entirety for the reasons stated above.

The Church has raised specific arguments as to the why the remaining six claims, based on a

tithing theory, fail as a matter of law.[187]  The court addresses the parties' arguments concerning

each claim in turn.

### 1.  First Claim: Fraud in the Inducement to Enter an Oral Contract

The court first summarizes Plaintiffs' allegations and the Church's arguments in favor of

dismissal before analyzing whether Plaintiffs' fraud in the inducement claim survives as it relates

to tithing.

#### a.  Plaintiffs' Allegations Concerning Tithing and the Church's Argument for Dismissal

Plaintiffs allege the Church used tithing for "the Lord's or Church purposes" and

"humanitarian aid," as well as "investment and commercial purposes."[188]  As to City Creek Mall,

Plaintiffs allege the Church made representations that "no tithing was used for City Creek Mall

and that tithing is (only) used for Church (reasonably interpreted as religious) purposes and

activities," but that in fact, when those representations were made, "[o]n information and belief. .

. [the Church] was using tithing for commercial real estate deals and commercial investments

---

[186] *See id.* ¶¶ 536–543.  Plaintiffs allege in the Seventh Claim that "[b]ut for [the Church's] misrepresentations as to *all but its tithing use*, Plaintiffs would not have committed to the [Church], nor paid tithing." *Id.* ¶ 539 (emphasis added).  In its Motion to Dismiss, the Church argues "[i]t is unclear whether this claim attempts to assert a theory of liability related to the Church's use of tithing funds," but that if such a theory is asserted, it is defective for the reasons the Church argues as to the other claims.  Dkt. 111 at 25–26.  In opposition, Plaintiffs do not argue that they seek to incorporate the tithing theory into the intentional infliction of emotional distress claim but instead focus on the religious belief-based theories that the court has already dismissed.  Plaintiffs argue the Church's misrepresentations about its history have caused members to suffer from "existential crises, suicidal ideation, destruction of familial relationships, insomnia, anxiety, and depression." Dkt. 118 at 36–37.  Based on Plaintiffs' pleading and argument in Opposition, the court concludes that they do not seek to include the tithing theory in the intentional infliction of emotional distress claim.

[187] Dkt. 111 at 13–25.

[188] *Id.* ¶ 293.

and other non-religious and non-charitable purposes."[189]  Plaintiffs did not understand then-President Hinckley's statement that "invested reserve funds" had been used for the City Creek Mall development in actuality meant tithing funds had been used.[190]  Similar representations that tithing was not used for commercial development "were false" because "upon information and belief," Church officials knew tithing "was used . . . for commercial purposes."[191]  But because the Church "required a full tithe in order to acquire and maintain temple recommends and/or be baptized and have ongoing access to an LDS[192] temple in order to ensure one's family is together in the afterlife and does not burn at the second coming of Christ," Plaintiffs relied on the Church's representations and were induced to enter an oral contract with the Church to  tithe.[193] Plaintiffs were further induced by the Church's claim "tithing was used only for ecclesiastical purposes, meaning that it was used to . . . proclaim the gospel, perfect the saints, [] redeem the dead, and care for the poor and needy," not "for commercial endeavors to expand a business empire."[194]

In its Motion to Dismiss, the Church divides Plaintiffs' tithing allegations as to this claim into two categories: first, "general allegations about the Church's uses of tithing funds and whether those uses really are 'for the Lord's work,'"[195] and second, "specific allegations about the source of funds for the City Creek project."[196]

---

[189] Dkt. 110 ¶ 366.

[190] *Id.* ¶ 375.

[191] *Id.* ¶ 381.

[192] "LDS" is a shortened acronym referencing "Latter-Day Saints," a portion of the Church's full name.

[193] *Id.* ¶ 385.  Plaintiffs further allege their reliance was reasonable, and they paid up to 10% of their income as a tithe "in order to obtain and maintain a temple recommend, and/or be baptized."  *Id.* ¶ 393.

[194] *Id.* ¶ 390.

[195] Dkt. 111 at 15 (citing Dkt. 110 ¶ 233).

[196] *Id.*

First, as to the general allegations concerning tithing, the Church argues the allegations violate the First Amendment: "Plaintiffs ask this Court to determine whether the Church's use of tithing funds really is 'for the Lord's work' and 'to support other Church purposes as directed by the designated servants of the Lord,'"[197] an examination which would "impermissibly entangle this Court in an ecclesiastical dispute—the proper use of the Lord's tithing funds."[198]   The Church specifically argues that Plaintiffs cannot meet the falsity element under this theory because determining the truth or falsity of whether tithing is "for the Lord's work" would violate the First Amendment.[199]   Additionally, the Church argues the reliance element, as pleaded, would also require the court to enter impermissible First Amendment territory because Plaintiffs variously plead that (1) they relied on Church statements requiring tithing "as a condition of membership" in the Church and to obtain a "temple recommend;" (2) they relied on the Church's teachings concerning the Book of Mormon and Joseph Smith in deciding to pay tithing and be baptized; and (3) they paid tithing based on the Church's characterization of tithing as "fire insurance to ensure safety from apocalyptic burning at the Second Coming of Jesus Christ."[200] The Church argues that there "is no way to determine upon what an individual would 'reasonably rely' in deciding to donate tithing without addressing the Church's religious teachings."[201]

Second, as to the tithing allegations connected to the funding sources for the City Creek Mall, the Church argues "Plaintiffs have not and cannot plead that the Church's statements about

---

[197] *Id.* at 16 (citing Dkt. 110 ¶¶ 230, 233).

[198] *Id.*

[199] *Id.*  The Church additionally argues that the Utah Supreme Court previously rejected the religious-commercial distinction Plaintiffs argue for in *Stone v. Salt Lake City*, 356 P.2d 631 (Utah 1960).  Dkt.111 at 17.  Because the court concludes this claim fails for other reasons, it does not address the religious-commercial distinction argument.

[200] *Id.* at 18 (citing Dkt. 110 ¶ 10, 391).

[201] *Id.* at 19.

the source of funds for City Creek were false."[202]  The Church notes Hinckley stated that "tithing was not used for the City Creek mall," but in the same statement clarified that "earnings of invested reserve funds" were used for the mall.[203]  Because Plaintiffs pleaded the Church "has in fact used at least interest (if not principal) on tithing donations to fund commercial ventures," the Church argues they have not pleaded falsity because invested reserve funds refer to interest on tithing, and Plaintiffs "do not actually plead that tithing principal was used."[204]  The Church further argues that because a California district court recently rejected a similar claim in a different case at summary judgment, it is impossible for Plaintiffs to plead falsity in good  faith.[205]

In opposition, Plaintiffs offer no substantive reply to any of these arguments.  They devote only one page of their lengthy Opposition Memorandum to the fraudulent inducement claim—mostly arguing about theories, already dismissed, concerning the Book of Mormon translation.[206]  Indeed, Plaintiffs provide only a two-sentence response to the Church's seven-page argument concerning why Plaintiffs' fraudulent inducement claim, based on the tithing allegations, fails: "Finally, despite [the Church's] claim, Plaintiffs did in fact allege City Creek statements were false.  Tithing, even if limited to interest on tithing, was the original source of the reserve funds."[207]  Plaintiffs do not respond to Defendants' argument as to why the general tithing allegations fail under the First Amendment.

