# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

| | |
|---|---|
| LAURA A. GADDY, LYLE D. SMALL, and LEANNE R. HARRIS, individually, and on behalf of all others similarly situated,<br><br>Appellants,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole,<br><br>Appellee. | Case No. 23-4110 |

## APPELLEE'S RESPONSE BRIEF

On appeal from the United States District Court, District of Utah, Judge Robert J. Shelby, Case No. 2:19-CV-00554

David J. Jordan
djordan@foley.com
Wesley F. Harward
wharward@foley.com

FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT  84111
Tel:  (801) 401-8900
Fax:  (385) 799-7576

**Counsel for Appellee/Respondent**

Oral argument is requested

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................. i

TABLE OF AUTHORITIES .................................................................................... iii

PRIOR OR RELATED APPEALS.......................................................................... vi

INTRODUCTION ......................................................................................................1

STATEMENT OF THE ISSUES...............................................................................3

STATEMENT OF THE CASE...................................................................................4

   I.    SUMMARY OF RELEVANT ALLEGATIONS IN THE SECOND AMENDED COMPLAINT. .........................................................................................4

      A.   The Church's Teachings About Joseph Smith's First Vision, the Book of Mormon, and the Book of Abraham. ..................................................4

      B.   Ms. Gaddy's Allegations Regarding Tithing. ...........................................6

   II.   PROCEDURAL HISTORY.................................................................................8

      A.   Ms. Gaddy's Original Complaint.................................................................8

      B.   Ms. Gaddy's Amended Complaint. ..............................................................8

      C.   Ms. Gaddy's Second Amended Complaint...................................................9

SUMMARY OF THE ARGUMENT ........................................................................10

ARGUMENT .............................................................................................................13

   I.    THE DISTRICT COURT PROPERLY DISMISSED THE RICO CLAIM BECAUSE IT WAS BASED ON THE CHURCH'S RELIGIOUS TEACHINGS. ........................13

      A.   The Church Autonomy Doctrine Bars Gaddy's RICO Claim. ...................15

      B.   Fraud Claims Based on "Purely Secular" Statements are Justiciable. But Fraud Claims Based on Religious Beliefs Fall Squarely Within the Church Autonomy Doctrine.........................................................................18

      C.   Ms. Gaddy's "Facts vs. Beliefs" Argument is Contrary to Binding Law and Ultimately Unworkable................................................................21

      D.   The "Sincerity" Allegations Do Not Save Ms. Gaddy's Claim................24

         1.   Ms. Gaddy must prove actual falsity—not insincerity. .............................24

         2.   Ms. Gaddy's "sincerity" theory is circular and is prohibited by the First Amendment. ............................................................................................26

   II.   THE DISTRICT COURT PROPERLY DISMISSED THE RICO CLAIM TO THE EXTENT IT WAS BASED ON ALLEGATIONS ABOUT THE CHURCH'S USE OF TITHING FUNDS. ..................................................................................29

      A.   Ms. Gaddy's Claim Fails to Meet the Rule 9(b) Standard.........................29

         1.   Ms. Gaddy failed to plead the required elements of her RICO claim.......31

         2.   Ms. Gaddy's argument that they need not plead reliance is also incorrect...............35

B.      Ms. Gaddy's Tithing Theory Is Also Barred by the First Amendment. ....................41

CONCLUSION ...................................................................................................................45

ORAL ARGUMENT STATEMENT ...................................................................................45

CERTIFICATE OF COMPLIANCE ...................................................................................47

# TABLE OF AUTHORITIES

Page(s)

Cases

553 U.S. 639 (2008) ................................................................................. 37, 38, 39, 40

*Anderson v. Worldwide Church of God* 661 F. Supp. 1400 (D. Minn. 1987) ............................. 19

*Bacchus Indus., Inc. v. Arvin Indus., Inc.* 939 F.2d 887 (10th Cir. 1991) .................................... 13

*BancOklahoma Mortg. Corp. v. Cap. Title Co.* 194 F.3d 1089 (10th Cir. 1999) ........................ 13

*Baskerville v. Fed. Land Bank* 25 F.3d 1055 (10th Cir. 1994) ...................................................... 32

*Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington D.C. v. Beards* 680 A.2d 419 (D.C. App. 1996) ................................................................................................ 45

*Bryce v. Episcopal Church in the Diocese of Colo.* 289 F.3d 648 (10th Cir. 2002) ... 17, 18, 29, 42

*Christofferson v. Church of Scientology of Portland* 644 P.2d 577 (Or. Ct. App. 1982) ............. 23

*Colo. Christian Univ. v. Weaver* 534 F.3d 1245 (10th Cir. 2008) ................................................ 16

*Daigle v. Shell Oil Co.* 972 F.2d 1527 (10th Cir. 1992) ............................................................... 36

*Fratello v. Archdiocese of N.Y.* 863 F.3d 190 (2d Cir. 2017) ....................................................... 16

*Hancock v. True Living Church of Jesus Christ of Saints of Last Days* 118 P.3d 297 (Utah Ct. App. 2005) ............................................................................................................................... 19

*Harris v. Matthews* 643 S.E.2d 566 (N.C. 2007) ......................................................................... 44

*Heritage Vill. Church & Missionary Fellowship, Inc. v. State* 263 S.E.2d 726(N.C. 1980) ........ 45

*In re Bible Speaks* 869 F.2d 628 (1st Cir. 1989) .......................................................................... 19

*Int'l Soc'y for Krishna Consciousness, Inc. v. Barber* 650 F.2d 430 (2d Cir. 1981) .................. 26

*Jacobsen v. Deseret Book Co.* 287 F.3d 936 (10th Cir. 2002) ....................................................... 7

*Jordan v. Bowen* 808 F.2d 733 (10th Cir. 1987) ........................................................................... 1

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.* 344 U.S. 94 (1952) ................................................................................................................................... 15

*Koch v. Koch Indus., Inc.* 203 F.3d 1202 (10th Cir. 2000) .................................................... 30, 31

*Liverman v. Comm. on the Judiciary, U.S. House of Representatives* 51 F. App'x 825 (10th Cir. 2002) ............................................................................................................... 36

*Lyons v. Jefferson Bank & Trust* 994 F.2d 716 (10th Cir. 1993) .................................................... 37

*McDonald v. Kinder-Morgan, Inc.* 287 F.3d 992 (10th Cir. 2002) ............................................. 36

*Mosier v. Maynard* 937 F.2d 1521 (10th Cir. 1991) ............................................................. 28, 29

*NLRB v. Cath. Bishop of Chi.* 440 U.S. 490 (1979) ............................................................. 17

*Our Lady of Guadalupe Sch. v. Morrissey-Berru* 140 S. Ct. 2049 (2020) .................................. 15

*Petrini v. Howard* 918 F.2d 1482 (10th Cir. 1990) ............................................................. 36

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church* 393 U.S. 440 (1969) ............................................................................................................. 16, 42

*Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich* 426 U.S. 696 (1976) ....... 17, 41

*Stone v. Salt Lake City* 356 P.2d 631 (Utah 1960) .............................................................. 35, 42

*Sullivan v. Univ. of Kan. Hosp. Auth.* 844 F. App'x 43 (10th Cir. 2003) ................................... 30

*Tal v. Hogan* 453 F.3d 1244 (10th Cir. 2006) ............................................................. 13, 30, 39

*Thomas v. Rev. Bd.* 450 U.S. 707 (1981) .............................................................................. 16

*Tilton v. Marshall* 925 S.W.2d 672 (Tex. 1996) ............................................................. 20, 25

*Turner v. Pub. Serv. Co. of Colo.* 563 F.3d 1136 (10th Cir. 2009) ............................................. 36

*United States v. Ballard* 322 U.S. 78 (1944) ....................................... 18, 19, 22, 25, 27

*Van Schaick v. Church of Scientology of Cal., Inc.* 535 F. Supp. 1125 (D. Mass. 1982)............. 19

*Watson v. Jones* 80 U.S. (13 Wall.) 679 (1871) ............................................................. 2, 16, 19

*Webster v. JP Morgan Chase Bank, NA* 290 P.3d 930 (Utah Ct. App. 2012)............................. 25

*Wisconsin v. Yoder* 406 U.S. 205 (1972)........................................................................ 18, 21, 23

*Xyngular v. Schenkel* 890 F.3d 868 (10th Cir. 2018)................................................................. 36

Statutes

18 U.S.C. § 1961(5) ............................................................................................................. 39

Rules

FRCP 9(b) ................................................................. 3, 4, 9, 12, 29, 30, 31, 32, 39, 40

Fed R. App. P. 28(a)(4) ................................................................................. 1

Federal Rule of Appellate Procedure 32(a)(5) ................................................ 46

Federal Rule of Appellate Procedure 32(a)(6) ................................................ 46

Federal Rule of Appellate Procedure 32(a)(7) ................................................ 46

Federal Rule of Appellate Procedure 32(f) ..................................................... 46

## PRIOR OR RELATED APPEALS

None.

