# IN THE UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

| | |
|---|---|
| **LAURA A. GADDY**, **LYLE D. SMALL, LEANNE R. HARRIS,** Individually, and on behalf of all others similarly situated, <br><br> *Appellants,* <br> **v.** <br><br> **CORPORATION of the PRESIDENT of the CHURCH OF JESUS CHRIST of LATTER-DAY SAINTS,** A Utah corporation sole and DOES 1-50 <br><br> *Appellee.* | **CASE NO. 23-4110** |

On Appeal from the United States District Court for the District of Utah

The Honorable Judge Robert J. Shelby, District Court Case No: 2:19-cv-00554

## APPELLANTS' REPLY BRIEF

Kay Burningham, Attorney at Law
299 S. Main St. #1375,
Wells Fargo Bank Bldg.
Salt Lake City, Utah 84111
kay@kayburningham.com
(888) 234-3706

Date: April 15, 2024                Oral Argument is requested

# TABLE OF CONTENTS

**GLOSSARY OF TERMS AND ABBREVIATIONS** ..................................................6

**I.The Church Autonomy Doctrine (C.A.D.) is not a Defense to Crime.** .........11

    A.    The Church Seeks to Greatly Expand the Scope of the C.A.D. ................12

    B.    Churches are Subject to Neutral Laws of General Applicability. .............12

    C.    Crime has Never been Protected under the C.A.D. ...................................13

    D.    There is No Establishment Clause Violation. ...........................................14

**II. The Sole Justification for a First Amendment Religious Defense is to Protect Sincerely Held Beliefs.** ...................................................................15

**III. There was/is no Theological Dispute; Rather, Appellants were Induced to Remain in the Church through Material Representations of Fact.** ................16

    A.    Gaddy is not About an Internal Theological Dispute. ...............................16

    B.    Consent Based on Fraud is Different from Disclosure Negligence. .........17

    C.    The Church's Deceptive Scheme Cannot be Reconciled with Moral Law 18

**IV. Appellants have Met the RICO Falsity and Reliance Requirements.** ......18

    A.    Brethren's States of Mind were Alleged as False Statements of Fact. ......18

    B.    Deceit, a False Promise of Future Performance, was Alleged. .................19

    C.    Lying for Gain is not Protected by the C.A.D. .........................................20

    D.    Falsity is not Required where Material Information is Concealed ...........20

**V. Kennedy was an Exception to Emply. Div. Because of Hybrid Rights** ......23

**VI. RFRA Should Not be Applied to Lawsuits between Private Parties.** ........23

**VII Assuming, Arguendo, that the RICO and/or the Federal Fraud Statutes are not Neutral or Generally Applicable, and/or RFRA Applies, the Church would not Suffer a Substantial Burden by Submitting to those Laws.** ...........24

    A    A Substantial Burden has Not been Identified. ..........................................24

    B.    Assuming Arguendo, a Substantial Burden has been Shown, Quashing the High Rate of Utah Fraud is a Compelling Governmental Interest. ....................24

    C.    "Substantial Burden" is not Primarily a Monetary Risk. .............................25

**VIII  RICO is the Least Restrictive Means to Control Religious Fraud.** .................26

**_IX Non-LDS Churches' Historical Claims are Easily Distinguished.** ............27

**X  Appellants Adequately Pleaded Misrepresentations of Historical Fact, and Tithing Use. .................................................................................28**

    A. Gaddy Complied with Rule 9(b), when the 2AC is Taken as a Whole.........28

    B. Reliance was Alleged, and is Inferred from Omissions of Material Fact........28

    C. Transmission by Mail and/or Wire is Reasonably Inferred from the Allegations Incorporated into the RICO Claim. ..................................................30

    D, The Tithing Claims were Adequately Pleaded. ...............................................31

**XI  RICO Claims based on the Federal Fraud Statutes are Allowed against Churches that have Admittedly Deceived Members through Misrepresentations of Material Facts upon which Individuals come to Base their Religious Beliefs. ...........................................................43**

**CERTIFICATE OF COMPLIANCE.........................................................45**

## TABLE OF AUTHORITIES

**Cases**                                                          **Page**

Affiliated Ute Citizens of Utah v. United States,

    406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972).........................................21

Agostini v. Felton,

    521 U.S. 203, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997)..................................13

Ashcroft v. Iqbal,

    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)..................................28

Baskerville v. Fed. Land Bank,

    25 F.3d 1055 (10th Cir. 1994)............................................................................29

Bryce v. Episcopal Church in the Diocese of Colorado,

    289 F.3d 648 (10th Cir. 2002)............................................................................14

Burwell v. Hobby Lobby Stores, Inc.,

    573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014)..................................23

Cantwell v. State of Connecticut,

    310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940)...........................................22

Carpenter v. United States,

    484 U.S. 19, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987)............................................. 19

CGC Holding Co., LLC v. Broad & Cassel,

    773 F.3d 1076.................................................................................................. 20

Clark v. Newman Univ., Inc.,

    2022 WL 4130828 (D. Kan. Sept. 12, 2022) .......................................................... 21

Clinton v. Sec. Benefit Life Ins. Co.,

    63 F.4th 1264 (10th Cir. 2023) ........................................................... 18, 26, 29, 30

Durland v. U S,

    161 U.S. 306, 16 S. Ct. 508, 40 L. Ed. 709 (1896)................................................. 17

Emp. Div., Dep't of Hum. Res. of Oregon v. Smith,

    494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)....................................... 11

George v. Urb. Settlement Servs.,

    833 F.3d 1242 (10th Cir. 2016)............................................................................. 29

Gibson v. Brewer,

    952 S.W.2d 239 (Mo. 1997) ................................................................................ 12

Kennedy v. Bremerton Sch. Dist.,

    597 U.S. 507, 142 S. Ct. 2407, 213 L. Ed. 2d 755 (2022)............................... 12, 21

Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,

    575 U.S. 175, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015)...................................... 17

Quintana v. Santa Fe Cnty. Bd. of Commissioners,

    973 F.3d 1022 (10th Cir. 2020).............................................................................. 26

Reynolds v. United States,

    98 U.S. 145, 25 L. Ed. 244 (1878) ........................................................................ 11

Schwartz v. Celestial Seasonings, Inc.,

    124 F.3d 1246 (10th Cir. 1997)........................................................................ 28, 29

Stone v. Salt Lake City,

    11 Utah 2d 196, 356 P.2d 631 (1960) ................................................ 32

Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,

    450 U.S. 707, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981) ..................................... 14

United States v. Alvarez,

    567 U.S. 709, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012) ................................... 18

United States v. Ballard,

    322 U.S. 78, 64 S. Ct. 882, 88 L. Ed. 1148 (1944) ......................................... 13

United States v. Quaintance,

    608 F.3d 717 (10th Cir. 2010) ................................................................... 22

United States v. Seeger,

    380 U.S. 163, 85 S. Ct. 850, 13 L. Ed. 2d 733 (1965) ....................................... 14

Watson v. Jones,

    80 U.S. 679, 20 L. Ed. 666 (1871) ............................................................ 15, 16

Williams v. United States,

    368 F.2d 972 (10th Cir. 1966) ................................................................... 19

Wisconsin v. Yoder,

    406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ....................................... 14

