## No. 23-4110

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

LAURA A. GADDY; LYLE D. SMALL; LEANNE R. HARRIS,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants*,

v.

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, A UTAH CORPORATION SOLE,

*Defendant-Appellee*

AND

DOES 1–50,

*Defendants.*

On Appeal from the United States District Court
for the District of Utah, No. 2:19-CV-00554-RJS,
Hon. Robert J. Shelby, Chief U.S. District Judge

## BRIEF OF *AMICI CURIAE*
## GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS,
## NATIONAL ASSOCIATION OF EVANGELICALS
## AND JEWISH COALITION FOR RELIGIOUS LIBERTY

Gene C. Schaerr
James C. Phillips
Justin A. Miller
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY ...................................................................................... vii

INTRODUCTION AND INTERESTS OF *AMICI CURIAE* ..................... 1

BACKGROUND .................................................................................. 3

SUMMARY OF ARGUMENT ................................................................ 4

ARGUMENT ...................................................................................... 5

    I.    As Recognized in Other Federal Decisions Under RICO, the Type of RICO Claim Asserted Here Implicates Vital First Amendment Church Autonomy Rights of All Religious Organizations. ........................................................... 5

    II.    RFRA Provides a Statutory Exception to the Scope and Reach of RICO, and that Exception Prevents Application of RICO in Cases Like This. .............................. 19

        A.    RFRA must be applied in a case between private parties brought under federal law. ............................. 19

        B.    RFRA is complete defense to any federal statute, whether adopted before or after RFRA, so long as its terms are satisfied and Congress has not expressed an exception, which Congress has not here. ............................................................................ 21

        C.    Imposing damages based on a highly contested interpretation of a religious leaders' interpretation of a religious practice would substantially burden religion ........................................................................ 22

        D.    There is no compelling interest in applying RICO to the Church and imposing damages on it here ........ 24

E.    Punishing the church with damages for its leaders'
instructions regarding tithing and other beliefs is
not the least restrictive means. ................................... 30

CONCLUSION ........................................................................ 31

CERTIFICATE OF COMPLIANCE ........................................ 33

CERTIFICATE OF DIGITAL SUBMISSION ......................... 34

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Ashwander v. Tennessee Valley Auth,*
  297 U.S. 288 (1936) ................................................................... 18

*Bryce v. Episcopal Church in the Diocese of Colo.,*
  289 F.3d 648 (10th Cir. 2002) ...................................................... 9

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682  (2014) ...................................................... 20, 23, 24, 30

*Clark v. Newman Univ., Inc.,*
  No. 19-1033-KHV, 2022 U.S. Dist. LEXIS 164360
  (D. Kan. Sept. 12, 2022) ............................................................ 20

*EEOC v. Catholic Univ. of Am.,*
  83 F.3d 455 (D.C. Cir. 1996) ...................................................... 20

*Fulton v. City of Phila.,*
  141 S. Ct. 1868 (2021) ...................................................... 24, 28, 30

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill,*
  617 F.3d 402 (6th Cir. 2010) ...................................................... 20

*Gonzales v. O Centro Espirita Beneficente
  Uniao do Vegetal,* 546 U.S. 418 (2006) ........................ 20, 21, 24, 25, 28

*Hankins v. Lyght,*
  441 F.3d 96 (2d Cir. 2006) ...................................................... 20, 22

*Hernandez v. Comm'r,*
  490 U.S. 680 (1989) ................................................................. 12

*Hosanna-Tabor Evangelical Lutheran Church
  & Sch. v. EEOC,* 565 U.S. 171 (2012) .................................... 16

*In re Young,*
  82 F.3d 1407 (8th Cir. 1996) ...................................................... 20

*Listecki v. Off. Comm. of Unsecured Creditors*,
   780 F.3d 731 (7th Cir. 2015) ............................................................. 20

*Morrison v. Garraghty*,
   239 F.3d 648 (4th Cir. 2001) ............................................................... 11

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ............................................................................. 17

*Nat'l Org. for Women v. Scheidler*,
   510 U.S. 249 (1994) ............................................................................. 13

*Ne. Women's Ctr., Inc. v. McMonagle*,
   868 F.2d 1342 (3d Cir. 1989) .............................................................. 15

*NLRB v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979) ............................................................................. 18

*Ogle v. Hocker*,
   279 F. App'x 391 (6th Cir. 2008) .......................................................... 9

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) ............................................................. 10, 12, 16

*Presbyterian Church in the United States v.*
   *Mary Elizabeth Blue Hull Mem'l*
   *Presbyterian Church*, 393 U.S. 440 (1969) ................................... 10, 11

*Puri v. Khalsa*,
   321 F. Supp. 3d 1233 (D. Or. 2018) ..................................................... 16

*Richison v. Ernest Grp., Inc.*,
   634 F.3d 1123 (10th Cir. 2011) ........................................................... 19