---

[202] *Id.*

[203] *Id.* at 19.

[204] *Id.*

[205] *Id.* at 20.

[206] *See* Dkt. 118 at 23–24.

[207] *Id.* at 24 (citing Dkt. 110 ¶¶ 381–82).

### b.   Analysis

The court agrees with the Church that Plaintiffs' fraud in the inducement claim fails, not for running into a First Amendment bar on the falsity or reliance elements,[208] but for a more fundamental failure to plead the claim with the specificity required under Rule 9(b).  Plaintiffs fail to identify specific actions taken or oral contracts entered into on the basis of any particular misrepresentations.[209]  Because the court concludes the Plaintiffs fail to plead fraud in the inducement on this more fundamental level, rather than separate the analysis into two categories as the Church does, the court evaluates Plaintiffs' allegations concerning tithing together.

To bring a fraudulent inducement claim under Utah law, a plaintiff must allege: "(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that

---

[208] For reasons more fully articulated in the Second Order, *see* Dkt. 100 at 26–28, the court is skeptical of the Church's argument that the First Amendment bars Plaintiffs' fraud in the inducement claim to the extent it is based on allegations concerning tithing.  The court does not understand Plaintiffs' allegations to be that the Church's teachings concerning tithing were false.  Rather, the court understands the allegations to be that the Church stated tithing was not used for commercial or investment purposes while, in fact, using tithing funds for just that.  Those allegations could be adjudicated without evaluating the truth or falsity of the Church's religious teachings concerning tithing.  Similarly, the court does not think this claim founders on the reliance element.  Whether a reasonable person would have relied on the Church's representations concerning the use of tithing funds—and specifically, that tithing was not used for commercial purposes—is an inquiry that can be made without implicating the underlying nature of tithing doctrine.

[209] In considering the Church's argument that the Second Amended Complaint fails to allege fraud with the specificity required by Rule 9(b), the court expands its analysis beyond the two elements (falsity and reliance) the Church identifies as deficient.  While the court typically will not look beyond the party's arguments when adjudicating a motion to dismiss, this is the third time it has considered a version of this complaint on the merits. *See* Dkt. 33; Dkt. 100.  The court must balance its obligations to both allow plaintiffs ample opportunity to plead claims and to shield defendants from undue prejudice caused by the need to defend against successive pleadings. The court is also conscious of its duty to construe and administer the federal rules to "secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  Accordingly, the court takes a broader view of the Second Amended Complaint to determine whether any of the repleaded claims adequately state a claim under the governing standards.

party's injury and damage."[210]  Utah courts have recognized that a plaintiff's failure to establish

each necessary element of a fraud claim under the facts alleged in a complaint dooms the claim.[211]

Under Federal Rule of Civil Procedure Rule 9(b), "a party must state with particularity the

circumstances constituting fraud."[212]  The Tenth Circuit has explained that Rule 9(b) requires a

complaint alleging fraud to "identify the time, place, content, and consequences of fraudulent

conduct," or more plainly, to "plead the who, what, when, where and how of the alleged

[fraud]."[213]  This accords with Rule 9(b)'s purpose "to afford defendant fair notice of plaintiff's

claims and the factual ground upon which they are based."[214]  In *George v. Urban Settlement

Services*, the Tenth Circuit found fraud allegations unsatisfactory when the plaintiff only generally

alleged that he "sometimes on specific dates, made phone calls . . . spoke with unidentified . . .

employees who made false representations to him via phone, and received letters through the mail

. . . containing false and misleading statements."[215]  However, allegations identifying specific

employees by name, specific dates when employees made false statements, and specific actions

taken in reliance on those misrepresentations were sufficient to state a claim for fraud.[216]

Plaintiffs' claim for "fraud in the inducement to enter an oral contract" fails to identify

specific oral contracts that Plaintiffs entered into, on specific dates, with specific Church leaders,

---

[210] *Gerwe v. Gerwe*, 424 P.3d 1113, 1117 (Utah Ct. App. 2018).

[211] *See, e.g.*, *Franco v. The Church of Jesus Christ of Latter-Day Saints*, 21 P.3d 198, 208 (Utah 2001), *abrogated on other grounds by Williams v. Kingdom Hall of Jehovah's Witnesses*, 491 P.3d 852 (Utah 2021).

[212] Fed. R. Civ. P. 9(b).

[213] *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010) (internal citations and quotations omitted).

[214] *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236–37 (10th Cir. 2000) (internal citation and quotation omitted).

[215] 833 F.3d 1242, 1255–56 (10th Cir. 2016).

[216] *Id.* at 1256.

and in reliance on particular false statements.  Rather, Plaintiffs only generally allege that "outsiders" as well as those who were "already members" made "[d]ecisions to be baptized," "remain a member," and "further commit . . . by serving as a full[-]time mission[ary]" or to "qualify[] and renew[] qualification for temple access and participation" based on the condition of paying 10% of their income as tithing, a sum the Church "extorted" with promises of "eternal salvation," "forever families," and the characterization of tithing as "fire insurance."[217]  Plaintiffs also allege that the Church made false representations (concerning the use of tithing funds and other matters) "to induce all Plaintiffs to enter into an oral contract with [the Church] who offered an LDS temple recommend on the condition that Plaintiffs . . . commit to pay a full tithe."[218] Plaintiffs allege the "recommend is/was renewable upon the condition that Plaintiffs continue to pay a full tithe."[219]  In short, Plaintiffs offer general allegations about the agreement to tithe, but fail to offer any specific allegations identifying an instance in which any Plaintiff agreed to pay tithing on the basis of a particular misrepresentation, by whom it was made, when it was made, and the like.

The closest the Second Amended Complaint comes to offering the specificity demanded by Rule 9 is by offering allegations describing certain interviews Church members had in which they either affirmed or recommitted to paying tithing.  For example, Plaintiffs allege Church members undergo a confidential interview at age eight with Church leaders in which they are asked, among other things, about whether they can commit to paying tithing.[220]  The Second Amended Complaint also alleges all members have a "temple worthiness" interview "as a young

---

[217] Dkt. 110 ¶ 10.