Pursuant to the Federal Rules of Appellate Procedure, Appellee The Church of Jesus Christ of Latter-day Saints (the "Church")[1] hereby submits its Response Brief.

---

[1] The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole, is the successor in interest to the Corporation of the President of The Church of Jesus Christ of Latter-day Saints (the entity named in Ms. Gaddy's complaints).

# INTRODUCTION

Ms. Gaddy[2] asks this Court to ignore over 150 years of Supreme Court precedent and allow her to convene a modern-day inquisition into the Church's teachings.  Ms. Gaddy asserted a RICO claim against the Church (which is the only claim she now appeals[3]) arguing that the Church engaged in "wire and mail fraud."

The heart of her RICO claim is that the Church made false statements about certain of its beliefs and doctrines.  As the district court observed, this lawsuit directly "seek[s] to have the court adjudicate the truth or falsity" of the Church's beliefs.  (App. Vol. 4, at 263).  Ms. Gaddy's claim would require a district court (and jury) to adjudicate questions of profound theological import for the Church, such as:  What actually occurred during Joseph Smith's 1820

---

[2] Laura Gaddy was the original named plaintiff in the underlying action.  (*See* Appellee Appendix ("Church App."), at 17).  It was not until the filing of the second amended complaint that appellants Lyle D. Small and Leanne R. Harris were named as plaintiffs.  (Appellants' Appendix ("App.") Vol. 3, at 1). Their claims are based on identical theories.  Accordingly, for the convenience of the Court, the Church references only Ms. Gaddy as representative of all appellants.

[3] Ms. Gaddy's Second Amended Complaint raised several claims, but she appeals only the dismissal of her RICO claim.  (*See* Appellants' Principal Brief ("Br.") at 10–12, 57).  She does not address any other claim in the Principal Brief and has therefore waived any argument as to those claims.  *See Jordan v. Bowen*, 808 F.2d 733, 736 (10th Cir. 1987) (citing Fed R. App. P. 28(a)(4) and explaining that "[a]ppellants who fail to argue the issue in their brief are deemed to have waive their contention on appeal").

theophany, which is the seminal event in the Church's founding?  By what means did Joseph Smith translate the Book of Mormon and the Book of Abraham?  Ms. Gaddy claims to admit these events occurred.  (Br. at 24).  She claims only to be challenging the Church's orthodox version of the events by suggesting, for example, that Joseph Smith actually used a "seer stone" to translate the Book of Mormon, whereas the Church taught that he used an ancient biblical device called the "Urim and Thummim."  (Br. at 19).

None of these questions belongs in a courtroom.  The law does not allow judges or juries to determine the truth or falsity of any religion or religious belief.  Judges and juries cannot determine whether Moses parted the Red Sea, whether Mohammed ascended to heaven, whether Jesus walked on water, or whether Joseph Smith saw God and Jesus Christ.  The United States Supreme Court has long maintained that "[t]he law knows no heresy" and "[i]n this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all."  *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728 (1871).  The district court properly held that it could not adjudicate the questions presented by Ms. Gaddy's RICO claim.

When it comes to the Church's financial dealings, Gaddy fails to articulate why the Church's teachings on tithing, or its use of tithing funds, constitutes a "predicate offense" under RICO that exposes the Church to the sledgehammer of treble damages.  Ms. Gaddy's 555-paragraph complaint contains scattered accusations about the Church's use of tithing funds, but her specific RICO theory is unclear, at best.  Ms. Gaddy complains that the Church has invested a portion of its funds into commercial endeavors rather than immediately deploying all funds into the Church's ecclesiastical operations.  She attempts to cast this prudent financial management as "wire and mail fraud" by arguing that investment for future needs is somehow inconsistent with the Church's statements that tithes are used to "help Jesus Christ's Church grow."  But none of those allegations remotely satisfies the heightened standard of pleading under FRCP 9(b).  Nor does the First Amendment allow a court to adjudicate whether the Church's disposition of its voluntary contributions actually furthers the Church's religious mission.  The district court properly rejected Gaddy's RICO claim and should be affirmed.

## STATEMENT OF THE ISSUES

1. Was the district court's dismissal of Ms. Gaddy's RICO claim proper when that claim was based on alleged misrepresentations about purely religious matters?

2. Was the district court's dismissal of Ms. Gaddy's RICO claim proper when she failed to plead the necessary predicate acts with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure?

**STATEMENT OF THE CASE**

## I.  SUMMARY OF RELEVANT ALLEGATIONS IN THE SECOND AMENDED COMPLAINT.

### A.  The Church's Teachings About Joseph Smith's First Vision, the Book of Mormon, and the Book of Abraham.

The Church of Jesus Christ of Latter-day Saints is a Christian faith founded in 1830 by the prophet Joseph Smith.  (App. Vol. 3, at 1 (the "Second Amended Complaint"), ¶¶ 25–32).  In the spring of 1820, Joseph Smith entered a grove of trees near his home to pray and seek spiritual guidance.  (*Id.* ¶ 26).  The Church teaches that both God and Jesus Christ appeared in a pillar of light in response to Joseph Smith's prayer.  (*Id.* ¶ 241).  This event is known in the Church as the "First Vision."  (*See id.* ¶ 26).  It was at that time that Joseph Smith received a prophetic calling to restore Jesus Christ's full gospel to the earth.  (*Id.* ¶¶ 26–32).  Ms. Gaddy contends that the orthodox version of the

4

First Vision is contradicted by Joseph Smith's earliest handwritten account, which does not explicitly mention *two* personages. (*Id.* ¶¶ 210, 213, 240–41).

A few years later, an angel visited Joseph Smith and told him about a book, written on gold plates, which contained the teachings of ancient prophets who lived in the Americas. (*Id.* ¶ 27). With divine help, Joseph Smith translated the inscriptions on those plates into English. (*Id.* ¶¶ 26–29). The result of this work is the Book of Mormon. (*Id.* ¶ 29). The Book of Mormon is part of the Church's canonical scripture. (*See id.* ¶ 12 n.4). Ms. Gaddy claims that while the Church publicly taught that Joseph Smith translated the Book of Mormon using the "Urim and Thummim" (something like spectacles attached to a breast plate) he in fact translated it by use of a "seer stone." (*Id.* ¶¶ 148–65; Br. at 19–20).

The Book of Abraham, also part of the Church's scriptural canon, contains teachings of the Old Testament prophet Abraham. (Second Amended Complaint, ¶¶ 12, 37). It originated with Egyptian papyri that resulted in God revealing the Book of Abraham to Joseph Smith beginning in 1835. (*Id.* ¶ 37). Ms. Gaddy contends that Joseph Smith's alleged translation of the Egyptian papyri was "fraudulent" and that the characters in the papyri (only fragments of which still exist) do not match the translation. (*Id.* ¶¶ 37–39, 73–79, 184–85).

### B.    Ms. Gaddy's Allegations Regarding Tithing.

The Church teaches the doctrine of tithing—the practice of donating 10% of one's income to the Church.  (*Id.* ¶ 10).  According to Ms. Gaddy, the Church teaches that tithing is necessary for "eternal salvation, and 'forever families'" and to "ensure safety from apocalyptic burning at the Second Coming of Jesus Christ."  (*Id.*)  Ms. Gaddy alleges that the Church's practice is to set "aside money from annual donations including member tithing for a rainy-day fund."  (*Id.* ¶ 72).  The Church teaches that "Tithing Is Used to Help Jesus Christ's Church Grow."  (*Id.* ¶ 229).  Church leader Dallin H. Oaks taught:

> The Lord has directed by revelation that the expenditure of his tithes will be directed by his servants, the First Presidency, the Quorum of the Twelve, and the Presiding Bishopric (see D&C 120).[4]  Those funds are spent to build and maintain temples and houses of worship, to conduct our worldwide missionary work, to translate and publish scriptures, to provide resources to redeem the dead, to fund religious education, and to support other Church purposes selected by the designated servants of the Lord.