Young v. Colorado Dep't of Corr.,

    94 F.4th 1242 (10th Cir. 2024) ................................................................... 28

**Statutes**

18 U.S.C.A. § 1961-1968 ......................................................................... 8

18 U.S.C.A.§338 ................................................................................... 17

18 U.S.C.A.§1962(c) ............................................................................. 11

**Rules**

Fed. R. App. P. 32(a)(5) ......................................................................... 43

Fed. R. App. P. 32(a)(6) ......................................................................... 43

Fed. R. App. P. 32(a)(7) ............................................................ 43

Fed. R. App. P. 32(f) ................................................................ 43

Fed. R. Civ. P. 9(b) .............................................................. 28, 29

**Other Authorities**

An Extended Essay on Church Autonomy,

    22 Federalist Soc' Rev. 244 (2021) ....................................... 16

The Limits of Church Autonomy,

    98 Notre Dame L. Rev. 1253 (2023) .................................. 12

## <u>GLOSSARY OF TERMS AND ABBREVIATIONS</u>

**2AC** is the Second Amended Complaint

**7thbr.** is the 7th Day Adventist, et.al., Amicus Brief.

**Anti-Mormon**: term used by LDS leaders, both paid and lay, and LDS members to describe any non-correlated information, especially facts that contradict the correlated narrative of LDS history. Also used to label individuals who don't agree with LDS doctrine.

**APLEbr.** Is the Appellee's Brief.

**APNTbr**. Is the Appellants' Brief

**BFbr**. is the Becket Fund Amicus Brief

**(BIC) Bonneville International Corporation.** is a media broadcasting corporation and
wholly owned subsidiary of the C.O.P., through its for-profit subsidiary, DMC. It began as a radio and TV network. It now owns over a dozen stations in major markets and an NBC affiliate
television station in its home market; it also manages additional radio stations. In 1980 BIC
formed Bonneville Communications Corporation, primarily to broadcast General Conference. (AV3:¶134)

**(BofA)  Book of Abraham**. LDS scripture, part of the canonized Pearl of Great Price, taught as written by the Hebrew Prophet Abraham in reformed Egyptian, upon papyri. Joseph Smith translated the papyri into the Book of Abraham, which also contains three facsimiles; the figures therein are taught as depicting Abraham interacting with Egyptian men.

**(BofM)  Book of Mormon**: The Book of Mormon is believed by the LDS Church to be the translated record of Hebrews who migrated to America in 600 B.C. Over the years, the Hebrew emigrants devolved into two main warring factions, the lighter skinned Nephites, and the dark-skinned Lamanites. The Nephite prophets kept a record of their history and the teachings of their leaders for the latter-days which was inscribed in "reformed Egyptian" on gold plates and then buried in a hill near Smith's upstate New York home.

**Brethren**: Defendants full time paid corporate leaders. The Quorum of the Twelve and three members of the First Presidency, a total fifteen members. (AV3:2 n.2.)

**C.A.D.** Church Autonomy Doctrine

**Church**: Church of Jesus Christ of Latter-day Saints

**COJCOLDS**: "Church of Jesus Christ of Latter-day Saints," a C.O.P.-owned trademark.

**COP or C.O.P.**: Corporation of the President of the Church of Jesus Christ of Latter-day Saints, Defendant in this case. Name of Defendant at the time the original complaint was filed. Defendant was the Corporation of the President of the Church of Jesus Christ of Latter-day Saints, doing business as [T]he Church of Jesus Christ of Latter-day Saints®, a registered trademark of Intellectual Reserve, Inc. It is believed to have since changed its name since the original complaint was filed. Therefore, Appellants will refer to the entity as "the Church," or Appellee, though prior references in pleadings refer to "COP," or "COJCOLDS.

**Correlation Department**: A department within the Church that was created in 1961 whereby the "First Presidency" approves all communication to its members, including publications, General Conference speeches, artwork, teaching, and missionary manuals.

**Correlated:** Rhetoric that has been approved by Correlation. The only type of material approved for teaching by both paid and local lay teachers, to all lay members in the Church.

**(DMC) Deseret Management Corporation:** Deseret Management Corporation is a private asset management holding company of for-profit businesses owned by COP. DMC's Board of Directors includes the First Presidency.

**(DN) Deseret News:** a C.O.P-owned newspaper, owned by its subsidiary, Deseret Management Corp., a holding company for businesses affiliated with the LDS Church (APNTbr.p.45n.22;AV3¶116 chart)

**(DC) District Court**

**Ensign Magazine: (Ensign)** COP-owned and correlated magazine (APNTbr.p.45.n.22)

**(EPA): Ensign Peak Advisors** an asset and investment management firm created in 1997 which, upon information and belief, has accumulated profits from investing tithing, including tithing principal, to over $128+ billion as of 2019, in a mostly liquid fund used to finance COP for profit businesses, including Salt Lake's City Creek shopping Mall. It was also used to bail-out Beneficial Life Insurance Company, another for-profit COP affiliate, which as of 2009 has ceased to write insurance policies. (2AC¶139)

**FLDS**: The Fundamentalist Church of Jesus Christ of Latter-day Saints. A religion that also finds its roots in the Book of Mormon.

**First Presidency**: a trio of men leading the Church, consisting of the President (who is also the LDS prophet), and his two counselors.

**General Authorities (GAs)**: LDS men who serve in paid Church leadership positions, including the Brethren and each member of the twelve quorums of the Seventy, of which there are hundreds stationed world-wide. (AV3:¶113).

**General Conference (GC)**: Biannual global meetings held in April and October over two days on a weekend, several hours each day, whereby GAs speak to all members of the Church. The priesthood session is held Saturday evening and only men are allowed to attend. The sessions are televised (streamed via satellite and the internet) for the general membership, with the exception of the priesthood meeting.

As of 2014, the priesthood session is now available electronically, but women are still barred from attending.

**Hill Cumorah:** Located in Manchester, New York, is the place where Joseph Smith met annually with the angel Moroni from 1823 to 1827. On September 22, 1827, the angel allowed Joseph to obtain the gold plates from which the Book of Mormon would be translated.

**Institute**: Where college age members are taught LDS history and theology.

**Joseph Smith, Jr. (Jospeh Smith/Smith)** Early 19th Century founder of Mormonism and the LDS Church.

**Lamanite(s):** People descended from Laman, a son of the Hebrew prophet Lehi, and identified as the ancestors of the American Indians. Compare Nephite.

**LDS:** shorthand term for Latter-day Saint, deemed less offensive than the word "Mormon," which President Nelson has discouraged. Also used to refer to members of the LDS Church.

**Mormon:** religious groups ideologically similar to the LDS Church, founded based on the writings of Joseph Smith as contained in the Book of Mormon.

**Nephites**: a member of a people descended from Nephi, a son of the Hebrew prophet Lehi who led a colony from Jerusalem to America about 600 B.C.E. organized as a church by the risen Christ and exterminated by the Lamanites leaving the scriptures recorded in the Book of Mormon.