*Savage v. Council on Am.-Islamic Rels., Inc.*,
   No. C 07-6076 SI, 2008 U.S. Dist. LEXIS 60545
   (N.D. Cal. July 25, 2008) ..................................................................... 14

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) ....................................................................... 10, 11

*Shelley v. Kraemer*,
    334 U.S. 1 (1948) ................................................................ 21

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ............................................................ 22

*Sutton v. Providence St. Joseph Med. Ctr.*,
    192 F.3d 826 (9th Cir. 1999) .............................................. 20

*United States ex rel. Attorney General v.*
    *Delaware & Hudson Co.,* 213 U.S. 366 (1909) ..................... 17

*United States v. Lee*,
    455 U.S. 252 (1982) ............................................................ 12

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ............................................................ 22

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014) .............................................. 11

**Statutes**

42 U.S.C. § 2000bb-1(c) ........................................................... 22

42 U.S.C. § 2000bb-2(1) ........................................................... 21

42 U.S.C. § 2000bb-3(a) ........................................................... 21

42 U.S.C. § 2000bb-3(b) ........................................................... 21

42 U.S.C. § 2000bb-1(a) ...................................................... 19, 22

42 U.S.C. § 2000cc-5(7)(A) ....................................................... 20

Religious Freedom Restoration Act of 1993,
    107 Stat. 1488 ..................................................................... 22

Organized Crime Control Act of 1970,
    Pub. L. No. 91-452, 84 Stat. 922 ........................................ 22

## Other Authorities

*I Samuel* 3 (The Complete Jewish Bible) .................................................. 6

115 Cong. Rec. S1861 (1969) ........................................................... 26

116 Cong. Rec. H35 (1970) ............................................................. 26

Abner J. Mikva & G. R. Blakey,
 *RICO and Its Progeny: Good or Bad Law*,
 2 Notre Dame J.L. Ethics & Pub. Pol'y 369 (1987) ............................ 27

Akbar S. Ahmed,
 *Discovering Islam: Making Sense of Muslim*
 *History and Society* 15 (1988) ................................................. 7

Brian J. Murray,
 *Protesters, Extortion, and Coercion: Preventing*
 *RICO from Chilling First Amendment Freedoms*,
 75 Notre Dame L. Rev. 691 (1999) ............................................. 12, 26

Carl H. Esbeck,
 An Extended Essay on Church Autonomy,
 22 Federalist Society Rev. 244 (2021) ......................................... 2

*Exodus* 3 (The Complete Jewish Bible) .................................................. 6

Gregory P. Joseph,
 Civil RICO: A Definitive Guide 3 (2d ed. 2000) .............................. 25

Nicholas R. Mancini,
 *Mobsters in the Monastery? Applicability of*
 *Civil RICO to the Clergy Sexual Misconduct*
 *Scandal and the Catholic Church*,
 8 Roger Williams U. L. Rev. 193 (2002) ...................................... 26

Rorie Sherman,
 *Courts Deal Blockaders Big Setbacks*,
 Nat'l L.J., Nov. 13, 1989 ..................................................... 13

# GLOSSARY

NAE (National Association of Evangelicals)

RICO (Racketeer Influenced and Corrupt Organizations Act)

RFRA (Religious Freedom Restoration Act)

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*[1]

This is a case about theological disagreements between the leaders and disaffected members of a church—in this case The Church of Jesus Christ of Latter-day Saints. *Amici* firmly believe federal courts are no place for such religious disputes—which are barred by both the First Amendment and the Religious Freedom Restoration Act (RFRA).

*Amicus* General Conference of Seventh-day Adventists is the national administrative body for the Seventh-day Adventist Church, a Protestant Christian denomination with more than 22 million members. Recognizing that constitutional and statutory religious liberty protections for all rise and fall based on how they are applied to any religious organization or individual, the General Conference files amicus briefs on religious freedom issues in federal and state courts around the country.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution intended to fund the brief's preparation or submission. Counsel for all parties have consented to the filing of this brief.

*Amicus* National Association of Evangelicals ("NAE") is the largest network of evangelical churches, denominations, colleges, and independent ministries in the United States. It serves forty member denominations, as well as numerous evangelical associations, missions, social-service charities, colleges, seminaries, and independent churches. NAE serves as the collective voice of evangelical churches, as well as other church-related and independent religious ministries. It believes that religious freedom is both a God-given right and a limitation on civil government, as recognized in the First Amendment and our nation's legal heritage. NAE also believes that the First Amendment doctrine of church autonomy is well-summarized at Carl H. Esbeck, *An Extended Essay on Church Autonomy*, 22 Federalist Society Rev. 244 (2021), https://fedsoc.org/fedsoc-review/an-extended-essay-on-church-autonomy.

*Amicus* Jewish Coalition for Religious Liberty is an incorporated group of rabbis, lawyers, and professionals who practice Judaism and are committed to defending religious liberty.

*Amici* file this brief to aid the Court in reaching its decision by providing insights beyond those provided by the parties as to the First Amendment concerns raised by the application of the Racketeer

Influenced and Corrupt Organizations Act (RICO) statute here. Additionally, *amici* explain why RFRA also prohibits applying RICO here.