[218] *Id.* ¶ 386.

[219] *Id.*

[220] *Id.* ¶¶ 286–87.  Notably, for each named plaintiff, this meeting happened long before specific alleged misrepresentations such as the President Hinckley statement.  *See id.* ¶¶ 286, 336, 345 (stating Gaddy and Harris were teenagers at the time of the Hinckley statement and establishing Small was an adult).

adult" in which they are asked if they "obey[] the law of tithing."[221]  Plaintiffs allege that each year, they have a meeting with their bishop in December for "tithing settlement," but do not allege any specific December meeting with any specific person during which they chose to renew or recommit to paying tithing on the basis of any representations.[222]  Finally, Plaintiffs generally plead "enter[ing] into ongoing oral contracts" to pay tithing "in order to obtain and maintain a temple recommend."[223]  Plaintiffs do not allege if at any of these interviews they specifically chose to begin to pay tithing or to continue to pay tithing on the basis of any particular representation.

Indeed, Plaintiffs' allegations about their personal involvement with the Church are marked by general descriptions of their lifelong adherence, rather than identification of specific instances in which they relied on a misrepresentation in choosing to enter a particular oral contract with the Church.  For example, the allegations about Gaddy discuss her lifelong devotion to the Church and continuing commitment, identifying no particular instance in which her decision to pay tithing was initially induced or even recommitted by way of a misrepresentation.[224]  The allegations concerning Small state he was a "full tithe payer since age eight."[225]  Plaintiffs allege Small "would not have paid tithing had he known tithes were used for commercial development," and further that he specifically heard the Hinckley statement, but does not allege any specific instance in which he chose or recommitted to paying tithing on the basis of any particular misrepresentation.[226]  Similarly, Plaintiffs allege Harris "was just a

---

[221] *Id.* ¶ 288.

[222] *Id.* ¶ 290.

[223] *Id.* ¶¶ 393–94.

[224] *Id.* ¶¶ 302–34.

[225] *Id.* ¶ 337.

[226] *See id.* ¶¶ 335–41.

teenager" at the time of the Hinckley statement, and that she "would not have paid tithing had she known tithes were used for commercial investment and development."[227]  In short, while Plaintiffs generally allege they would not have paid tithing had they known what tithing funds were used for, they do not allege with specificity that they entered any particular oral contract while relying on any particular misrepresentation concerning tithing.  And indeed, their allegations establish the opposite—Plaintiffs were lifelong, devoted members to the Church who paid tithing from a young age and until recently never wavered in their commitment.

In short, Plaintiffs' allegations much more closely resemble the insufficient allegations in *George*.  Alleging that they entered into non-specific oral contracts once a year on an ongoing basis in reliance on "the Church's" statements about tithing is not sufficiently particular to make out a claim for fraud in the inducement to enter into an oral contract.  As discussed, Plaintiffs must plead the who, what, when, where, and how of the alleged fraud.  Plaintiffs have not identified which Church leaders specifically induced them to enter "ongoing oral contracts," when these alleged ongoing contracts were made, and whether they entered into the contracts on the basis of specific misrepresentations.  Instead, as discussed, they allege they were lifelong, devoted members of the Church, and fail to allege any specific instance in which they committed to paying tithing on the basis of a misrepresentation.  Moreover, this failure to allege with the necessary specificity is not because the information is within the Church's control.  Quite the opposite— Plaintiffs have the best knowledge of their own experiences and whether there was ever a particular misrepresentation that caused them to enter a particular oral contract with the Church.

---

[227] *Id.* ¶¶ 342–45.

Because the circumstances of an alleged fraud must be pleaded with "enough specificity to put defendants on notice as to the nature of the claim,"[228] and Plaintiffs' Complaint fails to do so under the governing standard, the claim for fraud in the inducement to enter an oral contract must be dismissed.

### 2.   Second and Third Claims: Fraudulent Nondisclosure and Fraudulent Concealment

Plaintiffs reassert in the Second Amended Complaint a claim for fraudulent concealment,[229] and assert a new claim for "fraudulent nondisclosure."[230]  Plaintiffs maintain the difference between the two claims is that fraudulent nondisclosure does not require a showing of intent.[231] In its Motion to Dismiss, the Church correctly observes Plaintiffs' second and third claims are treated identically under Utah law.[232]  Indeed, "Utah . . . does not draw a distinction between the torts of fraudulent nondisclosure and fraudulent concealment."[233]  Accordingly, the court considers Plaintiffs' second and third claims together.

"To prevail on a claim for fraudulent nondisclosure, a plaintiff must prove by clear and convincing evidence that (1) the defendant had a legal *duty* to communicate information, (2) the defendant *knew* of the information he failed to disclose, and (3) the nondisclosed information

---

[228] *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (citing *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)).

[229] Dkt. 110 ¶¶ 424–50.

[230] *Id.* ¶¶ 399–423.

[231] *See* Dkt. 118 at 30.

[232] Dkt. 111 at 20–21.

[233] *Jensen v. Cannon*, 473 P.3d 637, 643 (Utah Ct. App. 2020).  The *Jensen* court notes that a few other jurisdictions recognize a separate tort of fraudulent concealment, but is clear that Utah courts do not recognize a separate tort.  *Id.* In their Opposition, Plaintiffs argue this analysis in *Jensen* is "confusing," and assert they can pursue separate fraudulent intent and fraudulent concealment claims.  Dkt. 118 at 30.  The court disagrees that *Jensen* is unclear on this point.

was *material*."[234]  The court concludes it cannot adjudicate the duty or materiality elements without running afoul of the church autonomy doctrine.

### a.  Plaintiffs' Allegations and the Church's Arguments in Favor of Dismissal

In their claim for fraudulent nondisclosure, Plaintiffs allege they "entered into a business transaction" with the Church by paying tithing,[235] which created a "confidential relationship that gave rise to [the Church's] duty to disclose material facts,"[236] but the Church failed to disclose material facts concerning tithing's use for commercial development projects.[237]

In its Motion to Dismiss, the Church argues Plaintiffs cannot satisfy the duty element given the court's prior Orders recognizing no fiduciary duty has been recognized by Utah courts, and moreover, there is no legal precedent supporting the proposition that a church has a duty to publicly disclose the use of its funds.[238]  The Church also argues Plaintiffs cannot plead the knowledge element because the Church publicly disclosed that "it invests a portion of its funds for future use,"[239] and finally, Plaintiffs cannot plead the materiality element because that would require an impermissible inquiry into "what information is 'material' to a member of the Church in deciding whether to donate tithing."[240]

---

[234] *Jensen*, 473 P.3d at 642 (internal citations and quotation omitted).