(*Id.* ¶ 230).

---

[4] This is a reference to Section 120 of the Doctrine and Covenants—another volume of canonical scripture in the Church.  That section contains revelation from God setting forth the ecclesiastical procedures for the administration of tithing funds.

Ms. Gaddy also makes allegations about statements made by Church leaders regarding the funding for the City Creek project—a redevelopment project adjacent to the Church's historic Salt Lake City Temple. Specifically, Ms. Gaddy quotes a portion of a sermon by former Church President Gordon B. Hinckley. (*Id.* ¶ 237). A more complete quotation of his statement is:

> I call attention to that which has received much notice in the local press. This is our decision to purchase the shopping mall property immediately to the south of Temple Square.
>
> The Church owns most of the ground on which this mall stands. The owners of the buildings have expressed a desire to sell. The property needs very extensive and expensive renovation. We have felt it imperative to do something to revitalize this area. But I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property. Nor will they be used in developing it for commercial purposes.
>
> ***Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with the earnings of invested reserve funds, will accommodate this entire program.***

(App. Vol. 4, at 148) (emphasis added).[5]

---

[5] A copy of the full text was attached to the Church's Motion to Dismiss Second Amended Complaint. (App. Vol. 4, at 146–49). This court may consider this quotation in its entirety because it is expressly referenced in the Second Amended Complaint. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) (A district court considering a Rule 12(b)(6) motion "may consider documents referred to in the complaint if the documents are central to

## II.    PROCEDURAL HISTORY.

Despite the fact that this case never progressed beyond the pleading stage, there were 146 separate filings before the district court.  (App. Vol. 1, at 1–19).  The district court patiently provided Ms. Gaddy every opportunity to plead a justiciable claim, but she could not do so.

### A.    Ms. Gaddy's Original Complaint.

Ms. Gaddy's original "Proposed Class Action Complaint" was 75 pages long (excluding exhibits) and asserted six fraud-based claims based on the Church's teachings about the translation of the Book of Mormon, Joseph Smith's First Vision, and the Book of Abraham.  (Church App., at 17).  The Church moved to dismiss, (App. Vol. 1, at 20), and the district court granted that motion, holding that all of Ms. Gaddy's claims were barred by the First Amendment (App. Vol. 1, at 104 (the "First Order")).

### B.    Ms. Gaddy's Amended Complaint.

Ms. Gaddy's "Amended Class Action Complaint" again pleaded fraud based on the Church's teachings about the coming forth of the Book of Mormon, the First Vision, and the Book of Abraham, in addition to new allegations challenging the Church's teachings on other religious topics.  (App.

---

the plaintiff's claim, and the parties do not dispute the documents' authenticity").

Vol. 1, at 125). She also raised new allegations concerning allegedly false statements about the Church's use of tithing donations. (*E.g.*, *id.* at 148–49).

The Church again moved to dismiss, based solely on the First Amendment. (App. Vol. 1, at 190). The district court granted in part and denied in part the Church's motion. (App. Vol. 2, at 178 (the "Second Order")). The district court again ruled that all claims related to the Church's religious teachings were barred by the First Amendment. (*Id.* at 204). The district court also concluded, however, that some of Ms. Gaddy's allegations regarding the Church's use of tithing funds were not necessarily barred by the First Amendment—the only ground on which the Church had moved to dismiss her claims. (*Id.* at 203–08).

## C.    Ms. Gaddy's Second Amended Complaint.

Instead of proceeding on the surviving allegations, Ms. Gaddy filed her Second Amended Complaint, which is 555 paragraphs and over 200 pages long—excluding exhibits. (Second Amended Complaint, at 1). Once again, this complaint asserted fraud-based claims against the Church related to its religious teachings. The Church again moved to dismiss, arguing that Ms. Gaddy's claims remained barred by the First Amendment and that she failed to state a claim for various other reasons, including failure to comply with Rule 9(b) of the Federal Rules of Civil Procedure. (App. Vol. 4, at 118).

On March 28, 2023, the district court granted the Church's motion to dismiss, concluding for the third time that claims based on the Church's religious teachings were barred and that Ms. Gaddy failed to state a claim related to her tithing allegations.  (App. Vol. 4, at 236 (the "Third Order")).  The district court also denied Ms. Gaddy's request to file a Proposed Third Amended Complaint and dismissed the case with prejudice.[6]  (*Id.* at 289–91).

## SUMMARY OF THE ARGUMENT

The district court properly dismissed Ms. Gaddy's RICO claim—the only claim she raises on appeal—which is almost entirely based on allegations that the Church's teachings about the First Vision, the Book of Mormon, and the Book of Abraham ignore contrary evidence and misrepresent how those miraculous events *actually* occurred, according to Ms. Gaddy.  The First Amendment plainly forbids adjudication of these questions.  Controlling Supreme Court precedent holds that courts may not entertain lawsuits contesting a church's religious beliefs or how those beliefs are taught.

Ms. Gaddy posits two paths around the First Amendment.  Both are dead ends.

---

[6] Including all proposals, revisions, errata, and amendments, Ms. Gaddy submitted nine different complaints to the district court.

First, she contends that the First Amendment prohibits only the adjudication of religious "beliefs" and not religious "facts."  But the distinction between the two is false and has not been adopted by any court.  Most "religious beliefs" are about "religious facts."  The resurrection of Jesus Christ, Moses parting the Red Sea, and the appearance of an angel to Mohammed are three such examples.  Those events either happened or they did not.  Thus, they can be described as questions of "religious fact."  But they are also matters of intense "religious belief."  Indeed, many people hold a variety of different *religious* beliefs about those *religious* "facts."  The relevant question under the First Amendment is not whether the allegations concern religious beliefs or religious facts, but whether the allegations are religious or secular.  As the district court correctly held, if the alleged falsehoods are religious in nature—as opposed to secular—they cannot be adjudicated.

Second, she argues that the Church must prove that it is "sincere" about its religious beliefs before those beliefs are entitled to First Amendment protection and contends that the Church did not "sincerely" believe the religious teachings it has professed for over two hundred years.  But to prove fraud, Ms. Gaddy must prove that the statements at issue are *false*, not insincere.  Moreover, her logic is circular.  She contends that the Church's representations about beliefs *cannot* be sincere because they are untrue.  In

other words, she attempts to prove the lack of sincerity by proving falsity—the very thing that is prohibited by the First Amendment.  Sincerity is an issue when someone seeks a religious exemption or accommodation based on religious belief, as in the Religious Freedom Restoration Act ("RFRA") cases Ms. Gaddy cites.  This is not such a case, as the district court correctly noted.

Finally, the district court also properly dismissed the same RICO claim to the extent it was based on allegations about the Church's use of tithing funds.  Ms. Gaddy failed to plead the requisite predicate acts of wire and mail fraud with anywhere near the specificity required by the heightened standard of Rule 9(b).  Moreover, Ms. Gaddy's tithing-based theory is inextricably intertwined with religious questions that cannot be adjudicated.  The First Amendment prohibits the adjudication of whether the Church's investment of a portion of its funds for anticipated future needs really does "help Jesus Christ's Church grow."  The First Amendment puts the very question beyond the judicial ken.  Accordingly, the RICO claim fails and was properly dismissed.  That decision should be affirmed.

# ARGUMENT

## I.    THE DISTRICT COURT PROPERLY DISMISSED THE RICO CLAIM BECAUSE IT WAS BASED ON THE CHURCH'S RELIGIOUS TEACHINGS.

"The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." Tal v. Hogan, 453 F.3d 1244, 1261 (10th Cir. 2006). A "racketeering activity" is defined by statute as "any act which is indictable under federal law and specifically includes mail fraud, wire fraud and racketeering." Id. (internal quotation marks omitted). This "racketeering activity" is frequently described as the "predicate act" or "acts." Id. at 1261–62.