**Reformed Egyptian:** the ancient language which LDS were taught was inscribed on the gold plates that Jospeh Smith obtained from Hill Cumorah and from which he translated the BofM.

**RICO** The Racketeer Influenced and Corrupt Organizations Statute of 1970. (RICO) 18 U.S.C.A. § 1961-1968. Appellants have brought a 1961(c) claim as the 2AC Sixth Cause of Action. (AV3:186)

**Second Amended Complaint (2AC)** Complaint dismissed without leave to amend, by DC Judge Shelby.

**Seerstone(s) or Seer Stone(s):** According to LDS theology, seerstones were used by Joseph Smith as well as ancient prophets, to receive revelation from God.

**Seminary**: Organization where high school age members are taught LDS doctrine.

**Tithing**: 10% of one's increase or income. A full tithe is required for LDS members to participate in the temple ordinances, which are in turn required for families to be together in eternity.

**Urim and Thummim. (U&T) aka Interpreters.** In the Hebrew Bible, the Urim and the Thummim are elements of the hoshen, the breastplate worn by the High Priest attached to the ephod. In LDS history, they are described as spectacles attached to a breast plate used by Joseph Smith to translate the first 116 pages of the "BofM," that were lost by Martin Harris. Thereafter, Smith used a seerstone or stones to translate that which is the extant BofM text.

Pursuant to the Federal Rules of Appellate Procedure, Appellants hereby submit their Reply Brief.

## I.    The Church Autonomy Doctrine (C.A.D.) is not a Defense to Crime.

A principle that a church can "decide for itself "matters of faith and doctrine," (APLEbr.p.15, 28-29;BFbr.p.3;7thbr.p.10), does not permit criminal conduct. Appellee misrepresented numerous facts to LDS members, current and potential, accomplished through the correlated restriction of what was taught and promulgated. For example, the *only* type of artwork depicted in its publications and displayed throughout the Church depicted founder Joseph Smith appearing to translate the Book of Mormon (BofA) directly from open gold plates, no seerstone used. This is in contrast to the 2020 admission by LDS President Nelson that Smith peered into a hat containing seerstone(s) to translate the BofM, *while the gold plates were "covered usually."* Appellants were shocked to learn that Smith dictated the wisdom of the ancient Nephite prophets by peering at a stone in a hat, and not by looking at the Reformed Egyptian inscriptions on gold plates.

Additionally, Appellee intentionally concealed key artifacts and documents, that, had they been disclosed, would have led reasonable LDS members to draw radically different conclusions about Joseph Smith, and the source of LDS scripture, from what the correlated rhetoric represented. [1]

---

[1] Pages appear after the Appendix Volume, e.g. AV4:106, means Appendix

A.    The Church Seeks to Greatly Expand the Scope of the C.A.D.

Binding precedent holds only that church autonomy defeats challenges to minister/teacher choice,  internal decisions by churches' adjudicatory bodies, and defamation claims based on internal church discussions (AV4:178-182). It has gone no further.

B.    Churches are Subject to Neutral Laws of General Applicability.

Amici argue that the Racketeer Influenced and Corrupt Organizations Statute (RICO) claims applied to churches sets a dangerous precedent, and that there is "nothing unique" about Gaddy to set it apart from representations of "religious facts" promulgated by other churches (7thBr.pp.4-8). They are wrong on both counts.

The federal mail and wire fraud statutes ("federal fraud statutes," or "mail/wire fraud") and RICO are neutral laws of general applicability. Therefore, granting a church exemption from those criminal laws would give it a benefit denied secular organizations. Reynolds v. United States, 98 U.S. 145, 166, 25 L. Ed. 244 (1878) (Bigamy conviction upheld.)

Where a law is neutral and generally applicable, there is no constitutional right to a religious exemption; religious exercise may be "incidentally burdened."

---

Volume 4, page 106. Paragraphs are noted after the volume, or page, with the "¶" sign, e.g., AV3¶167, or AV3:71¶167.

Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 872, 110 S. Ct. 1595, 1596, 108 L. Ed. 2d 876 (1990) (Users of peyote during religious ceremony denied unemployment compensation based on drug law violation). Citing Reynolds, Id., the Court reasoned that one cannot excuse actions which break neutral generally applicable laws because of religious beliefs. "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." 494 U.S. at 879.

Mail/wire fraud statutes and 18 U.S.C.A.§1962(c) of the RICO Act are neutral laws of general applicability. Therefore, they fall under Employment. Division's rule.

C.    Crime has Never been Protected under the C.A.D.

The Employment Division Rule clearly applies to "generally applicable criminal law." 494 U.S. at 884. "It also logically applies to intentional torts. Religious conduct intended or certain to cause harm need not be tolerated under the First Amendment." Gibson v. Brewer, 952 S.W.2d 239, 248 (Mo. 1997) (No First Amendment violation by adjudication of claim of intentional failure to supervise priest.)

When the First Amendment was drafted, "religious liberty itself [was] defined in relationship to an accountability principle—where each state had a

limitation point for the extent of church actions." [2] Although not specifically addressing fraud, Attorney Lael Weinberger, Stanford Constitutional Law Fellow, argues that "Church autonomy does not protect historically recognized criminal conduct…"[3] By extension, intentional torts based on crimes are also outside the limits of church autonomy.[4]

>D.    There is No Establishment Clause Violation.

The Establishment Clause, a fortiori, any entanglement arguments advanced by the churches (APEbr.pp.17,41;BFbr.p.20;7[th]br.pp.18, 24), must be interpreted by "'reference to historical practices and understandings,'" Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 535, 142 S. Ct. 2407, 2428, 213 L. Ed. 2d 755 (2022). The history-only approach must be used "in place of Lemon and the endorsement test." 597 U.S. at 510.

Opposition entanglement arguments are unavailing. Never has the prosecution of crimes been forgone due to entanglement. Entanglement between church and state is not necessarily negative, as reasoned in Agostini v. Felton, 521 U.S. 203, 233, 117 S. Ct. 1997, 2015, 138 L. Ed. 2d 391 (1997) where the Court found no evidence to support its former presumption that the entrance of public-

---

[2]

Lael Weinberger, The Limits of Church Autonomy, 98 Notre Dame L. Rev. 1253, 1305 (2023)
[3] Id. at 1316.
[4] Id.

school teachers into parochial schools would inevitably lead to the indoctrination of state-sponsored religion. It held that only those policies which generate an excessive conflict between church and state violate the Establishment Clause.

## II.    The Sole Justification for a First Amendment Religious Defense is to Protect Sincerely Held Beliefs.

United States v. Ballard, 322 U.S. 78, 82, 64 S. Ct. 882, 884, 88 L. Ed. 1148 (1944) held that a court cannot litigate the truth or falsity of religious beliefs. Though the issue was not appealed, the trial court allowed the jury to decide the question of defendants' sincerity in those beliefs, where the trial judge emphasized the "good faith" of defendants.

Appellee argues that since religious adherents believe in facts that are part of religious history or practice, the fact v. belief distinction is a false dichotomy. (APLEbr.p.23) Nevertheless, a belief must be sincere; otherwise, it is ipso facto not a belief. If "religious facts" are beliefs entitled to special treatment because they are promulgated by churches, they must be sincerely believed. The absence of LDS leaders' sincere belief in a religious fact renders it secular.