## BACKGROUND

To avoid the obvious problems posed by a lawsuit asking for resolution of a theological disagreement between the leaders and disaffected members of a church, Appellants have pleaded a variety of fraud and related claims, including civil RICO, against the Church.

Appellants first claim church leaders do not believe the Church's own teachings about its history and doctrine, given what Appellants view as inconsistencies over the years. And so, in their view, church leaders have been engaging in fraud and the like in their own religious teachings.

Second, Appellants allege that the Church, through its President at the time and other official communications, lied about the use of funds contributed to the Church as tithing donations—by saying that tithing contributions would not be used to commercially develop property near church headquarters, but that reserve funds would be used instead. Appellants argue that, because some of those reserve funds come from interest and other returns on investments the Church made with tithing

3

contributions, those *returns* should also be considered "tithing."  In short, this aspect of the case is a fight over the proper theological understanding of tithing.  So Appellants argue, based on their own theological interpretation, that the Church violated the federal civil RICO statute in its use of its contributions. And Appellants sought to certify a class of all people who have paid tithing or other contributions to the Church—a group that would be in the millions.

After allowing Appellants to amend their complaint twice, the district court dismissed all their claims—the fraud and related claims on First Amendment grounds, and the RICO count for failure to state a claim.

## SUMMARY OF ARGUMENT

The civil RICO claim against Appellee ("the Church") in this case is dangerous for all religious organizations—as there is nothing unique about the facts or religious beliefs that give rise to that claim. And the danger is more than merely financial; it's also a danger to the Church's First Amendment rights. Federal courts have long cautioned that RICO can pose a threat to such rights and that the statute should be interpreted with that constitutional backdrop in mind.

What is more, RFRA applies in this case and provides a basis for limiting RICO's sweep. That super-statute applies to all federal laws, past and present, and Congress has not exempted RICO from RFRA's reach. Under RFRA, a civil RICO claim cannot be applied to the Church on these facts because it would substantially burden the Church's religious free exercise, and there is no compelling government interest advanced by the least restrictive means. And, although the question is open in this Court, this Court should follow three other circuits that have held that RFRA applies to decisions and other actions by federal courts—and therefore necessarily applies in litigation between private parties.

## ARGUMENT

### I.    As Recognized in Other Federal Decisions Under RICO, the Type of RICO Claim Asserted Here Implicates Vital First Amendment Church Autonomy Rights of All Religious Organizations.

The implications of this case reach far beyond the specific religious beliefs and speech Appellants attack. If Appellants are successful, no religious organization would be immune from disaffected members bringing civil RICO claims. But the First Amendment does not allow a RICO claim to be entertained here, much less succeed, when the

allegations involve religious teachings in what is essentially a dispute between the leaders and disaffected members of a religious organization.

### A. If RICO applies, here, all religious organizations are threatened as there is nothing legally unique about the Church's beliefs or teachings.

Appellants argue that the Church violated the federal civil RICO statute through a host of its religious teachings: details concerning the founding prophet's account of a vision in which he was called as a prophet, how he translated church scriptures, where various events in church scriptures may have occurred, whether he had one wife or many, and other issues related to his life and character. Mar. 28, 2023 Memorandum Decision & Order, 25–28. While these specific issues may be unique to Appellee's faith, they are of the same type as beliefs in other faiths.

Take the calling of a prophet. In Judaism, prominent examples include Moses, to whom God spoke from a burning bush that was not consumed by the flame. *See Exodus* 3 (The Complete Jewish Bible), https://www.chabad.org/library/bible_cdo/aid/9864. Another example is Samuel: The Lord called him as a boy while he slept, speaking to him in his room. *See I Samuel* 3 (The Complete Jewish Bible),

https://www.chabad.org/library/bible_cdo/aid/15832. Similarly, in Islam, Mohammed was called to be a prophet by an angel who appeared to Mohammed in a vision. *See* Akbar S. Ahmed, *Discovering Islam: Making Sense of Muslim History and Society* 15 (1988).

Or consider the questions about the history of a church or faith's founder. The Hebrew Scriptures declare that Moses was raised by the daughter of an Egyptian Pharaoh in the royal court, yet historians and archeologists have yet to find evidence of Moses' existence there. In Christianity, Jesus has four different accounts of his birth, life, ministry, and death in the form of the four Gospels—which are each from a different perspective. While some *amici* believe these four perspectives to be in harmony, a secular court could find that they factually conflict.

In short, all religions are full of accounts and beliefs that secular disciplines either dispute, or at least cannot prove or disprove. That is the nature of faith. And if one can bring a civil RICO claim against a religious organization because its beliefs or accounts have some arguable inconsistencies, across time or across speakers, then all faiths would be threatened.