[235] Dkt. 110 ¶¶ 400–01.

[236] *Id.* ¶ 402.

[237] *Id.* ¶ 408.  Plaintiffs also allege the Church violated its duty by failing to disclose material facts concerning Joseph Smith.  *Id.* ¶¶ 404–16.  These claims have already been dismissed as being barred by the church autonomy doctrine.  *See supra* section 1(b) at 28–29.

[238] Dkt. 111 at 21.

[239] *Id.*  Defendants also discuss *Stone v. Salt Lake City*, arguing it supports the proposition that donated funds to a Church not being "disbursed immediately and directly" does not give rise to a cause of action by a donor.  *Id.* (citing *Stone*, 356 P.2d at 634).  Plaintiffs distinguish this case in opposition, noting the plaintiff in *Stone* sought to enjoin two real estate actions but had not brought any cause of action for fraud.  Dkt. 118 at 27.  Because this claim fails for other reasons, the court does not address whether *Stone* separately precludes the claim.

[240] Dkt. 111 at 22.

In opposition, Plaintiffs argue that the recent abrogation of *Franco v. The Church of Jesus Christ of Latter-Day Saints*, a 2001 case in which the Utah Supreme Court refused to recognize a fiduciary duty arising from ecclesiastical relationships,[241] "means that finding a fiduciary duty between the Brethren[242] and LDS members is not foreclosed."[243] In a paragraph that mostly focuses on Church officials' supposed duty to disclose facts about Joseph Smith, Plaintiffs identify additional factors supporting finding a fiduciary relationship:

> There are many factors which argue in favor of the Court finding a limited fiduciary duty in the relationship between the Brethren and Plaintiffs such that all material facts about the Church's founder, Joseph Smith, and how tithing is used should have been disclosed. Those factors are privity of contract, confidentiality, imbalance in knowledge, age, influence, bargaining power, etc., factors listed in *Yazd v. Woodside Homes Corp.*,[244] and an invitation to trust the Brethren[.] Combined, a limited fiduciary duty to disclose Smiths' legal history should be found.[245]

Plaintiffs then continue to argue, assuming a duty is found, that the Church should be subject to "commercial development requirements which Utah has found in real estate and other transactions."[246] Plaintiffs conclude by arguing that a Sixth Circuit decision from 1924, *Hansel v. Purnell*,[247] should be considered "persuasive with regard to [the Church's] management style of hiring lawyers and business men, and those trained in organizational behavior, lack of professionally trained clergy . . . lack of an internal dispute system (with the exception of local

---

[241] 21 P.3d at 205–06; *see also* Dkt. 33 at 18–20 (discussing *Franco*).

[242] In this context, "Brethren" refers to the Church's leadership.

[243] Dkt. 33 at 28.

[244] 143 P.3d 283, 286–87 (Utah 2006). Those factors appear to be: "[a]ge, knowledge, influence, bargaining power, sophistication, and cognitive ability. . . or where a 'special relationship' exists." *Id.* Notably, *Yazd* arises in the context of homebuyers bringing an action about a vendor, it does not analyze the potential existence of a legal duty between a church and its members. *See id.* at 285.

[245] Dkt. 118 at 28 (internal citations omitted).

[246] *Id.* at 29.

[247] 1 F.2d 266, 270 (6th Cir. 1924).

disciplinary councils) and greed (net worth of $400 billion) while donating just 1.3 billion from 1985-2010."[248]

In reply, the Church argues Plaintiffs have offered no case law to support the argument that a church has a duty to publicly disclose the use of its funds, and Plaintiffs only make the unsupported claim that "Utah requires disclosure of all material facts in order to make representations not misleading."[249]

### b. Analysis

The court agrees with the Church that Plaintiffs fail to state a claim for fraudulent nondisclosure on the tithing theory because Plaintiffs cannot show that a legal duty exists between the Church and its members requiring disclosure of material financial information.[250] The court has already determined that under Utah law there is no legally cognizable general fiduciary duty between a church and its members.[251] And despite Plaintiffs' invitation for the court to reconsider this holding in light of the abrogation of *Franco*,[252] the court does not find that *Franco*'s abrogation changes the analysis of the duty element.

In *Williams v. Kingdom Hall of Jehovah's Witnesses*,[253] the Utah Supreme Court abrogated the *Franco* decision in response to the United States Supreme Court's decision in

---

[248] Dkt. 118 at 29–30.

[249] Dkt. 121 at 9 (citing Dkt. 118 at 27).

[250] Because Plaintiffs fail to allege the duty element, the court declines to reach the question of whether Plaintiffs have pleaded facts supporting the knowledge or materiality elements.

[251] Dkt. 33 at 18–20.  In support of the duty element of their nondisclosure claims, Plaintiffs argue only for a "limited fiduciary duty" requiring disclosure of material financial information. Dkt. 118 at 28.  Because in their briefing Plaintiffs identify no other duty under Utah law requiring this disclosure, the court limits its discuss here to Plaintiffs' reliance on the existence of a fiduciary duty.

[252] Plaintiffs provide no argument or analysis for why the abrogation of *Franco* supports revisiting the court's holding on the duty element.  *See* Dkt. 118 at 28.

[253] 491 P.3d 852 (Utah 2021).

*American Legion v. American Humanist Association*,[254] which in turn departed from the *Lemon v. Kurtzman*[255] Establishment Clause test.[256] The *Williams* court explained, following *American Legion*, that courts should not use the *Lemon* test when analyzing Establishment Clause cases, but rather, "focus on the particular issue at hand and look to history for guidance,"[257] or as Justice Kavanaugh said in concurrence, "identify an overarching set of principles" "based on history, tradition, and precedent."[258] Because *Franco* relied on *Lemon*'s excessive entanglement analysis, the case was abrogated by *Williams*.[259] The *Williams* court remanded the case for the district court to consider "history, tradition, and precedent to identify core Establishment Clause principles" to apply to the case.[260] The *Williams* court also noted that "the conclusion reached by the district court . . . may ultimately prove to be the correct one," but the conclusion simply had to be reconsidered in light of the abandonment of the *Lemon* test.[261]

In the First Order, this court did not rely on the *Lemon* test in setting out overarching First Amendment principles; rather, it relied on the church autonomy doctrine—a doctrine that is rooted in history, tradition, and case precedent dating back to 1871.[262] In considering Gaddy's claim for a breach of fiduciary duty, the court noted the central issue with Gaddy's theory was that she cited no authority establishing that a legally cognizable fiduciary duty arises from purely

---

[254] 139 S. Ct. 2067 (2019).