To plead a claim of mail fraud, a plaintiff "must allege '(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representation or promises, and (2) use of the United States mails for the purpose of executing the scheme.'" Id. (quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 892 (10th Cir. 1991)). "The elements of wire fraud are very similar, but require that the defendant use interstate wire, radio or television communication in furtherance of the scheme to defraud." Id. (quoting BancOklahoma Mortg. Corp. v. Cap. Title Co., 194 F.3d 1089, 1102 (10th Cir. 1999)).

Ms. Gaddy claims that the Church—and tens of thousands of Church ministers—engaged in a "pattern of racketeering" by preaching false statements about its doctrines and beliefs.  Specifically, her RICO theory is based on allegations that the Church's *religious* teachings about its canonical scriptures and its founding prophet, Joseph Smith, are false.  (Ms. Gaddy explains that her "racketeering allegations" are found in paragraphs 140–290 and 291–301 of the Second Amended Complaint, (*see* Second Amended Complaint, ¶¶ 517–19), which span over 83 pages and, accordingly, cannot be detailed herein.)  Apart from a few references to tithing (addressed below), Ms. Gaddy's allegations all challenge the Church's beliefs about: i) the heavenly personages that appeared to Joseph Smith during the First Vision; ii) the divine method by which Joseph Smith interpreted ancient records to produce the Book of Mormon; iii) the authenticity of the Book of Abraham; iv) the geographical location of the events described in the Book of Mormon; and v) the historical practice of polygamy.

Ms. Gaddy claims, for example, that the Church made false statements about how Joseph Smith translated the Book of Mormon from ancient gold plates.  (*E.g.*, Second Amended Complaint, ¶ 3).  Similarly, she claims the Church's orthodox view of Joseph Smith's "First Vision"—that he was visited by God and Jesus Christ—is contradicted by an earlier account that she claims

14

suggests that only one heavenly being appeared to Joseph Smith.  (*E.g.*, *id.* ¶ 210).  Finally, she says the Book of Abraham is simply "fraudulent."  (*E.g.*, *id.* ¶ 38).  The First Amendment plainly prohibits any court from adjudicating disputes of this nature.

A.    **The Church Autonomy Doctrine Bars Gaddy's RICO Claim.**

Adjudicating Ms. Gaddy's RICO claim would directly violate the bedrock principle of First Amendment law known as the "church autonomy doctrine," which is rooted in a "long line of Supreme Court cases." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002) (quotation marks omitted).  "This church autonomy doctrine prohibits civil court review" of "matters of faith, doctrine, church governance, and polity." *Id*.  And as the district court observed, Ms. Gaddy directly "seek[s] to have the court adjudicate the truth or falsity" of the Church's beliefs.  (Third Order at 263).

"The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).  This Court cannot constitutionally decide the questions Ms. Gaddy poses as doing

so would require it to "engage in the forbidden process of interpreting and weighing church doctrine." *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969). Disputes about religious beliefs "can play *no* role in any . . . judicial proceedings" because it unconstitutionally "inject[s] the civil courts into substantive ecclesiastical matters." *Id.* at 450–51 (emphasis added). The First Amendment is violated when "litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Id*. at 449. "[T]he government is not permitted to have an ecclesiology, or to second-guess the ecclesiology espoused by our citizens. 'Courts are not arbiters of scriptural interpretation.'" *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1265 (10th Cir. 2008) (quoting *Thomas v. Rev. Bd.*, 450 U.S. 707, 716 (1981)).

The church autonomy doctrine is based partly on a "notion of judicial incompetence with respect to strictly ecclesiastical matters . . . ." *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 203 (2d Cir. 2017); *see also Watson*, 80 U.S. at 729 ("It is not to be supposed that the judges of civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own."). Ms. Gaddy's allegations would require the court to dive deep into theological questions that courts and juries are simply incapable of answering.

Church autonomy places such matters so far off limits that courts must steer clear of such disputes because even the process violates the First Amendment.  "It is not only the conclusions that may be reached" by civil courts that "may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979).  Permitting such claims to proceed past the pleading stage presents the "substantial danger that the State will become entangled in essentially religious controversies." *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 709 (1976).

Applying this principle, this Court affirmed summary judgment against a disaffected minister who brought a sexual harassment suit against her church based on remarks made during internal church discussions. *Bryce*, 289 F.3d 648.  The Court stressed that "[t]he church autonomy doctrine is rooted in protection of the First Amendment rights of the church to discuss church doctrine and policy freely" and protects "the right of the church to engage freely in *ecclesiastical discussions with members and non-members*." *Id.* at 658 (emphasis added).

Here, Ms. Gaddy is attempting to dictate the content of the Church's "ecclesiastical discussions" with its members.  She wants a jury to punish the Church for teaching core beliefs about the Church's foundational miracles

because she believes those miracles occurred in a different manner than the Church teaches—Joseph Smith only saw one heavenly visitor, not two; he used the seer stone to translate the Book of Mormon, not the Urim and Thummim, and so forth. Ms. Gaddy's claims fall squarely within the church autonomy doctrine and cannot be adjudicated by any earthly tribunal.

### B.     Fraud Claims Based on "Purely Secular" Statements are Justiciable. But Fraud Claims Based on Religious Beliefs Fall Squarely Within the Church Autonomy Doctrine.

The church autonomy doctrine does not allow churches to commit fraud, but it places clear limits on what fraud claims can be pleaded against churches. Fraud-based claims can evade church autonomy "only when the misrepresentation is exclusively secular and not mixed with religious beliefs and claims." Victor E. Schwartz & Christopher E. Appel, *The Church Autonomy Doctrine: Where Tort Law Should Step Aside*, 80 U. Cin. L. Rev. 431, 468 (2011). A fraud claim must present a "purely secular" dispute and cannot be "rooted in religious belief." *Bryce*, 289 F.3d at 657 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).

The U.S. Supreme Court has long held that courts cannot decide "the truth or verity of . . . religious doctrines." *United States v. Ballard*, 322 U.S. 78, 86 (1944). "Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious

doctrines or beliefs." *Id.* To permit suit by "any one aggrieved by [a church's] decisions" on a matter of doctrine would not only undermine religious freedom, but "lead to the total subversion of such religious bodies." *Watson*, 80 U.S. at 729. It can "hardly be supposed" that a church "could be tried before a jury charged with the duty of determining whether [its] teachings contained false representations." *Ballard*, 322 U.S. at 87.

Courts have repeatedly declined to entertain disputes over fraud claims based on religious representations. *See, e.g.*, *Hancock v. True Living Church of Jesus Christ of Saints of Last Days*, 118 P.3d 297, 300 n.2 (Utah Ct. App. 2005) (concluding that "[p]laintiffs' allegation that [one plaintiff] 'never met Christ face to face as promised' appears to be an entirely religious matter beyond the courts' ability to adjudicate"); *Anderson v. Worldwide Church of God*, 661 F. Supp. 1400, 1401 (D. Minn. 1987) (holding that the First Amendment barred plaintiff's allegations against a church that it had fraudulently misrepresented that the world was coming to an end to obtain his donation).

The First Amendment "does not allow purely secular statements of fact to be shielded from legal action because they are made by officials of a religious organization." *In re Bible Speaks*, 869 F.2d 628, 645 (1st Cir. 1989); *see also Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125, 1140 (D. Mass. 1982) (First Amendment did not shield "purely secular" statements that

19

"would not force this court to consider the truth or falsity of religious doctrine"). But when "the representation forming the basis of the fraud claim is a religious doctrine or belief, it is constitutionally protected from judicial inquiry." *Tilton v. Marshall*, 925 S.W.2d 672, 678 (Tex. 1996).

Ms. Gaddy's allegations are purely religious, not purely secular. The district court was indisputably correct when it held that it "can no more determine whether Joseph Smith saw God and Jesus Christ or translated with God's help gold plates or ancient Egyptian documents, than it can opine on whether Jesus Christ walked on water or Muhammed communed with the archangel Gabriel. The First Amendment prohibits these kinds of inquiries in courts of law." (First Order at 115).

The district court gave Ms. Gaddy several chances to try to plead a secular claim, but she repeatedly failed. Instead, in her Second Amended Complaint she tripled down on her attacks against the Church's religious beliefs. As the district court concluded when it finally dismissed her claims with prejudice:

> By pleading even more facts concerning Joseph Smith, Plaintiffs seek to have the court adjudicate the truth or falsity of the Church's beliefs and teachings concerning its founder by challenging the accuracy of facts surrounding those beliefs. But again, if religious events themselves sit beyond judicial purview, religious beliefs concerning the details of those events must enjoy the same protection.