Where the LDS Church's prophet admits that the process by which its scripture was translated is radically different from the sole type of depiction/representation promulgated over half a century, there is no exercise "rooted in religious belief," to be protected.

Sincerity is a longstanding threshold requirement for First Amendment protection.

> [W]hile the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption as a conscientious objector.

United States v. Seeger, 380 U.S. 163, 185, 85 S. Ct. 850, 863, 13 L. Ed. 2d 733 (1965)

Subsequent precedent is in accord. Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) (Amish belief that no formal schooling needed for children over sixteen); Thomas v. Rev. Bd. of Indiana Emp. Sec. Div., 450 U.S. 707, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981) (Benefits awarded employee who quit job rather than manufacture weapons upheld); and Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 652 (10th Cir. 2002) (Episcopalian belief that homosexuals should not be ministers).

## III.    **There was/is no Theological Dispute; Rather, Appellants were Induced to Remain in the Church through Material Representations of Fact.[5]**

A.    Gaddy is not About an Internal Theological Dispute.

Amicus incorrectly characterizes this case as an internal theological dispute (BRbr.pp.7-8). If it were, concededly, the state should not take sides. Watson v.

---

[5] Appellants were baptized as children.

Jones, 80 U.S. 679, 20 L. Ed. 666 (1871). (Factions developed over slavery issue; State would not interfere with the church-adjudicated policy rejecting slavery.) However, Gaddy is not about an internal theological dispute because the Church has admitted the materiality of previously concealed information through recently published essays, thus admitting the prior tort.

Additionally, since Correlation began, speech among LDS members has been censored. Professional LDS "[h]istorians…Fawn Brodie and D. Michal Quinn were excommunicated for writing accurate history about Smith and early Mormonism;" official LDS historian Leonard Arrington was demoted for attempting to do the same. AV3¶216-217. Only the correlated version of LDS history is taught/discussed. Whenever non-correlated facts are raised, they are shut down. "When the prophet speaks, the debate is over." And, as taught to Appellants' parents, "When our leaders speak, the thinking has been done." (AV3¶61.)

B.    Consent Based on Fraud is Different from Disclosure Negligence.

Amicus compares fraud in the inducement to a negligence claim requiring a standard of care (BFbr.pp.26-28). However, occasional disclosure carelessness is not equivalent to inducing belief in a particular church through intentional misrepresentation and concealment of the most material of all things—how that Church was founded, and by whom. Additionally, material omissions with respect

to Appellee's use of tithes, had they been known, would have been a substantial

factor in determining Appellants' decisions with respect to the Church (AV3¶477).

C. The Church's Deceptive Scheme Cannot be Reconciled with Moral Law

Watson limited church autonomy to that which is moral. Id. at 723.

Protection of insincerely held beliefs safeguards intrinsically immoral behavior.

St. Thomas Aquinas, inspired by Aristotle, wrote that "Words by their nature being

signs of thought, it is contrary to their nature and out of order for anyone to convey

in words something other than what he thinks." [6] Lying deprives the victim of his

autonomy by manipulating his actions for the speaker's purposes. The Church

admitted they lied by acknowledging omissions of previously concealed material

information. "[T]he Religion Clauses must not be allowed to become a refuge for

fakers, frauds, and charlatans." [7]

## IV. Appellants have Met the RICO Falsity and Reliance Requirements.

A.  The Brethren's States of Mind were Alleged as False Statements of Fact.

The Church argues that Appellants failed to plead falsity (APLEbr.p.24).

This is incorrect. Gaddy pleaded falsity regarding the Brethren's state of mind

---

[6] Thomas Aquinas, *41 Summa Theologiae 2a2ae, 110, 3*, in T. C. O'Brien (ed.)
(1971) pps. 157–159.
[7]  Carl H. Esbeck, An Extended Essay on Church Autonomy, 22 Federalist Soc'
Rev. 244, 257 (2021).

(AV3:¶¶451-462). The Brethren, speaking as one through correlated material, defined as "pure doctrine," misrepresented their collective state of mind (APNTbr.p.53).

Becket misconstrues the phrase "where a religious organization acts in "bad faith for secular purposes," (BFbr.p.30). The Brethren's statements that they (the prophet and sometimes apostles) "will never lead [LDS members] astray," (AV3¶144) must at least mean that the speaker has a good faith belief that the promised future act will not happen. Yet at the times these statements were made, concealed in Church archives were the opaque brown seerstone used in translation, and documents proving Smith's character was radically different from what the Church portrayed. "Every [ ] statement [of belief] explicitly affirms one fact: that the speaker actually holds the stated belief." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 176, 135 S. Ct. 1318, 1321, 191 L. Ed. 2d 253 (2015)

Secular purpose can be inferred from Appellee's initial funding of EPA, and thereafter annually depositing $1-2 Billion of surplus tithing into EPA (AV3:¶9), when compared to spending just $1.3B in humanitarian aid over 25 years (AV3¶8).

B.   Deceit, a False Promise of Future Performance, was Alleged.

Fraud defined under 18 U.S.C.A.§338, the precursor to §1341(mail fraud), under which the Ballard Defendants were charged, was held to include promises of

future performance. Durland v. U S, 161 U.S. 306, 16 S. Ct. 508, 510, 40 L. Ed. 709 (1896). Appellants' deceit claim was incorporated into their RICO claim (AV3¶¶451-462 via AV3¶481). This promise was false because the Brethren did not believe those statements when they were made.

C.     Lying for Gain is not Protected by the C.A.D.

Undoubtedly, the Church intentionally deceived its followers, as admitted by Apostle Packer (AV3¶214), and Columbia Professor Bushman (AV3¶¶267-269), and as witnessed by Historian Arrington (AV3¶¶168-170). Former CES employee Ken Clark confirms a Church-sanctioned habit of lying for religious reasons (AV3¶247). Historian Snow conceded the recent essay admissions were leaked slowly in order to "inoculate" members, presumably against the shocking realization that they'd been deceived.

Although lying is protected speech, fraud is not. United States v. Alvarez, 567 U.S. 709, 723, 132 S. Ct. 2537, 2547, 183 L. Ed. 2d 574 (2012). (Lying about receipt of a medal held protected speech. Lie didn't rise to the level of fraud or other types of speech exempt from First Amendment protection).

D.     Falsity is not Required where Material Information is Concealed.

Clinton v. Sec. Benefit Life Ins. Co., 63 F.4th 1264, 1284 (10th Cir. 2023) held that falsity need not be alleged in order to satisfy the elements of the mail and wire fraud statutes as predicate acts under RICO. Clinton alleged Issuer Security

Benefit devised a scheme to develop/sell equity-indexed deferred annuities that it knew would produce near-zero returns and used deceptive marketing practices to induce consumers to purchase these products. Issuer's statement that equity-indexed deferred annuity was "uncapped" was a misrepresentation actionable under mail and wire fraud statutes for annuitants' RICO claim, even though annuitants never alleged the annuities were "capped," but alleged that the issuer never disclosed how annuity's features functioned collectively in practice to reduce the proprietary indices' performance and limit returns.