Additionally, Appellants argue that the Church violated the federal civil RICO statute because its leaders and published communications promised that no tithing funds would be used to purchase property and build a commercial mall, whereas Appellants claim the Church did use tithing funds for that very enterprise. *See* March 28, 2023 Memorandum Decision & Order, 46–47. And the nub of this dispute with the Church is over the meaning of the word "tithing": Appellants interpret it expansively, to include any interest or profits gained on the original contribution of tithing funds. However, the leader of the Church used the term narrowly, to just apply to the original contribution. *See* App. Vol. 4, at 148 ("[T]ithing funds have not and will not be used to acquire this property. Nor will they be used in developing it for commercial purposes. Funds for this have come and will come from those commercial entities owned by the Church[,] . . . together with the earnings of invested reserve funds.").

Thus, we have a dispute between disaffected members and religious leaders over the meaning of a religious term. If this theological dispute is grounds for a civil RICO claim, then there is no end to civil RICO claims that could be brought against all types of religious organizations. After

8

all, religious organizations use a plethora of religious terms and there is often at least one person, in the faith or out of it, who interprets that term differently from the faith's leaders.

Take Catholicism and "transubstantiation." The Catholic Church may view or use the meaning of that term differently than some individual Catholic somewhere. Should such religious disagreements be the stuff of civil RICO claims, the courts would be clogged with fights over the meaning of religious terms. And that, as shown next, is something the First Amendment does not allow.

### B.    The First Amendment does not allow courts to decide the kinds of theological disputes at issue here.

The First Amendment's Free Exercise and Establishment Clauses bar courts from wading into theological squabbles. Alternatively called the ecclesiastical abstention or church autonomy doctrine,[2] this well-settled rule "prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir.

---

[2] *See Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008) ("Courts have variously termed this restraint as the church autonomy doctrine or ecclesiastical abstention.")

9

2002). As the Supreme Court has declared, "[t]he First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of . . . faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2055 (2020) (cleaned up). This means that "civil courts exercise no jurisdiction" over "a matter which concerns theological controversy." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14 (1976) (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871)).

This constitutional rule avoids the "substantial danger that the State will become entangled in essentially religious controversies," *id.* at 709, and the "hazards … ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern," *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). That is why the First Amendment leaves "civil courts no role to play in reviewing ecclesiastical decisions." *Serbian E. Orthodox Diocese*, 426 U.S. at 713.

Here, for a court to decide Appellants' civil RICO claim, it would have to determine the truthfulness of various Church teachings and

beliefs. A court would also have to decide which understanding of tithing to countenance. But in so doing, a court would commit the "error of intrusion into a religious thicket." *Id.* at 719. That is why the First Amendment "forbids" courts from "determin[ing] matters at the very core of a religion—the interpretation of particular church doctrines." *See, e.g., Presbyterian Church,* 393 U.S. at 450; *see also Morrison v. Garraghty*, 239 F.3d 648, 659 (4th Cir. 2001) ("Differing beliefs and practices are not uncommon among followers of a particular creed, and it is not within the judicial function and judicial competence to inquire whether the petitioner or another practitioner more correctly perceives the commands of their common faith.") (cleaned up). In short, what Appellants seek here "is exactly the inquiry that the First Amendment prohibits," and "recogni[zing] . . . an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry." *Serbian E. Orthodox Diocese,* 426 U.S. at 713.

Besides a lack of authority, secular courts suffer from a lack of relevant expertise. As then-Judge Gorsuch observed, "judges [and juries] are hardly fit arbiters of the world's religions." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014). To attempt to be such "would risk in the

11

attempt . . . many mistakes[,] . . . given our lack of any comparative expertise when it comes to religious teachings, perhaps especially the teachings of less familiar religions." *Id*.; *see also Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question . . . the validity of particular litigants' interpretations of [a faith's] creeds."). And, even if a judge or jury were somehow competent to engage in such theological inquiry, for reasons discussed above, "[t]he First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060.

In sum, "[i]t is not within 'the judicial function and judicial competence,' … to determine whether [Appellants] or the [Church] has the proper interpretation of the [Latter-day Saint] faith." *United States v. Lee*, 455 U.S. 252, 257 (1982) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981)).  For that reason alone, the district court was correct in dismissing Appellants' claims.

## C.    Federal decisions under RICO commonly acknowledge the need to apply the statute consistent with the First Amendment.

Nor surprisingly, given the sensitive First Amendment issues involved, courts have long recognized that the RICO statute must be interpreted and applied with care. In fact, while still a bill, the RICO

statute was revised due to First Amendment concerns. Brian J. Murray, *Protesters, Extortion, and Coercion: Preventing RICO from Chilling First Amendment Freedoms*, 75 Notre Dame L. Rev. 691, 699 (1999) ("Leading Senators and House members . . . united on the same point: the bill was narrowly drafted to avoid treading on civil liberties.").[3] Yet, despite that drafting care, nearly two decades later the ACLU would still warn of RICO's "enormous" "potential for chilling First Amendment rights." Rorie Sherman, *Courts Deal Blockaders Big Setbacks*, Nat'l L.J., Nov. 13, 1989, at 30, 32 (quoting Antonio Califa, Legislative Counsel for the ACLU, Washington, D.C.).