[255] 403 U.S. 602 (1971).  The Establishment Clause test consisted of three steps to evaluate challenged governmental action under the Establishment clause: "first, the action must have a secular purpose, second, its principal or primary effect must be one that neither advances nor inhibits religion, and third, it must not foster an excessive government entanglement with religion."  *Williams*, 491 P.3d at 856 (citing *Lemon*, 403 U.S. at 612–13).

[256] 139 S. Ct. 2067 (2019).

[257] *Williams*, 491 P.3d at 857 (citing *American Legion*, 139 S. Ct. at 2087).

[258] *Id.* (citing *American Legion*, 139 S. Ct. at 2093 (Kavanaugh, J., concurring)).

[259] *See Franco*, 21 P.3d at 203.

[260] *Williams*, 491 P.3d at 859.

[261] *Id.*

[262] *See* Dkt. 33 at 9–10 (summarizing church autonomy doctrine history).

ecclesiastical relationships.[263]  The court then cited *Franco*, not for its analysis under the *Lemon* test but for the proposition that the Utah Supreme Court had declined to recognize a fiduciary duty arising from ecclesiastical relationships:

> Defining such a duty would necessarily require a court to express the standard of care to be followed by other reasonable clerics in the performance of their ecclesiastic counseling duties, which, by its very nature, would embroil the courts in establishing the training, skill, and standards applicable for members of the clergy in this state in a diversity of religions professing widely varying beliefs.  This is as impossible as it is unconstitutional.[264]

Once again, Plaintiffs cite no case law—in any jurisdiction—establishing or even suggesting that a legally cognizable fiduciary duty arises or could arise from ecclesiastical relationships.[265]  Nor do Plaintiffs cite case law for the specific proposition that a church has a separate duty to publicly disclose the use of its funds.  The fact that *Franco* was abrogated insofar as it applied the *Lemon* test does not suggest the Utah Supreme Court would now reach a contrary conclusion on these legal questions.

In short, because this court did not rely on the *Lemon* test in its prior Orders, and because the court is not convinced—and Plaintiffs have not cited any case law to the contrary—that the Utah Supreme Court would find the existence of a fiduciary duty arising in ecclesiastical relationships given the abrogation of *Franco*, the court declines to revisit its prior Orders.  Because Plaintiffs have failed to establish the Church owes them a legal duty in this context, the second and third claims for relief are dismissed.

---

[263] *Id.* at 19.  The court noted that Gaddy cited *Yazd* but did not find the case instructive because it arose in a commercial context.  *Id.* at 19 n.105.  Plaintiffs again argue the *Yazd* factors favor finding a limited fiduciary duty between Church leaders and Plaintiffs.  Dkt. 118 at 28.  Yet Plaintiffs provide no legal basis for applying the *Yazd* factors in the ecclesiastical context.  *See id.*  For this reason, the court sees no reason to revisit its former ruling and dismisses this argument as unpersuasive.

[264] *Id.* at 19 (citing *Franco*, 21 P.3d at 206).

[265] Plaintiffs' citation to *Hansel* is unavailing.  That case does not provide any support for finding the existence of a fiduciary duty between a Church and its members.  *See* 1 F.2d 266, 271–72 (6th Cir. 1924) (upholding district court decree against religious leader who molested young women).

### 3.  Claim 4: Constructive Fraud Based on a Breach of Promises of Future Performance

Next, Plaintiffs bring a cause of action for "Constructive Fraud Based on a breach of promises of future performance," alleging, among other things, the Church "breached its promise never to lead Plaintiffs astray with respect to its representations" and it provided "less than full and fair disclosure" about its actions concerning Plaintiffs' tithing money.[266]

In its Motion to Dismiss, the Church argues "constructive fraud based on a breach of promises of future performance" is not a cause of action recognized under Utah law, and the allegations raised within this cause of action are duplicative of other claims.[267]  In its Opposition, Plaintiffs assert that the Utah Model Jury Instructions show "constructive fraud" is a separate cause of action, citing Instruction CV 1805.[268]  Plaintiffs also cite two Utah Supreme Court cases analyzing "promises and statements of future performance" in the context of general fraud claims to argue this cause of action exists.[269]  In reply, the Church points out that Instruction CV 1805 is "an instruction for one element of a general fraud claim."[270]

The court is unaware of any case law supporting the proposition that "constructive fraud based on a breach of promises of future performance" is an independent, recognized cause of action in Utah.  Indeed, Instruction CV 1805 is provided in Chapter 1800 of the Utah Model Jury Instructions, which catalogues the model instructions related to general fraud claims.[271]  Instruction CV 1805, "Promises and Statements of Future Performance," is merely illustrative of

---

[266] Dkt. 110 ¶ 457.

[267] Dkt. 111 at 23.

[268] Dkt. 118 at 31 (citing Utah Model Civil Jury Instructions CV 1805: Promises and Statements of Future Performance).

[269] *Id.* at 31 (citing *Hull v. Flinders*, 27 P.2d 56, 57 (Utah 1933); *Cerritos Trucking Co. v. Utah Ventures No. 1*, 645 P.2d 608, 610–11 (Utah 1982) (contract)).

[270] Dkt. 121 at 10.

[271] *See* Utah Model Jury Instruction CV 1801 (explaining the jury instructions following 1801, "Elements of fraud," provide "more information" about the basic elements of fraud enumerated in CV 1801).

one way a plaintiff can show falsity in a general fraud claim.[272]  Moreover, the cases Plaintiffs cite

describe breach of a promise of future performance in the context of general fraud claims.[273]

Neither case supports the proposition that "constructive fraud based on a breach of promises of

future performance" is a recognized cause of action in Utah.

Because "constructive fraud based on a breach of promises of future performance" does not

appear to be a recognized cause of action in Utah, and Plaintiffs provide no support for the

proposition it can stand alone as a cause of action, the court dismisses this claim.

### 4.  Claim 5: Violation of Utah Charitable Solicitations Act

Next, Plaintiffs bring a cause of action for "violation of the Utah Charitable Solicitations

Act" (UCSA), alleging the Church solicited tithing by saying it was required from members for

full temple access to keep families together in the afterlife, while omitting that tithing was used

for commercial projects.[274]  In its Motion to Dismiss, the Church argues the UCSA does not

create a private cause of action, but rather leaves enforcement to the Utah Attorney General's

Office and the Division of Consumer Protection.[275]  In opposition, Plaintiffs apparently concede

the Church is right, providing only two sentences in response to the Church's UCSA argument:

> Concededly, U.C.A. § 13-22-4 is vague.  Assuming arguendo that [the Church] is
> correct, the statute at least demonstrates an intent by the State of Utah that churches
> are not exempt from a fair disclosure in the context of their solicitations, with
> damages which exceed those limited by the statute.[276]

The court construes Plaintiffs' Opposition to have conceded this claim.  But even if Plaintiffs

did not concede the claim, the court agrees with the Church that the UCSA does not

---

[272] *See* Utah Model Jury Instruction CV 1805; *see also id.* CV 1802–06 (instructions for different ways to prove the falsity element of fraud).