(Third Order at 263) (internal quotation marks and citation omitted).  The

district court also noted that it had twice previously rejected Ms. Gaddy's

claims related to the Book of Mormon, the First Vision, and the Book of

Abraham.  (*Id.* at 262).

There is nothing remotely secular about the claims Ms. Gaddy

repeatedly tried to plead, or the RICO claim she presses on appeal.  Although

the First Amendment does not bar every fraud claim against a church, it

plainly bars Ms. Gaddy's allegations.

### C.  Ms. Gaddy's "Facts vs. Beliefs" Argument is Contrary to Binding Law and Ultimately Unworkable.

Ms. Gaddy attempts to avoid the First Amendment by arguing that she

"seek[s] to litigate facts, not beliefs."  (Br. at 23).  "Beliefs involve an

inherently different analysis from facts, but even 'religious facts' should be

litigated in a court of law," she contends.  (*Id.*)  Tellingly, she offers no case

from any jurisdiction adopting this distinction.  It is, however, unsurprising

that no court has ever adopted this reasoning because it would spell the end of

religious freedom.

Ms. Gaddy argues that "the distinction is actually between what is

transcendent—religious beliefs, and what can be empirically proven—facts.

Only the transcendent is *beyond the ken* of mortals and therefore the court."  (*Id.*

at 25).  The First Amendments protects the right of churches and believers to

21

teach and believe something even if it can be "empirically proven" false.  A church could teach that the earth is flat.  That is the central holding of *United States v. Ballard*.  322 U.S. at 87.

The line drawn by the First Amendment is not between belief and fact, but between religious and nonreligious.  As noted, when churches make "purely secular" claims, the First Amendment provides no protection.  But religious claims, *even if provably false by secular standards*, are absolutely protected by the First Amendment.  The First Amendment places beyond judicial scrutiny "all questions concerning the truth or falsity of religious beliefs or doctrines."  *Id.* at 88.

If Plaintiffs' position were the law, a religious belief that was provably false by secular standards would be subject to a claim for fraud and entitled to no protection under the First Amendment.  The First Amendment would protect religious *opinions* (adultery is a sin), but not religious truth claims (Jesus died and was resurrected).  That is a remarkable and completely unsupported position.

By secular standards, many religious beliefs are provably false.  If a court could adjudicate the question, is there any doubt scientific evidence would persuasively show that the earth was not created 6,000 years ago or in just six days?  Religious claims are often seen as mystical or supernatural (or absurd)

precisely because they are contrary to empirical human knowledge and understanding.  That does not mean the First Amendment provides no protection.

Under Ms. Gaddy's theory, the Church would have to convince a jury of the truthfulness of the canonical account of Joseph Smith's First Vision.  A jury would be allowed to determine by what miraculous means Joseph Smith dictated the Book of Mormon, and whether the Book of Abraham is simply fraudulent, because under her theory, each of these is a question of "fact" (not "belief") and is therefore justiciable in a secular court.  The notion of such a trial is absurd.

Philosophical and epistemological problems aside, Ms. Gaddy cannot cite a *single* case that has ever adopted her "beliefs" versus "facts" distinction. Rather, "[t]he fundamental qualification for protection based on the Free Exercise Clause of the First Amendment is that that which is sought to be protected must be 'religious.'"  *Christofferson v. Church of Scientology of Portland*, 644 P.2d 577, 600 (Or. Ct. App. 1982) (quoting *Yoder*, 406 U.S. at 215–16).

The district court properly concluded that the "fact versus belief framework" is "unworkable" and "presents a false dichotomy that fails to recognize that, when it comes to faith, facts and belief are often inextricably intertwined."  (First Order at 115–16).  As the district court correctly

concluded, the proper line—and the one drawn by other courts—"is between *religious* and *secular* facts." (*Id.* at 116). There can be no doubt that a RICO claim based on the Church's teachings about its founding prophet, canonical scripture, and founding history plainly seeks to adjudicate *religious* questions. Accordingly, the RICO claim was properly dismissed.

## D. The "Sincerity" Allegations Do Not Save Ms. Gaddy's Claim.

Ms. Gaddy argues she should at least be able to test the Church's religious sincerity before her RICO claim is dismissed under the First Amendment. (Br. at 35–38). But a sincerity analysis has no place here. And even if it did, dismissal would still be appropriate because the court would still have to determine the falsity of religious beliefs. The district court thus properly rejected this sincerity argument.

### 1. Ms. Gaddy must prove actual falsity—not insincerity.

Ms. Gaddy argues that dismissal was inappropriate where there is a factual dispute about sincerity. But even assuming this Court could permissibly conduct the "sincerity" analysis suggested by Ms. Gaddy—and, as discussed below, it cannot—that still would not save her claims.

To succeed on Ms. Gaddy's RICO claim, she would need to prove the actual falsity of the Church's teachings. Indeed, the first element of wire and mail fraud claims is engaging in an artifice to defraud. As the district court

explained, "even if the court engaged in a threshold inquiry into the sincerity of the Church's beliefs in its teachings" Ms. Gaddy's claim would still fail because "[f]alsity of a statement remains an essential element of a fraud claim." (Second Order at 198); *see also Webster v. JP Morgan Chase Bank, NA*, 290 P.3d 930, 936 (Utah Ct. App. 2012) (outlining elements of fraud).

The Texas Supreme Court recognized the irrelevance of sincerity to a religious fraud claim:

> As long as the representation forming the basis of the fraud claim is a religious doctrine or belief, it is constitutionally protected from judicial inquiry. Consequently, the religious objector's sincerity is irrelevant when a claim of fraud is based solely on a statement of religious doctrine or belief.

*Tilton*, 925 S.W.2d at 678 (citation omitted).

As the district court explained in rejecting Ms. Gaddy's argument "whether or not Church leadership believes any representations made, the First Amendment prohibits the next step, which requires the court to examine the truth or falsity of the First Vision, the translation of the Book of Mormon, the Book of Abraham, or [her] new doctrinal challenges." (Second Order at 198). "Because a statement's falsity is an essential element of fraud claims, adjudicating these claims would require the court to do exactly what the Supreme Court has forbidden—evaluate the truth or falsity of the Church's religious beliefs." (*Id.* at 188–89) (citing *Ballard*, 322 U.S. at 86–87). A First

Amendment right "cannot depend on the objective truth or verity of a defendant's religious beliefs." *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 439 (2d Cir. 1981).

### 2.    Ms. Gaddy's "sincerity" theory is circular and is prohibited by the First Amendment.

Ms. Gaddy's invitation to conduct an inquiry into the "sincerity" of the Church's teachings is also constitutionally barred.  She makes conclusory allegations that the Church's teachings were insincere.  She argues that the Church's teachings are not true and therefore they cannot be sincere.  Indeed, she alleges because the Church's teachings are (according to her) false, "ipso facto" the Church "lacked a sincere belief in representations that are contrary to the evidence."  (Br. at 26).

This is circular logic and is nothing more than a repackaged version of the "fact vs. belief" argument and should be rejected.  Ms. Gaddy cannot circumvent the First Amendment by arguing that she can "prove" religious teachings must have been insincere because she can "prove" those teachings are false.

Once again, if adopted, Ms. Gaddy's paradigm would permit a similar lawsuit against every religious organization.  A plaintiff could, for example, sue the Catholic Church alleging that the church's teaching that bread and wine become the body and blood of Christ through transubstantiation at Mass

is false.  And that same plaintiff, under Ms. Gaddy's theory, could easily avoid the First Amendment by merely alleging that the church's teaching was insincere.  As "evidence" of that insincerity, the plaintiff could offer expert opinions that bread and wine cannot be turned into flesh and blood.  Ultimately, a court (or a jury) would then have to determine whether transubstantiation was possible in order to conclude whether the Catholic Church sincerely believed its teachings.  This is nonsense.

As the district court held:

> The First Amendment's Religion Clauses bar secular courts from injecting themselves into disputes concerning church faith and doctrine.  Plaintiffs cannot circumvent this bar by purporting to reframe the issue as one directed only to the sincerity of a church's beliefs about religious doctrines they challenge.