Just as the annuitants never alleged the annuities were "capped," Appellants need not allege falsity. The material omission of the brown seerstone admittedly used in BofM translation, and the fact that the gold plates were "covered usually," is enough. These omissions are equivalent to the material information concealed from the Clinton annuitants.

"Fraudulent representations," as used in mail/wire fraud statutes "may be effected by deceitful statements…or the *concealment* of material facts." [8] Williams v. United States, 368 F.2d 972, 775 (10th Cir. 1966). Carpenter v. United States, 484 U.S. 19, 27, 108 S. Ct. 316, 321, 98 L. Ed. 2d 275 (1987). (Determination of

---

[8] Due to word count, arguments about First Vision and Book of Abraham (BofA) concealment are limited.

falsity not required in mail/wire fraud. Rather, the elements of these predicate acts are satisfied where defendant uses a cunning scheme intended to deceive.)

Contrary to the Church's claim, the fact that federal fraud statutes don't require reliance was briefly referenced below, but wasn't argued in depth because reliance, *as an element of those statutes*, was not raised by the DC until its final order of dismissal (AV4:283). The Church failed to raise the issue *as to RICO* in either its Motion to Dismiss the 2AC (AV4:141-142), or its Reply (AV4:219-220).

Additionally, Appellee cites no authority for the proposition that a failure to raise an issue in a motion to vacate constitutes waiver (APLEbr.p.37), nor argues that reliance *in the context of the federal fraud statutes* was addressed by either it , or the DC prior to its final order (APLEbr.p.37).

Although third party reliance doesn't apply in Gaddy (APLEbr.p.37), the Church omits any reference to Appellants' omission argument. Given a *material* omission, reliance is inferred and is sufficient to constitute fraud under the federal fraud statutes. Appellants addressed below how concealment of material facts is sufficient under RICO (APNTbr.p.50).

One cannot rely on something concealed, but when material information is concealed, it is a matter of "commonsense" to infer reliance. CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d 1076, 1095 n.12,13 (10th Cir. 2014). (An *inference* of reliance is sufficient in the context of RICO class certification where

a victim would consider the concealed facts material to his decision.)  See also

Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S. Ct. 1456, 31

L. Ed. 2d 741 (1972). (Probability of reliance derived from the "materiality" of the

information, and its effect on a "reasonable" investor.) Likewise, Appellants

would have "passed" on Mormonism had they known of the concealed material

facts/artifacts and tithing use, when committing to the Church as an adult.

## V.    Kennedy was an Exception to Emply. Div. Because of Hybrid Rights

In Kennedy, 597 U.S. 507, public-school football coach Kennedy's rights

under the Free Exercise Clause were violated when the district suspended him

because he persisted in praying quietly at midfield. However, that policy wasn't

neutral or generally applicable; it was specifically directed at religious practice.

Thus, the strict scrutiny test applied. 597 U.S. at 508.

## VI.    RFRA Should Not be Applied to Lawsuits between Private Parties.

Amici's argument that the Court can affirm the DC's ruling on any basis

(7thBr.pp.19-21), shouldn't apply with respect to invoking an RFRA defense. "The

text of the statute makes quite clear that Congress intended RFRA to apply only to

suits in which the government is a party." Clark v. Newman Univ., Inc., No. CV

19-1033-KHV, 2022 WL 4130828, at *12 (D. Kan. Sept. 12, 2022). Furthermore,

it was not argued as plain error.

However, even if applied to the facts of this case, Appellee must show that enforcement of the RICO claim, including its predicate acts:  "(1) substantially burdens (2) a religious belief,…(3) *that the defendant sincerely holds."* (Citation omitted. Emphasis added.) United States v. Quaintance, 608 F.3d 717, 719 (10th Cir. 2010). In this case the Church cannot meet the sincerity test.

**VII    Assuming, Arguendo, that the RICO and/or the Federal Fraud Statutes are not Neutral or Generally Applicable, and/or that RFRA Applies, the Church would not Suffer a Substantial Burden by Submitting to those Laws.**

7th Day Adventist, Evangelical and Jewish organizations argue RFRA applies and thus, a Free Exercise analysis is required (7[th]br.pp.19-23).

A    A Substantial Burden has Not been Identified.

The Church must identify *what* belief compliance with mail/wire fraud statutes would substantially burden, yet that has not been identified. It appears that the practice of continuing to misrepresent its origins and the character of its founding prophet is the exercise that the Church seeks to protect (AV3¶247).

B.    Assuming Arguendo, a Substantial Burden has been Shown, Quashing the High Rate of Utah Fraud is a Compelling Governmental Interest.

"Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public.

Certainly, penal laws are available to punish such conduct." Cantwell v. State of Connecticut, 310 U.S. 296, 306, 60 S. Ct. 900, 904, 84 L. Ed. 1213 (1940).

From 2008-2018 Utah was the nationwide leader in affinity fraud by two-thirds more than the next state. Attorney Mark Pugsley reasons that it's because faithful LDS trust their leaders (AV3¶¶22-23). If insincerely believed factual misrepresentations by churches were allowed, any unscrupulous business entity could incorporate a body of religious history and practice into its organization, thereby insulating itself from the federal fraud statutes and RICO.

C.  "Substantial Burden" is not Primarily a Monetary Risk.

Amici incorrectly claim the class sought to be certified is "all people who have paid tithing," (7[th]br.p.4). However, it is only those who have tithed and resigned (AV3¶347). Amici characterize the risk of an $800,000 penalty in Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 723, 134 S. Ct. 2751, 2777, 189 L. Ed. 2d 675 (2014). as the substantial burden (7[th]br.p.23). However, the true burden was putting "family-run businesses" to the choice of violating their sincerely held religious beliefs that life begins at conception, or making all of their employees lose their existing healthcare plans." Id. at 723.

Here, any burden on the LDS Church would be slight. As to past misrepresentations of its history, it need only forego continuing concealment of material historical facts. A step in that direction has been accomplished, though

without restitution to those harmed. Regarding concealment of how the Church used its tithing to expand its commercial empire, it need only provide an accounting of tithes received and how they are spent, as most churches do, and as it formerly did before 1960.

**VIII   RICO is the Least Restrictive Means to Control Religious Fraud.**

Amici argue that "the most obvious less-restrictive means is to go after behavior that actually causes the harm the RICO statute is directed at," (7thbr.p.31). This is what Appellants *are* doing. They only request that the Church be held accountable under the law for its previously admitted fraudulent misrepresentations of fact that were not believed, and thus not doctrinal, about LDS history and Joseph Smith. And, that they provide additional information so that the partial truths they had previously told about tithing use is not misleading.

Amici also argue that subjecting churches to RICO is not the least restrictive means for accomplishing a government's compelling state interest, noting treble damages as inappropriate (7thbr.pp.30-31). However, common law fraud claims support damages for personal injury, e.g., emotional distress, as opposed to mere property. Furthermore, a common law fraud claim can be the basis for punitive damages up to nine times special damages.

Additionally, the DC previously ruled that: "The Church can be liable for fraud under an omission theory only if it has made a material statement that is

misleading unless additional facts are supplied." (APNTbr.p.49, citing AV2:200).