1.     It is not surprising, then, that Justices Souter and Kennedy "caution[ed] courts applying RICO to bear in mind the First Amendment interests that could be at stake." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 265 (1994) (Souter, J., concurring, joined by Kennedy, J.).

---

[3] *See also* 116 Cong. Rec. 854 at 18,941 (1970) ("[RICO] offers the first major hope of beginning to eradicate the growing organized criminal influence in legitimate commerce, while posing no real threat to civil liberties.") (remarks of Sen. John L. McClellan, RICO's chief sponsor); *id.* at 35,344 ("[RICO] does not violate the civil liberties of those who are not engaged in organized crime, but who nonetheless are within the incidental reach of provisions primarily intended to affect organized crime.") (remarks of Rep. Richard H. Poff, sponsor of the bill in the House).

After all, they observed, "[c]onduct alleged to amount to . . . one of the . . . somewhat elastic RICO predicate acts may turn out to be fully protected First Amendment activity, entitling the defendant to dismissal on that basis." *Id*. at 264 (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 917 (1982)). Thus, "nothing . . . precludes a RICO defendant from raising the First Amendment in its defense in a particular case." *Id*.; *see also Savage v. Council on Am.-Islamic Rels., Inc.*, No. C 07-6076 SI, 2008 WL 2951281, at *12 (N.D. Cal. July 25, 2008) ("[D]efendants may use the First Amendment as a shield to defend against claims alleging . . . civil RICO violations.").

*Claiborne Hardware* provides important insight into the context of the First Amendment and RICO. That case involved the First Amendment rights of speech and association related to a civil rights boycott of segregated businesses that led to some violence. 458 U.S. at 888–89. And the Supreme Court declared that, given "the important First Amendment interests at issue in this case," a "limitation" on RICO must be observed: "While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity." *Id*. at 918. And so,

14

because one party "would impose liability on the basis of [conduct and speech] lying at the core of the First Amendment," the Court "approach[ed] this suggested basis of liability with extreme care." *Id.* at 926–927. In other words, "[w]hen . . . conduct occurs in the context of constitutionally protected activity, . . . precision of regulation is demanded." *Id.* at 916 (cleaned up). "Specifically, the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916–917. Cognizant "that the protection of the First Amendment bars subtle as well as obvious devices by which [First Amendment rights] might be stifled," *id.* at 932 (citation omitted), the Court ultimately found the First Amendment protected the non-violent conduct in question from civil RICO claims, *id.* at 933–934; *see also Ne. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1348 (3d Cir. 1989) ("We would have grave concerns were these or any other defendants held liable under civil RICO for engaging in [speech] in a manner protected under the First Amendment.").

That *Claibourne Hardware* and most other civil RICO cases that have collided with the First Amendment involved the freedoms of speech,

assembly, association, and petition does not matter. The Free Exercise and Establishment Clauses provide no less protection than these other First Amendment rights.   And indeed, under the church autonomy doctrine, they provide even more protection—as the doctrine is absolute in its safeguarding of church autonomy, rather than a doctrine that merely triggers some form of heightened scrutiny. *See, e.g., Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch.*, 140 S. Ct. 2049 (2020);. *see also Puri v. Khalsa*, 321 F.Supp.3d 1233, 1251 (D. Or. 2018) (quoting *Milivojevich*, 426 U.S. at 709) (holding the church autonomy doctrine barred review of claims, including a civil RICO claim, against a religious organization because the claims raised a "substantial danger that the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs").

In short, Appellants' right to swing the fist of civil RICO ends where the First Amendment's nose begins. The conduct and speech complained of here by Appellants is fully protected First Amendment activity. Thus, civil RICO cannot be applied in this case.

2.     If the above were not sufficient to foreclose a suit for damages (much less treble damages) based on a church's teachings about its doctrine and history, two canons of construction provide greater clarity.[4]

*First*, the canon of constitutional doubt makes clear that the RICO statute should be read to avoid constitutional problems. That canon states that, when there are two possible readings of a statute, one constitutional and one unconstitutional, the constitutional reading should be adopted, even if it is the less likely or less natural one. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012); *see also United States ex rel. Att'y Gen. v. Del. & Hudson Co.,* 213 U.S. 366, 408 (1909) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.") Here, between a reading of the RICO statute that would potentially (and unconstitutionally) impose treble damages on a religious organization for

---

[4] "The two rules together are sometimes called the 'rules of constitutional avoidance.' But it promotes clarity to keep the two separate. The constitutional-doubt canon is a rule of interpretation; the rule that statutory grounds will be considered first is a rule of judicial procedure." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 251 (2012) (citation omitted).

its religious teachings—teachings that don't advocate violence or lawbreaking—and a reading of the statute that would not violate the Constitution, the canon requires the latter reading. *See also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979) ("[A]n Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available.").