[273] *Hull*, 27 P.2d at 57; *Cerritos Trucking Co.*, 645 P.2d at 610–11.

[274] Dkt. 110 ¶ 467, 470.

[275] Dkt. 111 at 23 (citing Utah Code §§ 13-2[2]-3, 4).

[276] Dkt. 118 at 31–32.

create a private cause of action.[277]  In *Siebach v. Brigham Young University*, the Utah Court of
Appeals, addressing a preemption argument, held the UCSA does not *prevent* a donor to a
charitable organization from bringing a cause of action for fraud arising from the donation.[278]
However, nothing in the case, which analyzes the UCSA in some detail, suggests the UCSA
creates a separate, private cause of action.  Rather, the legal issue addressed was whether the
UCSA could prevent a plaintiff from maintaining his own separate cause of action for fraud.[279]

Because the UCSA does not appear create a private cause of action, and because effectively
Plaintiffs concede this point in their Opposition, the court dismisses Plaintiffs' claim for violation
of the UCSA.

### 5. Claim 6: Civil RICO

Finally, Plaintiffs reassert their civil RICO claim, this time incorporating the broader tithing-
based allegations described above in with a repleaded version of the sole surviving claim from the
Amended Complaint—that the Church "engaged in a scheme or schemes to defraud [Plaintiffs] by
concealing the fact that tithing was used for commercial purposes."[280]  Plaintiffs allege the Church
engaged in a "pattern of racketeering activity," including mail and wire fraud, in perpetuating the
alleged fraud.[281]  Plaintiffs further allege they suffered damages in reliance on the Church's
affirmative misrepresentations that "no tithing was used for City Creek Mall, its omissions about
commercial use of a substantial portion of tithing to bailout Beneficial Life

---

[277] UTAH CODE ANN. § 13-22-3(2)(b) ("[T]he director may bring an action in the appropriate district court of this
state[.]").

[278] 361 P.3d 130, 139–40 (Utah Ct. App. 2015).

[279] *See id.*

[280] Dkt. 110 ¶ 484.

[281] *Id.* ¶ 517.

Insurance and for the investment in, purchase and development of numerous commercial entities throughout the United States and the world."[282]

The court agrees with the Church that Plaintiffs have failed to plead a cognizable civil RICO claim.[283]  "The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity."[284]  "Racketeering activity is defined . . . as any 'act which is indictable' under federal law and specifically includes mail fraud, wire fraud and racketeering."[285]  These underlying acts are referred to as "predicate acts."[286]

In its Motion to Dismiss, the Church argues that to successfully plead a civil RICO claim, a plaintiff must sufficiently plead underlying claims (called "predicate acts"), and because all of Plaintiffs' underlying fraud-based claims fail, the civil RICO claim also fails.[287]  Additionally, the Church argues that even if Plaintiffs adequately alleged an underlying predicate act, they have failed to allege a "pattern of racketeering activity," a necessary element of a civil RICO claim.[288]  Finally, the Church maintains Plaintiffs have not identified any indictable conduct, which is also a necessary prerequisite for a civil RICO claim.[289]

---

[282] *Id.* ¶ 532.

[283] The Church's earlier Motion to Dismiss the Amended Complaint raised no arguments concerning the merits of the Amended Complaint's civil RICO claim, because the Motion focused entirely on the church autonomy doctrine issue.  *See* Dkt. 38.  Because the court concluded the tithing claims in the Amended Complaint concerned a secular issue, and in the absence of any additional argument about the civil RICO claim, the claim survived.  In its Motion to Dismiss the Second Amended Complaint, the Church supplies extensive arguments on why the civil RICO claim fails on the merits.  Faced with a different pleading and different arguments in a Motion to Dismiss, the court reaches a different conclusion.

[284] *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (citing 18 U.S.C. § 1962(a), (b), & (c)).

[285] *Id.* (citing 18 U.S.C. § 1961(c)(1)(B)).

[286] *Id.*

[287] Dkt. 111 at 24.

[288] *Id.*

[289] *Id.* at 25.

In opposition, Plaintiffs first outline changes they will propose in a "Motion to Supplement,"[290] including identifying more misrepresentations on the part of the Church.[291] Next, Plaintiffs argue[292]—again[293]—that material omissions can support mail and wire fraud allegations as predicate acts to the civil RICO claim, "in addition to the affirmative misrepresentations of fraud re[:] City Creek."[294]  Finally, Plaintiffs argue the question whether the phrase "earnings on invested reserve funds" was misleading is a fact question for a jury.[295]

Plaintiffs, in alleging the Church engaged in mail fraud and wire fraud, broadly incorporate all preceding allegations in the Second Amended Complaint.[296]  The elements necessary to allege mail or wire fraud, as explained by the Tenth Circuit, are:

> To establish the predicate act of mail fraud, [Plaintiffs] must allege (1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme.  The elements of wire fraud are very similar, but require that the defendant use interstate wire, radio or television communications in furtherance of the scheme to defraud.  The common thread among these crimes is the concept of "fraud."  Actionable fraud consists of (1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury.  Failure to adequately allege any one of the nine elements is fatal to the fraud claim.[297]

---

[290] As discussed above, Plaintiffs later filed a Motion for Leave to File Third Amended Complaint, which contains many of the changes discussed.  *See* Dkt. 122.

[291] Dkt. 118 at 32.

[292] *Id.* at 33.

[293] *See* Dkt. 47 at 21–22, 25–26.

[294] Dkt. 118 at 35.

[295] *Id.* at 36.

[296] Dkt. 118 at 32.  This incorporates 480 paragraphs of allegations.

[297] *Tal*, 453 F.3d at 1263 (internal citations and quotations omitted).