Second Order at 197).  The district court properly rejected this argument and dismissed the RICO claim.[7]

---

[7] Ms. Gaddy appears to rely heavily on *United States v. Ballard*, 322 U.S. 78 (1944).  Yet that reliance is misplaced.  As the district court noted, *Ballard* does not support Ms. Gaddy's approach.  (Second Order at 195).  Indeed, although *Ballard* has a complicated procedural history, "[t]he holding of *Ballard* is limited to the question of whether truth or falsity of a religious belief should go to a jury—it did not address the propriety of a mail fraud conviction based on insincere religious representations."  (*Id.* at 196) (discussing *Ballard*, 322 U.S. at 86).  And, of course, the Supreme Court ultimately held that the truth or falsity of religious beliefs was not appropriate for a jury determination.  *Ballard*, 322 U.S. at 88.

Ms. Gaddy contends that the Church must prove sincerity before it can claim First Amendment protection. "[C]hurch autonomy" is a "defense," Plaintiffs contend, and "a religious belief must be sincerely held before the [church autonomy doctrine] applies . . . ." (Br. at 11).

Plaintiffs must prove sincerity when requesting religious accommodations or exemptions under statutes like the Religious Freedom Restoration Act ("RFRA") and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), or under the Free Exercise Clause of the First Amendment. When a prisoner insists, for example, that his religious beliefs require him to grow facial hair in violation of prison regulations, the question is not the truth or falsity of that belief, but whether he sincerely holds that belief. *See, e.g.*, *Mosier v. Maynard*, 937 F.2d 1521, 1523 (10th Cir. 1991) (plaintiff seeking an exemption from prison grooming code under the Free Exercise Clause).

The district court correctly explained that this is not such a case. "[C]ourts engage in this [sincerity] inquiry of those seeking religious accommodation or exception" for the "purpose of ensuring the government accommodates only genuine religious beliefs that are sincerely held." (Second Order at 193 & n.94) (citing, *inter alia*, *Mosier*, 937 F.2d at 1526). But "the church autonomy doctrine is not an accommodation." (*Id.* at 193). Rather,

28

the church autonomy doctrine is based on the "'fundamental right of churches to decide for themselves, free from state interference, matters of . . . faith and doctrine,'" and "the reasoning behind the sincerity analysis" in other contexts "has no application here." (*Id.*) (quoting *Bryce*, 289 F.3d at 655 (internal quotation marks and citation omitted)). That is exactly right. Ms. Gaddy's attempted end run around the First Amendment under the guise of sincerity is a dead end.

## II. THE DISTRICT COURT PROPERLY DISMISSED THE RICO CLAIM TO THE EXTENT IT WAS BASED ON ALLEGATIONS ABOUT THE CHURCH'S USE OF TITHING FUNDS.

Ms. Gaddy contends that the district court improperly dismissed her RICO claim to the extent it was based on allegations about the Church's use of tithing funds. This Court should affirm the district court's dismissal based on the failure to plead a claim under Rule 9. Alternatively, the Court should affirm because the claim is barred by the First Amendment.

### A. Ms. Gaddy's Claim Fails to Meet the Rule 9(b) Standard.

The district court correctly concluded that Ms. Gaddy "failed to allege even a single predicate act of mail or wire fraud." (Third Order at 286). This Court has explained:

> To establish the predicate acts of mail fraud, [Plaintiffs] must allege (1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the

> purpose of executing the scheme. The elements of wire
> fraud are very similar, but require that the defendant use
> interstate wire, radio or television communications in
> furtherance of the scheme to defraud. The common thread
> among these crimes is the concept of 'fraud.' Actionable
> fraud consists of (1) a representation; (2) that is false; (3) that
> is material; (4) the speaker's intent it be acted on; (6) the
> hearer's ignorance of its truth; (7) the hearer's reliance; (8)
> the hearer's right to rely on it; and (9) injury. Failure to
> adequately allege any one of the nine elements is fatal to the
> fraud claim.

*Tal*, 453 F.3d at 1263 (internal citations and quotations omitted)).

When the predicate acts of a RICO claim sound in fraud, "a plaintiff
must plausibly allege each predicate act with particularity required by Rule
9(b)." (Third Order at 248) (citing *Sullivan v. Univ. of Kan. Hosp. Auth.*, 844 F.
App'x 43, 50 (10th Cir. 2003)). And under Rule 9(b) of the Federal Rules of
Civil Procedure, "a party must state with particularity the circumstances
constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requires a complaint
alleging fraud to "set forth the time, place and contents of the false
representation, the identity of the party making the false statements and the
consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th
Cir. 2000). Under Rule 9, allegations of fraud may be based "on information
and belief" only "when the facts in question are peculiarly within the opposing

30

party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Id.* at 1237 (citation omitted).

### 1. Ms. Gaddy failed to plead the required elements of her RICO claim.

The district court correctly concluded that Ms. Gaddy's claim failed to meet the Rule 9(b) standard. Her tithing-based RICO theory is not clearly articulated anywhere in the Second Amended Complaint. The Second Amended Complaint specifically cites to paragraphs 219–301—in a section entitled "Mail and Wire Fraud Allegations"—for its racketeering allegations. (Second Amended Complaint, ¶¶ 517–19). The vast majority of these paragraphs, however, are nothing more than general conclusory allegations. Indeed, there is not a *single* quotation of any statement by the Church in that entire section. And, of course, most allegations in that section are about the Church's *religious* teachings—not about tithing.[8] The only paragraph that provides any substantive detail about the Church's use of tithing funds comes in paragraph 293 as follows:

> [The Church], through its Brethren, knowingly devised or knowingly participated in a scheme and/or artifice to defraud [Ms. Gaddy] and other potential class members to obtain Plaintiffs' money or property by means of fraudulent

---

[8] As explained below, Ms. Gaddy's "tithing" theory is inextricably intertwined with her allegations about the Church's religious teachings in such a way as to render it barred by the First Amendment.

pretenses, representations, or promises, and/or engaged in a scheme to defraud Plaintiffs via making misleading representations in the form of outright fabrications, material omissions and significant obfuscation, about how it used and would use their tithing and concealing the amount and source of COP's significant wealth, all designed to deceive Plaintiffs. Tithing was not used only for the Lord's or Church purposes (reasonably interpreted as religious) but a substantial portion of tithes, especially when compared to humanitarian aid of $1.3 Billion from 1985-2010, was used for investment and commercial development purposes, including but not limited to City Creek Mall and bailing out Beneficial Life Ins. Co., and likely for other projects itemized in ¶ 8 above.

(*Id.* ¶ 293).

These types of generic allegations plainly fail to meet Rule 9(b)'s heightened standard. And even if the wire fraud and mail fraud allegations were expanded to include *any* allegation in the 555-paragraph complaint,[9] Ms.

---

[9] The RICO theory is murky at best. It is almost impossible to discern which allegations in the mammoth Second Amended Complaint may be relevant to the theory. And Ms. Gaddy's Principal Brief does nothing to elucidate their theory. Indeed, Ms. Gaddy's brief is so difficult to follow that the Court would be within its rights to dismiss the entire appeal as inadequately briefed. *See Baskerville v. Fed. Land Bank*, 25 F.3d 1055 (10th Cir. 1994) ("On appeal, plaintiffs have submitted a rambling and almost unreadable brief which raises no issues. We are not obliged to manufacture a party's argument on appeal when the party fails to carry its burden of drawing our attention to errors below."). It is not the job of the Church—or this Court—to piece together a RICO theory from unconnected allegations strewn throughout the 555 paragraphs of the Second Amended Complaint. Nevertheless, the Church attempts to do so here.

Gaddy still failed to plead her claim. The district court noted that she "fail[ed] to allege any single predicate act of mail or wire fraud because [she] fail[ed] to allege that [she] acted in reliance on any particular false statement in choosing to donate tithing." (Third Order at 286). The district court then expressly incorporated its prior analysis on one of Ms. Gaddy's other fraud-based theories where it concluded "while Plaintiffs generally allege they would not have paid tithing had they known what tithing funds were used for, they do not allege with specificity that they [made a decision to tithe] while relying on any particular misrepresentation concerning tithing." (Third Order at 272).