Omissions are a basis for a common law fraud claim. Therefore, common law

fraud claims are not less restrictive than RICO.

## IX    Non-LDS Churches' Historical Claims are Easily Distinguished.

The 2AC is replete with specific allegations of correlated materials that the

Brethren did not believe. Although it would be almost impossible to determine, the

historical facts enumerated in the opposition briefs, e.g., Moses parting the Red Sea

(APLEbr.p.11;BFbr.p.12) and witnessing a burning bush (7thbr.p.6) these events are

distinguishable. 1) extant evidence of misrepresentation of those facts is missing;

and more importantly, 2) material facts, artifacts, or other evidence that directly

contradict prior factual representations have not been disclosed or admitted by their

religious authors and/or those who promulgated the facts.

Appellee incorrectly compares concealment of evidence to secular provability

by analogizing to the Earth's age (APLEbr.p.22). Appellants agree that the C.A.D.

protects a Church's right to believe in events that contradict science. However, the

accurate analogy to this case would be if Christian churches had conspired with

archeologists to conceal geological evidence of anything other than a 6,000-year-

old Earth. Had that happened, and had they subsequently disclosed the concealed

geological evidence, that would be similar to Appellants' case.

## X  Appellants Adequately Pleaded Misrepresentations of Historical Fact, and Tithing Use.

A. Gaddy Complied with Rule 9(b), when the 2AC is Taken as a Whole.

Granting a motion to dismiss is a harsh remedy, for which there is a low bar. Quintana v. Santa Fe Cnty. Bd. of Commissioners, 973 F.3d 1022, 1034 (10th Cir. 2020); Clinton, 63 F.4th at 1276–1277.

"[T]he most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) ... is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading." (63 F.4th at 1277.)

B. Reliance was Alleged, and is Inferred from Omissions of Material Fact

The Church argues "Gaddy failed to plead the requirements of her RICO claim." (APLEbr.p.31). However, Appellants demonstrated that they specifically alleged reliance on tithing misrepresentations (APNTbr.pp.47-48). Additionally, reliance on misrepresentations about LDS history is alleged throughout the 2AC. For example, Gaddy's viewing in her chapel, AV3¶304 and teaching *from the only type of art provided [correlated or otherwise]—the open translation from gold plates* (AV3¶314,¶333), her devastation upon learning that Joseph Smith lied about his participation in polygamy (AV3¶¶325-326), and RICO claim AV3¶521,

wherein Appellants acted "…in reliance upon Defendant's affirmative

misrepresentations…," about LDS history.

These misrepresentations were then itemized, including the Brethren's states

of mind. Furthermore, the Church's concealment of material information

inferentially demonstrates reliance (AV3:¶432¶441¶).

The RICO claim is located at AV3¶¶481-535. The transmission process and

intent to deceive are generally alleged in "Mail and Wire Fraud Allegations,"

(AV3¶¶291-301), which are incorporated by reference into the RICO claim via

AV3¶481.

Additionally, the RICO claim alleges:

It is not possible for GADDY, SMALL and HARRIS to plead with
particularity all instances of mail and wire fraud that advanced,
furthered, executed, and concealed the scheme and/or schemes because
the particulars of many such communications are within the exclusive
control and within the exclusive knowledge of COP. By way of
example, however, COP specifically used the U.S. Postal Service or
interstate wires or caused the U.S. Postal Service or interstate wires to
deliver each and every electronic transfer [wiring funds], email, letter,
mailing, magazine [*Ensign*], conference speech, mission
announcement/calling, and other uses of the mail and wire described in
AV3¶¶140-290, above.

AV3¶298, and AV3¶489 of the RICO claim.

The table below deconstructs the RICO claim, demonstrating the sufficiency

of Appellants' RICO allegations. However, due to the scope of the scheme and the

secrecy within which the Church operates, Appellants could not determine in most cases whether the transmission of the information was by mail and/or wire.

C. Transmission by Mail and/or Wire is Reasonably Inferred from the Allegations Incorporated into the RICO Claim.

The partial representations and concealment of material facts were pleaded with Fed. R. Civ. P. 9(b) specificity. Transmission of the deceitful representations and acts incident thereto (whether by mail or wire) can be *reasonably inferred* from AV3¶¶140-290, as cross-referenced in AV3¶489 and/or incorporated by reference into the RICO claim (AV3¶¶1-480 via AV3¶481).

In reviewing a trial court's grant of a 12(b)(6) motion, the standard to be applied is to "…*view[] all reasonable inferences in favor of the nonmoving party*, and liberally construe the pleadings." (Citations omitted) .Young v. Colorado Dep't of Corr., 94 F.4th 1242, 1249 (10th Cir. 2024) (Emphasis added.) See also Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252–53 (10th Cir. 1997) (where a "fair reading" of the Complaint indicates that cross-referencing as allowed by Rule 10(c), sufficiently particularizes the circumstances constituting fraud to comply with Rule 9(b)).

The context of the RICO allegations may be difficult to determine due to the extensive scope, in both time and subject matter, of Appellee's scheme. Therefore, Rule 9(b)-specific allegations, misrepresentations, and admissions, have been

extracted from the 2AC into the table below. Ashcroft v. Iqbal, 556 U.S. 662, 679,
129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) ("Determining whether a
complaint states a plausible claim for relief will…be *a context-specific task*."
(Emphasis added.)

Even where "not *all* of the plaintiffs' allegations" are pleaded with
particularity (citing George v. Urb. Settlement Servs., 833 F.3d 1242, 1255 (10th Cir.
2016)), a complaint satisfies Fed. R. Civ. P. 9(b) when "*taken as a whole.*" In that
case, the allegations are deemed sufficiently particularized. 124 F.3d at 1249; 63
F.4th at 1280.

Appellee cites Baskerville v. Fed. Land Bank, 25 F.3d 1055 (10th Cir. 1994)
(unpublished), arguing that the 2AC is inadequately pleaded (APLEbr.p.32).
However, Gaddy addressed the DC's reasons for dismissing the RICO claim. The
2AC's length is due to a myriad of allegations, including affirmative misstatements
of fact,[9] partial misleading misrepresentations, and concealment of material
documents and artifacts, which occurred over half a century.

D, <u>The Tithing Claims were Adequately Pleaded</u>.

Contrary to allegations (APLEbr.p.39), Gaddy's reliance on affirmative
misrepresentations about tithing was alleged (APNTbr.pp.47-48). Additionally,
reasonable persons, including Laura Gaddy, would think it material that $1-2B of

---

[9] Including the Brethren's states of mind.

yearly tithes have been deposited into EPA for over 25 years and, that these tithes were commingled with Appellee's for-profit businesses and used for commercial investment and development (AV3:¶¶85-86,¶89,¶¶512-513 and AV4:105-110).

"[D]eceitful concealment of material facts may constitute actual fraud." 63 F.4th at 1282–83. "[A] fraudulent scheme requires a material misrepresentation… affirmative misrepresentations are not essential." Id. at 1285–1286. Even if the City Creek affirmative misrepresentations were not false, the omission of additional facts that would have clarified those statements should have been made with respect to the tithing claim. (APNTbr.p.49,citingAV2:200).