*Second*, the canon of constitutional avoidance provides that, where a court can choose between deciding a matter on constitutional grounds versus statutory grounds, it should prefer a statutory-based ruling. *See Ashwander v. Tenn. Valley Auth,* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction . . . , the court will decide only the latter."). This could be applied in two ways here. This Court could simply affirm the district court's ruling that Appellants failed to sufficiently plead a civil RICO claim. *See* March 28, 2023 Memorandum Decision & Order, 49–51. Alternatively, this Court could hold, as discussed below, that here applying the federal RICO statute would violate RFRA. And thus, there is no need to reach the constitutional issues in the case.

18

## II. RFRA Provides a Statutory Exception to the Scope and Reach of RICO, and that Exception Prevents Application of RICO in Cases Like This.

Regardless of RICO's text or other indicia of its proper interpretation, RFRA provides an exception from RICO given the nature of Appellants' claims.[5] RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion" for any reason, unless the two requirements of strict scrutiny are both met. 42 U.S.C. § 2000bb-1(a).[6] As explained below, neither of those two requirements—"in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that" interest—is met here. *Id.* § 2000bb-1(b).

### A. RFRA must be applied in a case between private parties brought under federal law.

But before analyzing this dispute under RFRA, it is important to understand why RFRA applies to this dispute between private parties.

---

[5] While the RFRA argument was not raised and ruled on below, this court "may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to [the court] on appeal." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

[6] While using the term "person," RFRA's protections also apply to religious organizations, which are likewise treated as "persons" under the

To be sure, RFRA is normally invoked in cases where one of the parties is the federal government. And "[t]he Tenth Circuit has not addressed whether RFRA applies in suits by private parties seeking to enforce federal law against other private parties." *Clark v. Newman Univ., Inc.*, No. 19-1033-KHV, 2022 WL 4130828, at *12 (D. Kan. Sept. 12, 2022).[7] But this Court can and should hold that RFRA applies to suits between private parties.

*First*, the statute prohibits the federal government from burdening one's free exercise of religion, and defines government broadly to

---

statute. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423, 439 (2006) (applying RFRA's protections to a "religious sect"); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014) ("Congress . . . included corporations within RFRA's definition of 'persons.'"). And "religious exercise" is defined as "includ[ing] any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

[7] There is a circuit split on the issue, with three circuits allowing RFRA's application in such a scenario, *see Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006); *In re Young*, 82 F.3d 1407, 1416–17 (8th Cir. 1996), *vacated, sub nom. Christians v. Crystal Evangelical Free Church*, 521 U.S. 1114 (1997), *reinstated, sub nom. In re Young*, 141 F.3d 854 (8th Cir. 1998); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996), and three circuits not allowing RFRA in a suit between private parties, *see Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010); *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834–43 (9th Cir. 1999).

encompass any "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb-2(1). A federal court obviously falls under this definition. And, by applying RICO to the Church, the court would be substantially burdening the Church's religious free exercise. *Cf. Shelley v. Kraemer*, 334 U.S. 1, 20 (1948) (holding that judicial officers enforcing discriminatory contracts between private actors constituted state action under the Fourteenth Amendment).

Therefore, RFRA may be invoked as a defense by the Church against the civil RICO claim.

**B.     RFRA is complete defense to any federal statute, whether adopted before or after RFRA, so long as its terms are satisfied and Congress has not expressed an exception, which Congress has not here.**

RFRA, moreover, "applies to all Federal law, . . . whether adopted before or after" its enactment. 42 U.S.C. § 2000bb-3(a). The only exception to this topically and temporally universal application is when a later-enacted "law explicitly excludes such application by reference to [RFRA]." *Id.* § 2000bb-3(b). And "[a] person whose religious practices are burdened in violation of RFRA 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.'" *Gonzales*

21

*v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(c)). Thus, if not satisfied, RFRA becomes a "complete defense" to the application of any federal law. *Hankins v. Lyght*, 441 F.3d 96, 102 (2d Cir. 2006).

With that understanding, RFRA applies here. Congress enacted RICO decades before RFRA. *See* Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488; Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922. And the statute has never been amended to be expressly exempt from RFRA's application. Thus, the Church may raise RFRA as a defense against Appellants' civil RICO claim.

### C. Imposing damages based on a highly contested interpretation of a religious leaders' interpretation of a religious practice would substantially burden religion.

For RFRA to foreclose the claim asserted here, the Church's free exercise of religion must be substantially burdened. 42 U.S.C. § 2000bb-1(a). Because RFRA "restore[s]" the "test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)," those cases are instructive. *Id.* § 2000bb. The burdens in those cases were the violation of one's faith, or, respectively, a loss of unemployment

22

benefits and a $5 fine. *See Sherbert,* 374 U.S. at 404; *Yoder*, 406 U.S. at 208.