A "pattern of racketeering activity" must include at least two predicate acts.[298]  And where the alleged predicate acts sound in fraud, a plaintiff must plausibly allege each predicate act with the particularity required by Rule 9(b).[299]  Moreover, "while two acts are necessary, they may not be sufficient to establish a pattern."[300]  Namely, the pattern element requires a plaintiff to show a relationship between the predicate acts as well as "the threat of continuing activity."[301]

In evaluating whether a Plaintiff has adequately pleaded a pattern of predicate acts, the Tenth Circuit cautions courts to be mindful of Rule 9(b)'s purpose of "afford[ing] a defendant fair notice of a plaintiff's claims and the factual grounds supporting those claims."[302]  Courts may also consider whether pleading deficiencies "resulted from the plaintiff's inability to obtain information in the defendant's exclusive control."[303]

Plaintiffs have failed to allege with the necessary specificity a pattern of predicate acts supporting the civil RICO claim.  Plaintiffs allege that the Church "engaged in a scheme or schemes to defraud [Plaintiffs] by concealing the fact that tithing was used for commercial purposes."[304]  But Plaintiffs fail to allege even a single actionable instance of fraud, let alone two, because they do not allege any specific instances in which Plaintiffs relied on the Church's representations concerning tithing.  In their Opposition, Plaintiffs identify specific allegations in the Second Amended Complaint concerning false statements about tithing:[305]

---

[298] *See* 18 U.S.C. § 1961(5); *see also, e.g.*, *Deck v. Engineered Laminates,* 349 F.3d 1253, 1257 (10th Cir. 2003).

[299] *See, e.g.*, *Sullivan v. Univ. of Kan. Hosp. Auth.*, 844 F. App'x 43, 50 (10th Cir. 2021).

[300] *George*, 833 F.3d at 1254 (internal citations and quotations omitted).

[301] *Id.* (internal citations and quotations omitted).

[302] *Id.* (internal citations and quotations omitted).

[303] *Id.* (internal citations and quotations omitted).

[304] Dkt. 110 ¶ 484.

[305] *See* Dkt. 118 at 32.

- The President Hinckley statement that tithing funds were not being used for the construction of City Creek Mall,[306]

- Two statements, printed in *Ensign Magazine* and the *Deseret News*, respectively, stating that no tithing funds were used for the development of the mall,[307]

- A statement made by Keith McMullin, "then a member of the Corporation of the President Bishropic" to Caroline Winter, a Bloomberg Businessweek writer, that "not one penny of tithing goes to the Church's for-profit endeavors."[308]

Plaintiffs also identify the above allegations along with the following as examples of "misleading omissions" concerning tithing:[309]

- Ensign Peak Advisors being funded with tithing,[310]

- The bailout of Beneficial Life Insurance using "$600 million of tithing (at least interest if not principal),[311] and

- The creation of 13 companies "to deceive [the Church's] members and others about the amount of tithing it had accumulated and how LDS tithing is used."[312]

Plaintiffs argue, in conclusory manner, that these acts and omissions are "sufficient to be part of a RICO scheme."[313]

---

[306] Dkt. 110 ¶ 236.

[307] *Id.* ¶ 244.

[308] *Id.* ¶ 258.

[309] Dkt. 118 at 34.

[310] Dkt. 110-5 (Exhibit Declaration of David A. Nielsen).

[311] Dkt. 110 ¶ 116; Dkt. 110-5 ¶¶ 9–10.

[312] Dkt. 110 ¶ 266.

[313] Dkt. 118 at 34.

Even assuming Plaintiffs have alleged with sufficient specificity false, material misrepresentations that the Church intended to be acted upon,[314] Plaintiffs fail to allege any single predicate act of mail or wire fraud because they fail to allege that they acted in reliance on any particular false statement in choosing to donate tithing. As discussed above,[315] Plaintiffs fail to identify any instance in which they relied on a particular misrepresentation in choosing to pay tithing. Instead, the Second Amended Complaint states each Plaintiff was a lifelong member of the Church who paid tithing from a young age and further states, in conclusory manner, they would not have paid tithing had they known the truth about Church history and tithing practices.[316] These generalized allegations do not satisfy the heightened pleading standard imposed under Rule 9(b).

Because Plaintiffs fail to allege even a single predicate act of mail or wire fraud, the court agrees with the Church that Plaintiffs have failed to allege a "pattern" of predicate acts sufficient to plead a cognizable civil RICO claim. Accordingly, the claim fails and must be dismissed.

### 6. Conclusion

Each of Plaintiffs' seven claims are dismissed to the extent they are based on theories of the Church perpetuating a fraud based on teachings and representations about the First Vision, Book of Mormon Translation, Book of Abraham, locations of events in the Book of Mormon, Church history, locations in the book of Mormon, or Joseph Smith's personal history. These

---

[314] The court notes it is skeptical that any of these examples, save perhaps the President Hinckley statement, allege intent in a way that could satisfy the pleading standard under Rule 9(b). For example, Plaintiffs allege that misrepresentations about tithing appeared in "Defendant's publications," quoting a statement printed in *Ensign Magazine* that "[n]o tithing funds will be used" in the City Creek Mall project and a similar statement printed in the "[Church]-owned" *Deseret News*. *See* Dkt. 110 ¶ 244. However, nowhere in the Complaint do Plaintiffs allege that the Church controls the content of these publications, or that it had the specific intent to mislead members by placing specific statements in these publications. As such, it is unclear whether many of Plaintiffs' examples of alleged misrepresentations from the Second Amended Complaint would meet the intent element of fraud and therefore could be considered predicate acts of mail or wire fraud.

[315] *See supra* section 1(b).

[316] *See* Dkt. 110 ¶¶ 302–45 (allegations concerning each Plaintiffs' lifelong involvement in the Church).

claims all fail for the reasons previously articulated in the First Order and Second Order. Plaintiffs' six claims resting on the allegations concerning tithing (all but the Intentional Infliction of Emotional Distress claim) are dismissed for the specific reasons given above. Accordingly, all of Plaintiffs' claims are dismissed in their entirety.

## II.     Motion for Leave to File Third Amended Complaint

Immediately after the Motion to Dismiss the Second Amended Complaint was briefed, but before the court could issue a decision, Plaintiffs filed a Motion for Leave to Amend, attaching a proposed Third Amended Complaint as an exhibit.  The Motion identifies the following proposed changes: (1) the basis of allegations made upon information and belief are added, (2) the fourth cause of action is reworded as a claim for constructive fraud, (3) an affirmative misrepresentation from a 2012 tithing form is added, (4) new factual allegations are added supporting the claim Church brethren and general authorities "do not believe what they teach," (5) new allegations are added comparing the percent of annual tithing used for investment funds with the percent of tithing used for humanitarian aid.[317]

Leave to amend should be "freely [given] where justice so requires,"[318] but justice does not require granting leave where amendment would be "futile."[319]  The court concludes the Third Amended Complaint would be subject to dismissal and therefore the proposed amendment is futile. [320]

The primary failing of the Second Amended Complaint—which was also the primary failing of the original Complaint and Amended Complaint—is that the majority of Plaintiffs'

---

[317] Dkt. 122 at 3–9.

[318] Fed. R. Civ. P. 15(a)(2).

[319] *Prisbry*, 2018 WL 1508559, at *3.