Indeed, the majority of Ms. Gaddy's allegations about "reliance" undercut her theory. She explained upon which statements she relied in making her determination to pay tithing. Specifically, she alleged Church members committed to pay tithing "as a condition of membership in the . . . Church" and to obtain a "temple recommend." (Second Amended Complaint, ¶ 386). She claims she relied on, among other things, the Church's teachings about the Book of Mormon and Joseph Smith in deciding to pay tithing and be baptized. (*Id.* ¶ 391). She further alleged that tithing was "extorted" "not only by promising eternal salvation, and 'forever families' but by characterizing payment of a full tithe as 'fire insurance' to ensure safety from apocalyptic burning at the Second Coming of Jesus Christ." (*Id.* ¶ 10).

Ms. Gaddy also failed to plead falsity with respect to the only statements identified with any particularity—those about the Church's investment in the City Creek mall.  (Second Amended Complaint, ¶ 237).  To plead falsity, Ms. Gaddy would have to allege that the funds for City Creek did not come from "commercial entities owned by the Church" and "earnings on invested reserve funds."  (*Id.*)  She does not (and cannot) allege that she has personal knowledge about Church finances or the City Creek project.  And she does not actually plead that tithing principal was used.  Instead, she alleges that the Church "has in fact used at least interest (*if not principal*) on tithing donations to fund commercial ventures since the early days of" the Church.  (*Id.* ¶ 8) (emphasis added).

Ms. Gaddy has not and cannot plead that the Church used tithing principal to pay for the City Creek mall development.  And she has not and cannot plead that the Church ever represented it would not use interest or returns earned on the investment of tithing donations to pay for the development.  To the contrary, she acknowledges that the Church indicated it would use "earnings of invested reserve funds" to pay for the development.  (*Id.* ¶ 237).  And President Hinckley expressly distinguished "tithing funds" from "earnings on invested reserve funds."  (App. Vol. 4, at 146–149).  Because Ms. Gaddy has not and cannot plead that the Church used funds

other than earnings on invested reserves to pay for the City Creek mall development, she failed to plead falsity.[10]

Finally, to the extent Ms. Gaddy seeks to find fault with the Church for investing a portion of its donations in for-profit enterprises rather than immediately expending them (or stuffing them in a mattress), the Utah Supreme Court has definitively addressed that issue.

> [I]t is obvious that all of the funds the Church collects would not be disbursed immediately and directly for such purposes. It is but common sense and common knowledge that there is need for the exercise of management of such funds for the ultimate accomplishment of the purposes stated. How this is to be done to best serve those objectives is for those in charge of the management of the Church to decide. It may well entail the keeping of collected funds in savings accounts, bonds, real estate or any type of investment which, in the judgment of those in charge, best suits that purpose.

*Stone v. Salt Lake City*, 356 P.2d 631, 634 (Utah 1960). In short, the district court correctly concluded that Ms. Gaddy failed to plead her claim.

### 2. Ms. Gaddy's argument that they need not plead reliance is also incorrect.

Ms. Gaddy argues—for the first time on appeal—that she need not plead reliance because reliance is not an element of a RICO claim. (Br. at 48–49).

---

[10] Of course, even if this single allegation were sufficiently pled, it does not establish the "pattern of racketeering"—meaning at least two predicate offenses—necessary to sustain a RICO claim.

This Court generally "will not consider arguments raised for the first time on appeal." *Xyngular v. Schenkel*, 890 F.3d 868, 875 (10th Cir. 2018) (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1143 (10th Cir. 2009)).  It will depart from the general rule only under extraordinary circumstances, such as when "sovereign immunity or jurisdiction is in question" *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992), or "where resolution of an issue is 'beyond reasonable doubt, and the failure to address the issues would result in a miscarriage of justice,'" *Liverman v. Comm. on the Judiciary, U.S. House of Representatives*, 51 F. App'x 825, 827 (10th Cir. 2002) (quoting *Petrini v. Howard*, 918 F.2d 1482, 1483 (10th Cir. 1990)).

In an attempt to justify her failure, Ms. Gaddy argues:  "Defendant did not ague reliance with [regard to] the RICO claim and thus [Ms. Gaddy] did not respond to the nonexistent argument, [but] the [district court] dismissed the [RICO] claim for failure to allege reliance."  (Br. at 49) (internal citations omitted).  This argument fails for at least two reasons:  First, it is factually incorrect.  The reliance issue was extensively briefed below with regard to all of Ms. Gaddy's fraud-based claims, which are the predicate claims to her RICO claim.  *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002) (explaining that the Court will not consider new arguments on appeal, regardless of whether an "appellant is attempting to raise 'a bald-faced new

issue' or 'a new theory on appeal that falls under the same general category as an argument presented [below]'" (quoting *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 722 (10th Cir. 1993)).

Second, even if her argument were factually correct, it is not an extraordinary circumstance. She cites no case to the contrary, and the Church is aware of none. Parties have an opportunity to brief issues raised *sua sponte* by a district court; parties can file motions for reconsideration and motions to vacate. Here, after the district court dismissed her Second Amended Complaint, Ms. Gaddy filed a motion to vacate. Yet she failed to argue that reliance is not an element of a fraud-based RICO claim. (Church App., at 92).

In any case, Ms. Gaddy misreads the applicable case law. She primarily relies on *Bridge v. Phoenix Bond & Indemnity Co.*, for the assertion that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing causation, that it relied on the defendant's alleged misrepresentations." 553 U.S. 639, 661 (2008). Tellingly, Ms. Gaddy does not discuss *Bridge* in any detail or provide the rest of the Supreme Court's reasoning. (Br. at 48–49).

*Bridge* involved a scheme regarding public auctions by Cook County of property it acquired based on delinquent taxes. 553 U.S. at 642. To prevent gamesmanship and ensure fair allocation of property, bidders in those auctions

had to provide certifications that they were not affiliated with other bidders

(thereby preventing one group of bidders from obtaining an increased

allocation of awards using shell entities).  *Id.*  The plaintiffs were a group of

bidders that alleged that the defendants filed false certifications and were

therefore awarded a disproportional allocation of property.  *Id.*  Plaintiffs'

theory was not that they personally relied on the defendants' false

certifications.  Rather their theory was that the *county* relied on the false

certifications which, in turn, caused plaintiffs harm in the form of lost

allocations.  *Id.* at 645–46.

The Supreme Court granted certiorari "to resolve the conflict among the

Courts of Appeals on the 'substantial question,' whether first-party reliance is

an element of a civil RICO claim predicated on mail fraud."  *Id.* at 646

(internal citations omitted).  The Court ultimately concluded that the so-called

third-party reliance theory was cognizable.  But in so doing, the Court also

explained:

> Of course, none of this is to say that a RICO plaintiff who
> alleges injury "by reason of" a pattern of mail fraud can
> prevail without showing that *someone* relied on the
> defendant's misrepresentations. . . .  [T]he complete absence
> of reliance may prevent the plaintiff from establishing
> proximate cause. . . .

> Accordingly, it may well be that a RICO plaintiff alleging
> injury by reason of a pattern of mail fraud must establish at
> least third-party reliance in order to prove causation.

*Id.* at 658–59 (internal citations omitted).

Ms. Gaddy also argues that "Judge Shelby appeared to rely on dicta in

*Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006), indicating that the elements

of mail and wire fraud were similar to those of common law fraud, which

includes reliance." (Br. at 49). She goes on to quote and characterize as

incorrect the district court's statement that "Plaintiffs fail to allege any single

predicate act of mail or wire fraud because they fail to allege that they acted in

reliance on any particular false statement in choosing to donate tithing." (*Id.*)

This too mischaracterizes the district court's ruling and grossly

oversimplifies *Tal*'s holding. The district court correctly noted that "[a]

'pattern of racketeering activity' must include at least two predicate acts. And

where the alleged predicate acts sound in fraud, a plaintiff must plausibly

allege each predicate act with the particularity required by Rule 9(b)." (Third

Order at 284) (quoting 18 U.S.C. § 1961(5)). The district court did not say that

wire fraud is the same things as common-law fraud. It said that all fraud

allegations, regardless of their packaging, must be pled with particularity.

Specifically:

> Plaintiffs fail to identify any instance in which they relied on
> a particular misrepresentation in choosing to pay tithing.
> Instead, the Second Amended Complaint states each
> Plaintiff was a lifelong member of the Church who paid
> tithing from a young age and further states, in a conclusory
> manner, they would not have paid tithing had they known
> the truth about Church history and tithing practices. These
> generalized allegations do not satisfy the heightened
> pleading standard imposed under Rule 9(b).

(Third Order at 286).

As the district court explained, Rule 9(b) requires much more than what

Ms. Gaddy offered. The fact that the word "reliance" isn't used in the mail

and wire fraud statutes does not mean a RICO plaintiff can prevail without

connecting misrepresentation to injury—without alleging that *someone* relied on

the defendant's alleged misrepresentations.

Here, Ms. Gaddy does not advance a "third-party reliance" theory. She

does not allege, for example, that others relied on the Church's statements

about tithing in a way that caused her harm. Instead, she advances a theory

that requires first-party reliance. (Although she has not properly pled such

reliance). As the Supreme Court explained, an absence of first-party reliance

"tend[s] to show that an injury was not sufficiently direct to satisfy § 1964(c)'s

proximate-cause requirement." *Bridge*, 553 U.S. at 659. Thus, regardless of

whether the district court characterized the failure as one of reliance (as it did)

or whether the pleading failure is more properly characterized as one of lack of causation (as suggested by the Supreme Court), the result is exactly the same. Ms. Gaddy failed to plead a RICO claim.

### B.    Ms. Gaddy's Tithing Theory Is Also Barred by the First Amendment.

Adjudicating Ms. Gaddy's tithing-based RICO theory would also violate the First Amendment.[11]  To succeed on her claim, Ms. Gaddy would need to prove that the Church's statements about its use of tithing are false.  In other words, Ms. Gaddy seeks to adjudicate whether the Church's use of tithing funds really is "for the Lord's work" and "to support other Church purposes as directed by the designated servants of the Lord."  (Second Amended Complaint, ¶¶ 230, 233).  Examination of these teachings, however, would impermissibly entangle a trial court in an ecclesiastical dispute—the proper use of the Lord's tithing funds and even the meaning of "tithing funds."[12]  This process of "interpreting and weighing" the Church's teachings is "forbidden"

---

[11] As described above, Ms. Gaddy's theory also fails for failure to state a claim upon which relief can be granted.  Accordingly, this Court—like the district court below—need not reach this constitutional issue.  (*See* Third Order at 268 n.208) (addressing this argument only by way of a footnote).

[12] To the extent Gaddy's theory depends on redefining "tithing funds"—which President Hinckley expressly distinguished from "earnings on invested reserve funds," Hinckley, The Condition of the Church, *supra*—that too would require resolution of an "essentially religious controvers[y]"—precisely what the First Amendment forbids.  *Milivojevich*, 426 U.S. at 709.

by the First Amendment. *Presbyterian Church*, 393 U.S. at 451. The proper use of Church funds is a quintessential matter of "church government," one of the "fundamental right[s] of churches to decide for themselves, free from state interference" under the church autonomy doctrine. (First Order at 112) (quoting *Bryce*, 289 F.3d at 655).

To begin with, Ms. Gaddy has not and cannot plead the essential element of falsity, except in a conclusory and non-justiciable manner. In no objectively determinable (or constitutionally permissible) sense can the statements that tithing is used "for the Lord's work" or to "help Jesus Christ's Church grow" be found to be false. These are not "purely secular" statements. Ms. Gaddy cannot establish that the investment of donated funds—for future use by the Church to advance its work—constitutes any kind of fraud. Quite the contrary, the Church has every right under the First Amendment and the laws applicable to any non-profit organization to invest a portion of its funds for future use *by the organization*.[13] As noted above, this precise issue was addressed in *Stone*. 356 P.2d at 634.

---

[13] The Church has also repeatedly disclosed this practice to its members. For example, President Hinckley explained at a worldwide conference in 1991 that unspent tithing funds are invested "to build reserves against what might be called a possible 'rainy day.'" Indeed, Ms. Gaddy reference that talk in the Amended Complaint. (*See* Second Amended Complaint, ¶¶ 331, 340, 345). She also disingenuously alleges that the "information was not provided to" her because she is a woman and "was not invited to the 1991 and 1995 priesthood

Like her fact vs. belief argument, Ms. Gaddy's entire tithing framework presents a false dichotomy.  She attempts to draw a distinction between "commercial" and "religious," alleging that the Church uses tithing funds for "commercial" rather than "religious" purposes.  (*E.g.*, Br. at 48).  But that dichotomy dissolves upon inspection.  Ms. Gaddy describes the Church's *investment* of funds as "commercial" even though those same funds (now invested assets) are merely invested for future needs by the Church.  Apparently, she would have no problem with the Church putting tithing funds in a low-interest savings account or in a mattress, but she claims it is somehow "fraud" to invest earnings on those funds in real estate to generate additional value for future use by the Church.  Said another way, Ms. Gaddy invites the Court to take the place of an investment advisor and decide that putting unexpended tithing funds in a bank account is "religious" and consistent with "the Lord's work," but investing earnings from those funds in real estate is "commercial" and does not "help Jesus Christ's Church to grow."  That is nonsensical and simply cannot constitute "fraud."

---

conference sessions." (*Id.* ¶ 345).  This is sleight-of-hand.  Tellingly, she does not allege that the information was inaccessible to her—rather only that it "was not provided" to her.  This is because President Hinckley's entire sermon was printed the following month in Church magazines and has always been accessible to all members of the Church.  Indeed, all sessions of the Church's General Conference for many decades are recorded, printed, and available to all members.

But falsity is not the only element whose adjudication would require the Court to enter "forbidden territory" under the First Amendment.  The reliance element is similarly problematic—*as highlighted by Ms. Gaddy's own allegations.* As described above, Ms. Gaddy pled that—unsurprisingly—she made her decision to tithe based on her belief in the Church's religious teachings.  *See supra* § II(A)(1).

In short, Ms. Gaddy's own allegations reveal that tithing itself (and the reasons people donate tithing) is inherently "rooted in religious belief."  (First Order at 116).  There is no way to determine upon what an individual would "reasonably rely" in deciding to donate tithing without addressing the Church's *religious* teachings.  In other words, if the Church's teachings are true and God has commanded the payment of tithing, then it is reasonable to pay it.  Conversely, the donation of tithing to the Church is much less reasonable if the Church's teachings are not true.  But those are precisely the questions this Court may not adjudicate under the First Amendment.  Accordingly, the RICO claim fails.[14]

---

[14] Courts around the country have refused to adjudicate disputes over the "proper" use of a church's funds.  *See, e.g, Harris v. Matthews*, 643 S.E.2d 566, 572 (N.C. 2007) ("Because a church's religious doctrine and practice affect its understanding of" how funds should be used, "seeking a court's review of [church governance] matters … is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the

## CONCLUSION

For the reasons stated herein, the Court should affirm in full the district court's dismissal of Ms. Gaddy's RICO claim with prejudice.

## ORAL ARGUMENT STATEMENT

This case presents important questions about the religious autonomy doctrine, which, if decided in Ms. Gaddy's favor would have sweeping implications.

---

congregation's beliefs."); *Heritage Vill. Church & Missionary Fellowship, Inc. v. State*, 263 S.E.2d 726, 735(N.C. 1980) (explaining that a court may not adjudicate whether a church spends "an unreasonable percentage" of its funds for other than "a charitable purpose" because "the propriety of a religious organizations' expenditures can be evaluated only by reference to the religious organization's own doctrinal goals and procedures"); *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington D.C. v. Beards,* 680 A.2d 419, 429 (D.C. App. 1996) ("[A] church's financial regime, including any required reports to members, necessarily reflects an array of decisions about a member's obligation to pledge funds, and about the leaders' corresponding responsibility to account for those funds, that a civil court cannot arbitrate without entangling itself in doctrinal interpretations[.]").

DATED:  March 1, 2024.

Respectfully submitted,

*/s/ David J. Jordan*
David J. Jordan (UT State Bar #1751)
*djordan@foley.com*
Wesley F. Harward (UT State Bar #15623)
*wharward@foley.com*
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT  84111
Telephone: (801) 401-8900

*Attorneys for Appellee/Respondent Corporation of the President of The Church of Jesus Christ of Latter-day Saints*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 10,604 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

I also certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

*/s/ David J. Jordan*
David J. Jordan