AV3¶¶482-485, and ¶523 of the RICO claim allege reliance inferred from concealment that tithing was used for commercial investment/development, a material fact important to Appellants. See also (AV3¶¶470-477).

Assuming stockpiling tithes for commercial investment is considered the "Lords work," that material fact was intentionally concealed. If Appellee didn't intend to deceive, why must "people [] not know" that tithes were used for City Creek Mall? (AV4:106-107¶10.) Why didn't President Hinckley say that City Creek Mall would be funded with earnings on invested "excess tithing," instead of "reserve funds?" (APLEbr.p.7).

The creation of shell companies circa 2016 to hide more than $32 billion dollars is a violation of federal fraud statutes, unrelated to any protected religious belief or practice (AV3¶266).

The Church's argument that Appellants dispute the definition of tithing is false, and a reductive red herring (APLEbr.passim). As attested by David Nielsen, all EPA employees, including "senior leadership," referred to the commingled whole of EPA funds as "tithing." (AV4:105¶6.)

Properly understood, Appellants' tithing claim should proceed as the DC initially ordered (AV2:202-206.)

| LDS Background and Mail/Wire Use Determined through Reasonable Inference. Subsequent Admissions Bolded[10] | 2AC Location in AV3. And 2AC Exhibits in AV4 |
|---|---|
| **Incorporated Background:1826** Smith is convicted of fraud for unsuccessful treasure hunting with the same brown seerstone now admittedly used in BofM translation. | AV3¶31 |
| **Background: 1827-1830.** Gold plates are retrieved. Subsequently, the translation from gold plates is completed and the BofM is published. | AV3¶¶26-29 |

---

[10] "Mail?," or "Wire?," or "mail/wire?," indicates that Appellants don't know how this information was transmitted.

| | |
|---|---|
| **Background:** **1844.** Smith killed while in jail for destruction of a printing press and after a grand jury indicted him for treason. | AV3:20¶36, last row. |
| **Background:** **1890s.** Temple Lot polygamy affidavits obtained and concealed. | AV3¶48 |
| **Background:** "**1959** is the last year COP reveals its annual income and expenses to lay LDS members."[11] | AV3¶69 |
| **Background:** **1963.** "*Though not disclosed to the general membership,*" [the Church] starts setting aside excess tithing while "fostering a belief among lay members…that church business profits are maintained separate from tithing donations, which are used solely for ecclesiastical purposes." Since then, ways that tithing principal is used have never included commercial investment/development. | AV3¶72 |
| **Background.** **1967.** Fragments of papyri admittedly used by Smith to translate Facsimile no. 1 of the Book of Abraham (BofA) are found. Smith/C.O.P claimed (and as | AV3¶¶73-78 |

---

[11] Appellee argues that Stone v. Salt Lake City, 11 Utah 2d 196, 356 P.2d 631, 634 (1960), definitively addressed the issue of the Church's tithing investment (APPEbr.p.35). Gaddy distinguished Stone, 11 Utah 2d 196, in the DC. Stone alleged no fraud claim and was decided in 1960 based on facts from 1959, the last year that tithing finances were disclosed to LDS members (AV4:195).

| | |
|---|---|
| of 2017 Appellee still claims) a figure in the facsimile depicts the Hebrew prophet Abraham. LDS are taught that the Hebrew prophet Abraham wrote the BofA…inscribing the Egyptian papyrus with his own hand. | **AV3¶39¶218** |
| | **AV3¶184¶37** |
| **Admission:** | |
| **"None of the characters on the papyrus fragments mentioned Abraham's name or any of the events recorded in the [BofA]. Mormon and non-Mormon Egyptologists agree that the characters on the fragments do not match the translation given in the [BofA] … Scholars have identified the papyrus fragments as parts of standard funerary texts that were deposited with mummified bodies. These fragments date to between the third century B.C.E. and the first century C.E., long after Abraham lived."** | **AV3¶195** |
| **1997-2019, annually.** Church starts depositing $1 billion annually of tithing principal for investments (AV4:110*note). EPA former employee, David Nielsen claims:. "…in 1997 EPA was formed and seeded with tithing money…" ¶5. EPA senior leadership and employees | AV3¶85-86&n.30. AV3¶89. AV4:110 AV4:105¶¶5-6¶10 |

| | |
|---|---|
| referred to all EPA funds as "tithing" regardless of whether they were principal or earnings on principal which was commingled with EPA earnings. ¶6. "It was important that people should not know EPA's role as the source of the funds." ¶10. (Wire?)<br><br>(Local lay leaders collect tithes and wire(?) them to SLC.) | AV3¶123. |
| **1971-2011. <u>Background</u>**: The *Ensign* magazine is widely circulated to lay LDS members (mail/wire?) | AV3:89, text below photo & AV4:115 (*Ensign* pic dates). |
| **1961. <u>Background:</u>** Correlation Department, overseen by the Brethren, is created to ensure "purity of doctrine." Correlation compiles, edits, and promulgates… historical religious facts material to Church origins and scriptures. "Over the last half century… correlated materials were/are provided to unpaid teachers and administrators in charge of local wards or branches," and young missionaries. Those materials were/are promulgated worldwide (mail/wire?). | AV3¶¶126-128 |
| **<u>Background:</u>** General Conference (GC) is streamed biannually to local LDS via BIC broadcast (wire). | AV3¶130,¶134 |

| | |
|---|---|
| **Background**: DB sells correlated publications through catalogs (mail?) e-mail, and DeseretBook.com website (wire). | AV3¶135 |
| **1972-2014.** Brethren's GC statements that the prophet (and sometimes apostles) will never lead them astray (made while the brown seerstone, and polygamy affidavits lay concealed in COP archives). (Wire) | AV3¶144 |
| **1970s-2010s**. The *only* type of art that COP promulgated, in magazines, teaching journals, art kits, and displayed in chapels, depicted Smith's translation process as a directly from open gold plates, no seerstone in sight. ¶147. This conclusion is based on BYU Professor Sweat's research. AV3¶148.<br><br>**Admissions:**<br><br>**1) 2015 "Never-before-seen photographs," [by the public] of the opaque brown seerstone (which had been concealed) for over a century) revealed on LDS website; and,**<br><br>**2) 2020, LDS website publishes President Nelson's demonstration where Smith translates BofM while** | AV3¶P147-148<br><br>AV3¶167<br><br>AV4:115(Ex.110-7)<br><br><br>**AV3¶193, and ¶261&fn85.**<br><br><br><br><br><br>**AC3¶¶154,159-162** |

| | |
|---|---|
| **peering at a seerstone(s) in a hat, gold plates "covered usually."** | |
| **Circa 2016**. After the essays containing admissions of the misrepresented/concealed material facts about LDS history were published, a letter (mail/wires?) sent by COP to local lay leaders allowed them to mention the essays should a ward member ask. | AV3¶¶177-178 |
| **Circa 2016. Admission: Official LDS historian admits the Church buried essays on its website to "inoculate" LDS members from facts that had been misrepresented/concealed.** | **AV3¶¶179-180** |
| **Continuing Concealment.** Written statements of eyewitnesses to the BofM translation indicating that the brown seerstone was used for BofM translation. Concealed | AV3¶¶191-192 |
| **1946.** Deseret News (DN) denies the authenticity of Smith's 1826 fraud guilty verdict. (Mail.) (DN is a COP-owned business. AV3¶116 & AV3:passim.) **2018 Admission: C.O.P. releases 1826 fraud verdict, (AV3¶36, first row), C.O.P.-typed version of original referenced in 1946.** | AV3¶196  **AV3¶¶197-200** **AV4:72-73** |

| | |
|---|---|
| **1930-1965**. Smith's original First Vision account is concealed. | AV3¶210 |
| **1988** Missionary Guide Material Omissions about BofM translation. (mail?) | AV3¶¶221-222 |
| **1993 &1997** *Ensign* articles describe U&T-like stones used in the BofM translation, with obscure misleading art showing Smith appearing to translate from open gold plates. (mail/wire?). | AV3¶¶225-227 |
| **1996/97** LDS Primary Manual Misrepresents Translation as Directly from Plates. (Distributed via mail?) | AV3¶231 |
| **1997.** Church History Art Kit misrepresents translation process used at local wards (Copies sent by mail?) | AV¶232 |
| **1993--present.** Priesthood Manual Omissions re: Tithing Use. | AV3¶233 |
| **2001** LDS President Monson omits material facts about the BofM translation process at GC (wire). | AV3¶¶234-235 |
| **2003** at GC, LDS Prophet Hinckley states that "…tithing funds have not and will not be used to acquire [City Creek]." (wire). | AV3¶237 |

| | |
|---|---|
| **2004** and **2007** editions of required LDS Sunday School manuals about Smith's life and teachings, used worldwide, conceal Smith's adultery/polygamy/polyandry and crimes. (Mail/wire?). | AV3¶239<br><br>AV3¶246 |
| **2014 Admission in buried essay: Smith married "30-40" women, "12-14" of whom were already married.** | **AV3¶41 and AV3:23-chart** |
| **2004** Missionary guide misrepresents Smith's translation process (mail?) | AV¶242 |
| **2006-2007** Tithing misrepresentations about City Creek published in Church's online publications. (wire). | AV3¶244 |
| **2009** Gospel Art Book depicts Smith translation directly from open plates, no seerstone. | AV3¶248 |
| **2010** DN instructs LDS to use correlated materials. (¶136-mail&wire) article. | AV3¶250 &<br>AV4:111 |
| **2005/2011** editions of LDS film depict Smith as a happy monogamist, who translated the BofM directly from gold plates, distributed online (wire). Omits polygamy/adultery. | AV3¶¶251-255. |
| **2009** SL Tribune publication of Elder McMullin's statement to reporter that "not one penny of tithing goes to | AV3¶258&n.83. |

| | |
|---|---|
| the church's for-profit endeavors." When this statement was made [based on Nielsen's' declaration] Mr. McMullin had already [2009] issued checks from EPA's accumulation of tithing principal for City Creek Mall development and the Beneficial Life Ins. bailout." | AV4:106¶¶9-10. |
| **2014** Graphic with material omissions about tithing use (wire/mail?) | AV3¶260 |
| **1869.** LDS leader Joseph Fielding Smith, Sr., obtains affidavits of 24 of Smith's wives. **1887,** LDS Historian Andrew Jenson compiles report of 27 wives. | AV3¶264 |
| Official 20th Century Church history repeats Smith's claim, omitting the fact that they had previously documented his adultery. "*What a thing it is for a man to be accused of committing adultery, and having seven wives, when I can only find one.*" | AV3¶265 |
| **2016,** Church creates 13 LLCs to conceal $32,769,914,000.[12] (wire?). | AV3¶266 |

---

[12] In 2023, the SEC fines the Church/EPA for concealment of assets from 1997-2019, finding that the Church directed EPA's fraudulent actions. AV4:227-235.

| | |
|---|---|
| **2017** Continued teachings that Abraham is depicted in the BofA facsimiles, despite recent admission to the contrary. | AV3¶270 |
| **2018** *Ensign* contains misleading graphic about tithing use. (wire/mail) | AV3¶273 |
| **Continuing sales**. Denial of any "evil" seerstone use in Apostle's 1956 book distributed through Amazon.com (wire). | AV3¶¶202-203 |
| At her Gastonia, NC chapel Laura "saw pictures of Smith translating directly from the gold plates." (mailed?) | AV3¶304. |
| Laura's tithing sent by (mail?/wire?) local bishop to SLC. | AV3¶308. |
| Laura listened biannually to GC broadcast from SLC to NC. (Wire). | AV3¶309. |
| "She ordered temple garments, teaching materials, and mementos from Deseret Book by telephone, and then later, online through [DB's] website." (Mail and wire) | AV3¶310 |
| Laura received her *mailed* mission calling from COP headquarters. | AV3¶312 |
| Laura's husband searched the internet (wire). He found and told Laura that "…the 2006 Ensign [online Church | AV3¶331 |

| magazine-wire] report and a 2007 DN article—both Church-owned online publications," quot[ed] [the Church or its] agents who assured members that no tithing was used for City Creek Mall." Laura then dismissed her friend's claim as "anti-Mormon" propaganda. | |

## XI  RICO Claims based on the Federal Fraud Statutes are Allowed against Churches that have Admittedly Deceived Members through Misrepresentations of Material Facts upon which Individuals come to Base their Religious Beliefs.

Amici argue that RICO's intent was focused on organized crime (7thbr.p.34). Appellants agree. It then follows that when a large corporate entity uses organized criminal actions to procure and keep patrons, the State's compelling interest cannot simply be ignored because the word "church" is part of that corporation's name. If not, mafia syndicates could feign religious exercise as cover for their crimes.

Gaddy's case is unique because the misrepresentations of LDS history have been admitted by the Church. Absent admissions involving extant evidence to the contrary, facts believed as part of non-LDS religious traditions can be assumed to have been sincere when promulgated. Thus, those facts can be defended against

fraud claims under the Free Exercise clause. Therefore, a narrow ruling could be crafted whereby the DC's dismissal is reversed, limited to the Gaddy facts.

Those who were induced to believe by an intentional scheme of misrepresentations of material fact, whether false affirmative misrepresentations, partial representations and/or wholesale concealment of artifacts and documents- that a reasonable church member would think material to their religious decisions, should have redress in the courts of law.

Allowing Appellants to proceed would give former LDS members an opportunity to obtain compensation for the 10% of their income provided the Church, sometimes at great personal sacrifice (AV1:149¶79).

Dated: April 15, 2024                              By:

                                                   /s/ *Kay Burningham*

                                                   Kay Burningham (Utah Bar #4201)
                                                   kay@kayburningham.com
                                                   299 S Main #1375
                                                   Wells Fargo Bank Bldg.
                                                   Salt Lake City, Utah 84111

                                                   *Attorney for Appellants, Laura Gaddy,*
                                                   *Lyle Small, and LeAnne Harris.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 6,499 words, excluding the parts exempted by Fed. R. App. P. 32(f).

 I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Kay Burningham*
_____
Kay Burningham