Here, the burden RICO imposes on the Church's free exercise of religion is damages (and potentially treble damages and attorneys' fees), which is an exorbitant amount given the claimed damages are the sum of money each member of the class has paid to the Church over their entire affiliation with the Church, which includes 10% of their annual income. Granted, with inflation, average unemployment compensation in 1963 and $5 in 1972 would translate to larger sums today,[8] but the financial burden placed on the Church is clearly a substantial burden. Indeed, even without trebling or attorneys' fees, the damages sought in this case dwarf the $800,000 that was deemed substantial under RFRA in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014). Given this, RFRA's two remaining requirements must be satisfied—there must be a "compelling governmental interest," and the imposition of such damages must be the "least restrictive means" of achieving that purpose. 42 U.S.C. § 2000bb-1(b)(1).

---

[8] Five dollars in 1972 is worth about $37.32 today. *See* "What is $5 in 1972 worth in 2024?," Amortization.org, https://tinyurl.com/b2txe27b.

**D. There is no compelling interest in applying RICO to the Church and imposing damages on it here.**

As to the first of these requirements, the Supreme Court has observed that compelling governmental interests are "interests of the highest order." *Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021) (quoting *Church of the Lukumi Babalu Aye, Inc., v. City of Hialeah*, 508 U.S. 520, 546 (1993)). Furthermore, to satisfy RFRA's compelling governmental interest requirement, a general interest in enforcing the law at issue will not suffice. Rather, "RFRA requires the . . . demonstrat[ion] that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 430–431 (quoting 42 U.S.C. § 2000bb-1(b)). So, courts must "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431.; *accord Burwell*, 573 U.S. at 727 (describing the compelling interest inquiry as "look[ing] to the marginal interest in enforcing the [law] in th[is] case[]").

Thus, in *O Centro*, which involved a religious sect's challenge to the federal government's prohibition of the use of a hallucinogenic drug,

24

"[u]nder the more focused inquiry required by RFRA," it was insufficient to satisfy the compelling governmental interest requirement to "mere[ly] invo[ke] . . . the general characteristics of Schedule I substances," which the Court conceded "are exceptionally dangerous." *Id*. at 432. Rather, the Court found "no indication that Congress, in classifying [the drug], considered the harms posed by the particular use at issue here—the circumscribed, sacramental use of [the drug] by the [religious sect]." *Id*. Thus, "Congress' determination that [the drug] should be listed under Schedule I simply does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA." *Id*.

So too here. Organized crime may well be "exceptionally dangerous." But just because Congress sought the "eradication of organized crime in the United States," Gregory P. Joseph, Civil RICO: A Definitive Guide 3 (2d ed. 2000), by penalizing racketeering, does not mean that Congress, in enacting RICO, "considered the [alleged] harms posed by the particular use at issue here"—a theological dispute between a Church and its disaffected members. *Id*.

On the contrary, there appears to be no evidence that Congress imagined RICO could be applied in the scenario of this case.[9] For example, the Senate Committee's Statement of Findings and Purpose for the Organized Crime Control Act focused solely on the problem of organized crime and the impact such crime had on businesses and the nation's economy. *See* 115 Cong. Rec. 9568 (1969). Likewise, the House sponsor, Representative Richard Poff, declared that RICO "does not violate the civil liberties of those who are not engaged in organized crime, but who nonetheless are within the incidental reach of provisions primarily intended to affect organized crime." 116 Cong. Rec. 35,344

---

[9] *See* Brian J. Murray, Note, *Protesters, Extortion, and Coercion: Preventing RICO from Chilling First Amendment Freedoms*, 75 Notre Dame L. Rev. 691, 695 (1999) (noting how litigation has "transform[ed] [the federal civil RICO statute] from a powerful weapon to fight racketeering of all kinds into an indiscriminate bludgeon of First Amendment freedoms"); Nicholas R. Mancini, Comment, *Mobsters in the Monastery? Applicability of Civil RICO to the Clergy Sexual Misconduct Scandal and the Catholic Church*, 8 Roger Williams U. L. Rev. 193, 196 (2002) ("The inclusion of a treble damages provision for RICO violations has transformed the law into an attractive basis for recovery in suits that Congress by no means envisioned when formulating the statute. . . . [Litigation] has led to RICO's application in areas well beyond its original and intended focus. . . .")

(1970) (statement of Rep. Richard H. Poff, sponsor of RICO in the House).[10]

Similarly, former D.C. Circuit Judge Abner Mikva, who was a member of Congress when the federal civil RICO statute was passed, observed in 1987 that "it is clear that the civil RICO provision, as it was written and as it is being used, goes beyond anything that Congress had in mind." Abner J. Mikva & G. R. Blakey, *RICO and Its Progeny: Good or Bad Law*, 2 Notre Dame J.L. Ethics & Pub. Pol'y 369, 373 (1987). He further noted that "the range of cases" "in which a civil RICO claim has been filed" "boggle[s] the mind. These are not cases against Mafia figures. These have nothing to do with some poor merchant who has been squeezed by the mafiosi in a loan transaction. RICO makes its appearance in everything from divorce suits to religious disputes. . . ." *Id*. at 371. And Judge Mikva mused, "[i]f I had known then what I know now about the legislative process and legislative history—this was my first term in Congress I say as my plea in abatement . . . I would have said,

---

[10] *See also* Mancini, *supra*, at 199 ("[B]oth the timing of the bill's passage and the legislative history of the OCCA strongly suggest applicability only to traditional organized crime and mafia entities. . . .")

'We certainly do not want to apply this to religious controversies.'" *Id*. at
375.

Since Congress did not consider the types of issues in this case when
enacting civil RICO, it does not satisfy the compelling governmental
interest requirement to merely point to the statute and argue that
combatting racketeering is sufficiently compelling. Instead, it must be a
compelling governmental interest to apply civil RICO to the Church
based on the facts of *this* case—that is, there must be a compelling
interest in denying a religious *exemption* to RICO here.    *See O Centro*,
546 U.S. at 432 (requiring the government show why it was a compelling
"interest of the highest order," not to enforce federal drug laws generally,
but to enforce them against that specific religious entity in that
particular situation and so deny it an exemption).

Thus, for instance, in *Fulton*, which  applied the same principle, but
under the Free Exercise Clause, the Court grappled with a non-
discrimination policy. In analyzing whether a compelling governmental
interest existed, the Court observed that "[t]he question, then, is not
whether the [government] has a compelling interest in enforcing its non-
discrimination policies generally, but whether it has such an interest in

28

denying an exception to [the religious organization in that case]." *Fulton*, 593 U.S. at 541. And the Court concluded that "[o]nce properly narrowed, the [government's] asserted interests are insufficient" because the government "fail[ed] to show that granting [the religious organization] an exception will put those goals at risk." *Id.* at 541–42.

So too here. The government's goals with RICO, putting an end to organized crime, are not furthered by denying a RICO exception to the Church in this case. And it is certainly not a *governmental* "interest of the highest order" for a court to wade into these theological disputes, buttressed by First Amendment protections, over such things as whether the Church's first president saw one or two beings when he was called to be a prophet, or which meaning of tithing another church president was using in a particular sermon.

Thus, lacking a compelling governmental interest in adjudicating this dispute, RFRA prohibits a court from applying federal civil RICO to the Church in this case.

**E.    Punishing the church with damages for its leaders' instructions regarding tithing and other beliefs is not the least restrictive means.**

Even if RFRA's compelling governmental interest could somehow be satisfied here—and it cannot—the least-restrictive-means standard also must be satisfied, and it "is exceptionally demanding." *Burwell*, 573 U.S. at 728. Under that standard, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

So, in *Burwell*, which involved a federal mandate that employers include contraception in their employees' health insurance, the Supreme Court determined the standard was not met because the government "has not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." 573 U.S. at 728. The government could, the Court noted, pay for the contraceptive coverage itself or require the insurer to exclude contraceptive coverage and provide separate payments for the costs of contraceptive services, as the government had done already in a related context. *Id.* at 728–731.

Here also the "exceptionally demanding" least-restrictive-means standard cannot be satisfied, as the interests of stopping organized crime can be accomplished without burdening religion. After all, punishing a church through damages (and even treble damages) hurts all of the religious organization's members, not just whoever may have said or done something inconsistent with civil RICO—though that did not occur here. And the most obvious less-restrictive means is to go after behavior that actually causes the harm the RICO statute is directed at, rather than the purely religious speech at issue here.

Hence, applying RICO here is not the least restrictive means, and under RFRA the Church's religious free exercise cannot be burdened.

## CONCLUSION

Holding a church liable under RICO based upon a disagreement about history or theology would be extraordinary—and extraordinarily damaging to religious bodies of all stripes.  This Court can and should avoid that result, either by holding that RICO simply does not reach the conduct alleged here or, alternatively, by holding that RFRA provides a complete defense to any such RICO action.

Under either rationale, the district court's decision can and should be affirmed.

Dated: March 8, 2024                    Respectfully submitted,

                                        */s/ Gene C. Schaerr*
                                        Gene C. Schaerr
                                        James C. Phillips
                                        Justin A. Miller
                                        SCHAERR | JAFFE LLP
                                        1717 K Street NW, Suite 900
                                        Washington, DC 20006
                                        Telephone: (202) 787-1060
                                        gschaerr@schaerr-jaffe.com

                                        *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 32(g)(1) and 29(a)(5), I certify that this brief:

(i) complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,374 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 10th Circuit Rule 32(B), as determined by the word counting feature of Microsoft Word; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 10th Circuit Rule 32(A) because it has been prepared using Microsoft Office Professional 2016, set in Century Schoolbook 14-point font.

Dated: March 8, 2024

*/s/ Gene C. Schaerr*
Gene C. Schaerr

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing brief:

(1)    all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)    the digital submissions have been scanned for viruses with the most recent version of Microsoft Defender, a commercial virus scanning program, and according to the program are free of viruses.

Dated: March 8, 2024

*/s/ Gene C. Schaerr*
Gene C. Schaerr