[320] *See Jefferson Cnty.*, 175 F.3d at 85.

fraud-based claims would require the court, in adjudicating the falsity element, to enter impermissible First Amendment territory.  As to the allegations based on tithing payments, the Second Amended Complaint's fraudulent inducement and civil RICO claims failed to allege with the necessary specificity the actions the Plaintiffs took in reliance on alleged Church statements. The fraudulent nondisclosure claim failed to plead a legally cognizable duty, and the fraudulent concealment claim failed for being duplicative of the fraudulent nondisclosure claim.  The "constructive fraud based on a breach of promises of future performance" claim failed for not being a recognized cause of action under Utah law.  And the UCSA claim failed for not providing a private right of action.

None of Plaintiffs' identified changes rectify the fatal flaws of prior complaints.  The first set of identified changes add additional factual allegations to the complaint: a further basis for allegations made on information and belief, new allegations concerning affirmative misrepresentations on the 2012 tithing form, additional factual allegations that Church authorities do not believe what they teach, and allegations comparing the percent of annual tithing used for investments with the percent used for humanitarian aid.  These additional allegations do not address the failures identified above—the failure to allege any specific instances in which Plaintiffs relied on a misrepresentation and took some kind of action or entered an oral contract on that basis.

Second, repleading "constructive fraud based on a breach of promises of future performance" as constructive fraud would also be futile.  Because constructive fraud is a recognized standalone cause of action in Utah, [321] unlike "constructive fraud based on a breach of promise of future performance," the court will briefly address why this proposed new cause of

---

[321] *See Jensen v. IHC Hospitals, Inc.*, 944 P.2d 237, 339 (Utah 1997).

action would be subject to dismissal.  Constructive fraud requires two elements: "(i) a confidential relationship between the parties; and (ii) a failure to disclose material facts."[322]  As to the first element, Plaintiffs allege a confidential relationship arose between the Church and its members based on the Church's repeated "promise[s] to never lead them astray."[323]  Plaintiffs include a table with several examples of Church leaders making this promise, nearly all in the context of religious proceedings such as the Church's annual general conference.  The promise, as Plaintiffs plead it, was typically made as follows: "Brethren, keep your eye on the President of this Church . . . the Lord will never let his mouthpiece lead this people astray."[324]  As to tithing, Plaintiffs allege the Church "breached that promise to never lead Plaintiffs astray with regard to its representations and less than full and fair disclosure of material facts about what it had done, was doing, and/or intended to do with respect to Plaintiffs' tithing."[325]

The first element, as pleaded, would be subject to dismissal for running afoul of the church autonomy doctrine.[326]  To show a confidential relationship, a plaintiff must indicate "the circumstances are such that the defendant could exercise extraordinary influence over the plaintiff and the defendant was or should have been aware the plaintiff reposed trust and confidence in the defendant and reasonably relied on defendant's guidance."[327]  Thus, the court would have to determine that the Church "could exercise extraordinary influence" over its members, or that it should have been aware its members "reposed trust and confidence" in it, on

---

[322] *Id.*

[323] Dkt. 122-1 (Proposed Third Amended Complaint) ¶ 452.

[324] *Id.* ¶ 144.

[325] *Id.* ¶ 458.

[326] Because the first element fails, the court does not address whether the materiality element could be adjudicated without offending the church autonomy doctrine bar.

[327] *Blodgett v. Marsh*, 590 P.2d 298, 302 (Utah 1978).

the basis of its statements to members that "the Lord will never lead its mouthpiece astray."[328]
For the court to make that determination, it would necessarily have to consider matters of "church government as well as those of faith and doctrine," an inquiry forbidden by the Religion Clauses.[329]  Similarly, to determine whether Plaintiffs "reasonably relied on defendant's guidance," it would have to determine whether a reasonable person would rely on the statement "the Lord will never lead its mouthpiece astray," an inquiry that is also forbidden by the church autonomy doctrine because the court would have to consider the reasonableness of internal statements of religious doctrine.[330]

In short, none of the proposed changes in the Third Amended Complaint address the fatal flaws the court identified not just in the Second Amended Complaint, but in the original Compliant and Amended Complaint.[331]  The Third Amended Complaint would be subject to dismissal as well and on the same bases.  Therefore, the court concludes amendment would be futile.

Moreover, in considering any motion to amend, the court must consider the balance between ensuring plaintiffs enjoy ample opportunity to plead their case and preventing prejudice to defendants who have to defend against multiple pleadings.  If the court granted leave to amend in this case, that balance would decidedly tip and cause prejudice to the Church—if it has not done so already.  Plaintiffs have had three opportunities to amend their complaint.  Even when one claim survived Defendants' Second Motion to Dismiss, rather than proceed to discovery, Plaintiffs elected to replead several claims, and theories underlying those claims, that the court

---

[328] Dkt. 122-1 ¶ 144.

[329] *Bryce*, 289 F.3d at 655.

[330] *See id.*

[331] *See* Dkt. 33; Dkt. 100.

had previously rejected.  In fact, Plaintiffs significantly expanded those claims, turning a sixty-five-page Amended Complaint into a two-hundred-page Second Amended Complaint.  The Second Amended Complaint contained hundreds of paragraphs of allegations once again asking the court to adjudicate the truth or falsity of the Church's core beliefs—an inquiry the court twice before explained it could not undertake.  Moreover, Plaintiffs failed to replead the tithing theory, the basis for the sole claim that survived the Second Motion to Dismiss, with the specificity required by Rule 9(b).  The Third Amended Complaint, as discussed above, does not address these fatal flaws.  Allowing further amendment at this stage would be futile and cause significant prejudice to the Church.

Accordingly, the Motion for Leave to Amend is denied, and dismissal of the Second Amended Complaint is with prejudice.[332]

## CONCLUSION

For the reasons stated above, the Church's Motion to Dismiss Plaintiffs' Second Amended Complaint is GRANTED.  Plaintiffs' Motion for Leave to File the Third Amended Complaint and Request for Oral Argument are DENIED.  The Second Amended Complaint is DISMISSED WITH PREJUDICE.  The Clerk of Court is directed to close the case.

SO ORDERED this 28th day of March, 2023.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[332] "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (citation omitted).

**XII Attachment Two – 134 Judgment**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| LAURA A. GADDY, LYLE D. SMALL, and LEANNE R. HARRIS, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, and DOES 1-50,<br><br>    Defendant. | **JUDGMENT IN A CIVIL CASE**<br><br>Case No. 2:19-cv-00554-RJS-DBP<br><br>Chief District Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

It is ORDERED AND ADJUDGED that judgment is hereby entered in favor of Defendants.

SO ORDERED this 28th day of March, 2023.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge