No. 23-4110

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
————————————————

LAURA A. GADDY, LYLE D. SMALL, and LEANNE R. HARRIS,
individually and on behalf of all others similarly situated
*Plaintiffs-Appellants,*

v.

CORPORATION of the PRESIDENT of THE CHURCH
of JESUS CHRIST of LATTER-DAY SAINTS,
a Utah corporation sole, et al.
*Defendants-Appellees.*
————————————————————

On Appeal from the United States District Court
for the District of Utah No. 2:19-cv-00554 (Hon. Robert J. Shelby)

BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR
RELIGIOUS LIBERTY IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE

Eric C. Rassbach
The Hugh and Hazel Darling
Foundation Religious Liberty Clinic
PEPPERDINE UNIVERSITY SCHOOL OF LAW
24244 Pacific Coast Hwy.
Malibu, CA 90263

Samuel V. Lioi
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114

Noel J. Francisco
*Counsel of Record*
David T. Raimer
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
nfrancisco@jonesday.com

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................ii

INTEREST OF THE *AMICUS* ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 3

ARGUMENT ......................................................................................... 6

I.    The Church Autonomy Doctrine Bars Plaintiffs' Suit................... 6

    A.    The Church Autonomy Doctrine Prohibits Secular Interference with Internal Church Affairs.......................... 6

    B.    Plaintiffs Cannot Challenge the Truth or Falsity of Church Doctrine.................................................................. 10

    C.    Plaintiffs Cannot Challenge Purported Misrepresentations Regarding the Meaning and Use of Church Tithing Funds......................................................... 14

        1.    Tithing is inherently religious. .................................. 15

        2.    Tithing involves matters of internal church governance................................................................ 18

        3.    Plaintiffs' tithing theory requires religious entanglement. ........................................................... 20

II.    No Exception to the Church Autonomy Doctrine Applies............ 26

    A.    There Is No "Uninformed Adherent" Exception to the Church Autonomy Doctrine. .............................................. 26

    B.    No Fraud-Based Exception to the Church Autonomy Doctrine Applies Here.......................................................... 28

CONCLUSION .................................................................................... 31

CERTIFICATE OF COMPLIANCE...................................................... 33

CERTIFICATE OF DIGITAL SUBMISSION ....................................... 34

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Ad Hoc Comm. of Parishioners of Our Lady of the Sun Cath. Church, Inc. v. Reiss,*
224 P.3d 1002 (Ariz. Ct. App. 2010) ................................................... 31

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam,*
387 F. Supp. 3d 71 (D.D.C. 2019) ...................................................... 21

*Anderson v. Watchtower Bible & Tract Soc. of N.Y., Inc.,*
2007 WL 161035 (Tenn. Ct. App. Jan. 19, 2007) ............................. 29

*Bell v. Presbyterian Church (U.S.A.),*
126 F.3d 328 (4th Cir. 1997) ...................................................... 21, 30

*Bryce v. Episcopal Church in the Diocese of Colo.,*
289 F.3d 648 (10th Cir. 2002) ....................... 4, 5, 7, 8, 9, 10, 25, 27, 30

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................................................. 13

*Colo. Christian Univ. v. Weaver,*
534 F.3d 1245 (10th Cir. 2008) ............................................... 3, 10, 11

*Demkovich v. St. Andrew the Apostle Par.,*
3 F.4th 968 (7th Cir. 2021) (en banc) ................................................. 1

*El Pescador Church, Inc. v. Ferrero,*
594 S.W.3d 645 (Tex. Ct. App. 2019) ................................................ 21

*Fowler v. Rhode Island,*
345 U.S. 67 (1953) .............................................................................. 25

*Fratello v. Archdiocese of N.Y.*,
863 F.3d 190 (2d Cir. 2017) ........................................... 1, 13

*Gonzalez v. Roman Cath. Archbishop of Manila*,
280 U.S. 1 (1929) ........................................................ 28

*Harris v. Matthews*,
643 S.E.2d 566 (N.C. 2007) ....................................... 21, 22

*Hawthorne v. Couch*,
911 So. 2d 907 (La. Ct. App. 2005) .................................. 21

*Heard v. Johnson*,
810 A.2d 871 (D.C. 2002) ............................................. 29

*Hiles v. Episcopal Diocese of Mass.*,
773 N.E.2d 929 (Mass. 2002) ......................................... 9

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.
EEOC*,
565 U.S. 171 (2012) ................................ 1, 6, 8, 9, 10, 18, 31

*Huntsman v. Corp. of the President of the Church of Jesus
Christ of Latter-Day Saints*,
76 F.4th 962 (9th Cir. 2023) .......................................... 25

*Huntsman v. Corp. of the President of the Church of Jesus
Christ of Latter-Day Saints*,
2024 WL 878088 (9th Cir. Mar. 1, 2024) ............................ 25

*In re Diocese of Lubbock*,
624 S.W.3d 506 (Tex. 2021) ............................................ 9

*Kaufmann v. Sheehan*,
707 F.2d 355 (8th Cir. 1983) .......................................... 30

iii

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox
    Church in N. Am.,*
    344 U.S. 94 (1952) .................................................. 2, 3, 8, 9, 21, 27, 31

*Knuth v. Lutheran Church Mo. Synod,*
    643 F. Supp. 444 (D. Kan. 1986) ......................................................... 31

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh,*
    903 F.3d 113 (3d Cir. 2018) ........................................................... 1, 31

*Moon v. Moon,*
    431 F. Supp. 3d 394 (S.D.N.Y. 2019) .................................................. 30

*Myhre v. Seventh-Day Adventist Church Reform Movement
    Am. Union Int'l Missionary Soc'y,*
    2015 WL 13687326 (N.D. Ga. July 24, 2015) ...................................... 31

*NLRB v. Cath. Bishop of Chi.,*
    440 U.S. 490 (1979) ............................................................................. 7

*O'Connor v. Diocese of Honolulu,*
    885 P.2d 361 (Haw. 1994) ................................................................... 9

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ..................... 1, 2, 3, 5, 6, 7, 8, 10, 14, 23, 25, 27

*Pfeil v. St. Matthews Evangelical Lutheran Church of the
    Unaltered Augsburg Confession of Worthington,*
    877 N.W.2d 528 (Minn. 2016) ............................................................. 9

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l
    Presbyterian Church,*
    393 U.S. 440 (1969) ......................................................................... 3, 9

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
    772 F.2d 1164 (4th Cir. 1985) ........................................................... 30

iv

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich,*
   426 U.S. 696 (1976) ............................5, 7, 8, 14, 23, 24, 27, 28, 29, 31

*Thomas v. Review Bd.,*
   450 U.S. 707 (1981) ........................................................................ 3, 13

*Trs. of the New Life in Christ Church v. City of Fredericksburg,*
   142 S. Ct. 678 (2022) ........................................................................ 13

*United States v. Ballard,*
   322 U.S. 78 (1944) ..................................................................... 3, 11, 13

*Van Osdol v. Vogt,*
   908 P.2d 1122 (Colo. 1996) .............................................................. 29

*Watson v. Jones,*
   80 U.S. (13 Wall.) 679 (1872) ............................................................. 8

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) .......................................................................... 30

## OTHER AUTHORITIES

Adam S. Chodorow, *Maaser Kesafim and the Development of Tax Law*, 8 Fla. Tax Rev. 153 (2007) .................................................. 16

"Chapter 31: Obedience to the Law of Tithing," *Teachings of the Church: Joseph F. Smith*, The Church of Jesus Christ of Latter-day Saints, https://perma.cc/E2MR-X9XB ......................... 18

The Church of Jesus Christ of Latter-day Saints, General Handbook: Serving in The Church of Jesus Christ of Latter-day Saints (2023), https://perma.cc/6YBY-STPW .................. 24

Dallin H. Oaks, *Tithing*, The Church of Jesus Christ of Latter-day Saints (Apr. 1994), https://perma.cc/J2EW-3TC2 ......................................................................... 24

David A. Bednar, *The Windows of Heaven*, The Church of Jesus Christ of Latter-day Saints (Oct. 2013), https://perma.cc/UE3S-VDB9 ............................................. 23

Diana L. Eck, *The Religious Gift: Hindu, Buddhist, and Jain Perspectives on Dana*, 80 Social Research 359 (2013) ........................ 17

*Explorer's Discovery Could Change Theories of Noah's Flood*, CNN (Sept. 17, 2000 4:18 pm), https://perma.cc/KCM3-RSGD ........................................................................... 12

Gordon B. Hinckley, *The State of the Church*, The Church of Jesus Christ of Latter-day Saints (Apr. 1991), https://perma.cc/ZEB5-FFAU ................................................ 23

Gordon B. Hinckley, *The Times in Which We Live*, The Church of Jesus Christ of Latter-day Saints (Oct. 2001), https://perma.cc/3LRS-BRV6 ............................................. 18

Juan R. Prestol, *Tithing, the Church, and Mission*, Dynamic Steward 11 (Oct.-Dec. 2010) (publication of Stewardship Department of the General Conference of Seventh-day Adventists), https://perma.cc/Y3TP-UB82 ....................................... 19

Ken Walker, *Tithing: What should the church teach its members about giving?*, Baptist Press (July 11, 2003), https://perma.cc/5C9R-JA4T ............................................ 15

Maaser Kesafim: On Giving a Tenth to Charity (Cyril Domb, ed., 1982) ...................................................................... 16

Morris H. Chapman, *Local Church Autonomy*, SBC Life (Dec. 1, 1997), https://perma.cc/6EQ8-TQ7E ...................................... 19

Oliver B. Pollak, *"Be Just Before You're Generous": Tithing and Charitable Contributions in Bankruptcy*, 29 Creighton L. Rev. 527 (1996) ............................................... 15

*Per Capita*, Presbyterian Church (U.S.A.) Office of the General Assembly, https://perma.cc/H35N-FNBE ............................ 19

Southern Baptist Convention, *Baptist Faith & Message 2000* https://perma.cc/S629-WJEX ............................................... 15

*Tithing*, The Church of Jesus Christ of Latter-day Saints, https://perma.cc/4TDL-5YC6 ...................................... 18, 20

*Tithing Principles and Guidelines* (General Conference of Seventh-day Adventists) (1990), https://perma.cc/285S-2RLG ........................................................................... 16

*Trust and Obey*, Discipleship Ministries of the United Methodist Church (Oct. 24, 2006), https://perma.cc/F59T-92LZ ........................................................................... 16

*Use of Tithe*, Seventh-day Adventist Church (Oct. 14, 1985), https://perma.cc/2PEG-TGCT ....................................... 16, 20

*Viewpoint: Make a Payment of Faith*, The Church of Jesus Christ of Latter-day Saints (July 19, 2015), https://perma.cc/L2TE-PQNV ............................................ 18

*What Is Tithing?*, The Church of Jesus Christ of Latter-day Saints, https://perma.cc/5WSA-ZKVA ............................... 17

*What is Zakat?*, Zakat Foundation of America, https://perma.cc/4B7N-CC84 ............................................ 17

# INTEREST OF THE *AMICUS*[1]

The Becket Fund for Religious Liberty is a non-profit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. Becket has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others. Becket regularly litigates church autonomy cases, both in the Supreme Court of the United States and in federal and state courts nationwide. *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968 (7th Cir. 2021) (en banc); *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113 (3d Cir. 2018); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 203 (2d Cir. 2017).

Becket submits this brief because it is concerned that Plaintiffs' arguments for reversal, if credited, would undermine well-established First Amendment principles that "protect[] the right of religious

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, or any person, other than *Amicus* or its counsel, contributed money intended to fund the preparation or submission of this brief.

institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady*, 140 S. Ct. at 2055 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

# INTRODUCTION AND SUMMARY OF ARGUMENT

"'Courts are not arbiters of scriptural interpretation.'" *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1265 (10th Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981)). And their involvement in religious disputes would "plainly jeopardize" constitutional "values" by both "inhibiting the free development of religious doctrine" and entwining "secular interests in matters of purely ecclesiastical concern." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).

For these reasons, the U.S. Supreme Court has long held that the judiciary cannot decide "the truth or verity of … religious doctrines," *United States v. Ballard*, 322 U.S. 78, 86 (1944). "[A]ny attempt by [the] government to dictate or even influence such matters" is wholly "outlaw[ed]" by the First Amendment. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). Rather, the Religion Clauses protect the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

These well-established principles resolve this case. As the district court observed, this lawsuit "seek[s] to have the [judiciary] adjudicate the truth or falsity" of various beliefs held by The Church of Jesus Christ of Latter-day Saints (the "Church"). App. Vol. 4 at 263. That has not changed on appeal. Plaintiffs continue to contend, for example, that the Church "misrepresented the process by which the Book of Mormon was created" as well as the character of its "founding prophet, Joseph Smith." Opening Br. 21. But resolving those questions lies no more within the judicial ken than adjudicating the origin of the Qur'an or the virtue of the Buddha. Nothing could be further from the kinds of "purely secular disputes" that fall within this Court's competence. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002) (citation omitted).

Further, the First Amendment not only forecloses judicial inquiry into "the Church's teachings and representations" as to its scripture and history, App. Vol. 4 at 262, but also its representations regarding the purpose and use of Church members' tithes. Tithing is a profoundly spiritual issue for many faith traditions—including the Church—with deep scriptural roots. It is a devotional practice, not a business

transaction, and spiritual principles such as inspiration and revelation frequently guide the discussion and disbursement of tithing funds. Yet notwithstanding the "right of the church" to "discuss church doctrine and policy freely," *Bryce*, 289 F.3d at 658, Plaintiffs would have this Court parse communications made during a worship service for consistency with their preferred understanding of what constitutes a tithe and how tithing funds should be used. Any such inquiry is barred by the First Amendment. *Id.* at 658–59.

None of Plaintiffs' purported exceptions to the "broad principle" of church autonomy alter this analysis. *Our Lady*, 140 S. Ct. at 2061. Rather, permitting Plaintiffs' suit to proceed would present a "substantial danger" of the courts "becom[ing] entangled in essentially religious controversies." *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 709 (1976). And it would threaten the independence assured to all religious bodies by the Constitution. Accordingly, this Court should affirm the decision below.

# ARGUMENT

## I.  The Church Autonomy Doctrine Bars Plaintiffs' Suit.

Plaintiffs' suit boils down to the allegation that by teaching purported falsehoods about the Church's scripture and history, Church leaders "induc[ed] others to join" or "remain dedicated to" the Church, which in turn allowed for the wrongful collection of tithes believers are obligated to contribute. Opening Br. 32. While they describe the Church's theological claims as "the core" of the alleged fraud, Plaintiffs alternatively point to purported "misrepresentations and concealment about tithing use." *Id.* at 41. Both theories of liability fall within the heartland of inquiries forbidden by the church autonomy doctrine.

### A.  The Church Autonomy Doctrine Prohibits Secular Interference with Internal Church Affairs.

The "principle of church autonomy" ensures religious organizations "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 140 S. Ct. at 2061. This principle, which dates back to the Magna Carta, was part of the "background" against which "the First Amendment was adopted" and can be traced through 150 years of Supreme Court precedent. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182–

88 (2012) (tracing the history of the church autonomy doctrine); *see Bryce*, 289 F.3d at 655 (discussing the "long line of Supreme Court cases" affirming the doctrine). Church autonomy is grounded in both the Free Exercise Clause and the Establishment Clause of the First Amendment, as "[s]tate interference in th[e] sphere [of faith and doctrine] would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Our Lady*, 140 S. Ct. at 2060. In fact, "the very process of inquiry" into a religious entity's internal affairs "may impinge on rights guaranteed by the Religion Clauses." *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979); *see Milivojevich*, 426 U.S. at 718 ("detailed review" of church procedures by court was "impermissible" under First Amendment); *Bryce*, 289 F.3d at 654 n.1 (courts resolve church autonomy defenses "early in litigation" to "avoid excessive entanglement in church matters").

The church autonomy doctrine is thus a "broad principle," *Our Lady*, 140 S. Ct. at 2061, that generally "prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity," *Bryce*, 289 F.3d at 655. Courts have accordingly

applied the doctrine in diverse circumstances ranging from employment decisions to church property disputes. *See, e.g.*, *Our Lady*, 140 S. Ct. at 2061 (employment decisions); *Hosanna-Tabor*, 565 U.S. at 196 (same); *Milivojevich*, 426 U.S. at 724 (internal church procedures); *Kedroff*, 344 U.S. at 120–21 (same); *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1872) (church property dispute); *Bryce*, 289 F.3d at 658 (disputes arising from discussions of "church doctrine and policy"). Simply put, whenever the "subject of [an] action" "concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them," the First Amendment bars the suit. *Milivojevich*, 426 U.S. at 714; *see Bryce*, 289 F.3d at 658.

This remains true even in the most compelling circumstances. For example, the Supreme Court refused to interfere in matters of church polity even where a state supreme court had deemed the decisions of a religious body to be "arbitrary" and inconsistent with the institution's "own laws and procedures." *Milivojevich*, 426 U.S. at 712–13, 721. So too where the church was purportedly commandeered by a hostile government and "infiltrat[ed]" by "atheistic or subversive influences."

*Kedroff*, 344 U.S. at 108–09. And likewise where the church was alleged to have "departed from the tenets of faith and practice" in place at the time congregants had "affiliated with" it. *Hull Church*, 393 U.S. at 441.

Indeed, principles of church autonomy mandate dismissal even where other important rights are implicated. Thus, courts routinely decline to adjudicate civil rights and tort claims that would entangle them in the internal affairs of a religious organization. *E.g.*, *Hosanna-Tabor*, 565 U.S. at 196 (no adjudication of employment discrimination claim by employee with important religious functions); *Bryce*, 289 F.3d at 659 (no adjudication of sexual harassment claim arising from statements at church meetings).[2] While the "interest of society" in

_____

[2] *See also In re Diocese of Lubbock*, 624 S.W.3d 506, 509 (Tex. 2021) (barring defamation claim relating to sex abuse that was "inextricably intertwined" with church law and church governance decision); *O'Connor v. Diocese of Honolulu*, 885 P.2d 361, 362 (Haw. 1994) (barring fraud, defamation, and negligence claims arising from excommunication); *Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929, 937 n.12 (Mass. 2002) (rejecting defamation claim due to "absolute First Amendment protection for statements made … in an internal church disciplinary proceeding"); *Pfeil v. St. Matthews Evangelical Lutheran Church of the Unaltered Augsburg Confession of Worthington*, 877 N.W.2d 528, 542 (Minn. 2016) (adjudicating defamation claims based on statements made in religious disciplinary proceeding "would excessively entangle the courts with religion and unduly interfere with respondents' constitutional right to

enforcing civil rights is "undoubtedly important," "so too is the interest of religious groups in choosing … [how to] carry out their mission." *Hosanna-Tabor*, 565 U.S. at 196. When these interests conflict, "the First Amendment has struck the balance." *Id.* Churches "must be free to choose" how to conduct their own religious affairs. *Id.*

## B. Plaintiffs Cannot Challenge the Truth or Falsity of Church Doctrine.

Plaintiffs' challenge to the Church's teaching regarding its scripture and origins is the epitome of a claim barred by the church autonomy doctrine. This Court has been clear that the First Amendment precludes the judiciary from "insert[ing] itself into a theological discussion about [a] church's doctrine," *Bryce*, 289 F.3d at 651, or "second-guessing [its] religious beliefs and practices," *Colo. Christian Univ.*, 534 F.3d at 1261; *see also Our Lady*, 140 S. Ct. at 2060–61 (preserving a "church's independent authority" over "preaching, teaching, and counseling"). That is all the more so where litigants ask secular triers of fact to opine on the "truth or falsity of … religious beliefs or doctrines."

---

make autonomous decisions regarding the governance of their religious organization").

*Ballard*, 322 U.S. at 88.  Courts have long been foreclosed from entering this "forbidden domain": "[m]en may believe what they cannot prove" and churches "may not be put to the proof of their religious doctrines or beliefs."  *Id.* at 86–87.

That, however, is precisely what Plaintiffs seek to do.  For example, Plaintiffs propose to prove that "the Church misrepresented the process by which the Book of Mormon was created," that the Church's holy scripture was not "translate[d] directly from gold plates," and that much of the religious "artwork promulgated by the Church" of its founding is inaccurate.  Opening Br. 19, 21, 26.  Likewise, Plaintiffs seek to hold the Church liable for "concealing material facts about its founding prophet" and lying about his "faithful[ness]" and "character."  *Id.* at 31.  But the Church can no more "be tried before a jury charged with the duty of determining whether [its] teachings [on these matters] contained false representations," than one who takes his "gospel from the New Testament" could be compelled to substantiate "the Divinity of Christ, life after death, [or] the power of prayer."  *Ballard*, 322 U.S. at 87.  Those are "matters about which" courts "ha[ve] neither competence nor legitimacy" to judge.  *Colo. Christian Univ.*, 534 F.3d at 1265.

Plaintiffs seek to circumvent this conclusion by contending that they only contest "facts, not beliefs." Opening Br. 21. But as the Church explains, that distinction is entirely facile: whether described as facts or beliefs, "judges or juries" are not properly asked to determine, for example, "whether Moses parted the Red Sea," "whether Jesus walked on water," or whether "Muhammed communed with the archangel Gabriel." Resp. Br. 2, 20. Certainly, many historical matters contained within religious scripture, like the Great Flood of Genesis, are comprised of factual details that are commonly debated among scholars and scientists.[3] But the existence of these secular debates does not erase the theological significance of these claims, nor does it allow a court to penalize a religious organization for its beliefs based on a judicial determination that the factual underpinnings for those teachings have been conclusively debunked.

---

[3] *See, e.g., Explorer's Discovery Could Change Theories of Noah's Flood*, CNN (Sept. 17, 2000 4:18 pm), https://perma.cc/KCM3-RSGD (discussing purported "evidence the catastrophic flood … that the prophet Noah escaped in his ark, occurred not in the Middle East, but here in the Black Sea").

To the contrary, courts have never indulged the "'arrogant pretension' that secular officials may serve as 'competent Judge[s] of Religious truth.'" *Trs. of the New Life in Christ Church v. City of Fredericksburg*, 142 S. Ct. 678, 679 (2022) (Gorsuch, J., dissenting from denial of certiorari) (quoting *Memorial and Remonstrance Against Religious Assessments*, *in Selected Writings of James Madison* 21, 24 (R. Ketcham ed., 2006)). It is precisely in situations where doctrines, decisions, and practices, do not seem "logical, consistent, or comprehensible" to outsiders that First Amendment protections are most critical. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (quoting *Thomas*, 450 U.S. at 714). Many religious beliefs, after all, are grounded on factual assertions that may appear "incredible, if not preposterous" to the unbeliever, *Ballard*, 322 U.S. at 87, or rest on considerations "that, though perhaps difficult for a person not intimately familiar with the religion to understand, are perfectly sensible—and perhaps even necessary—in the eyes of the faithful," *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 203 (2d Cir. 2017). Allowing courts to adjudicate the verity of such beliefs under the guise of making purportedly *factual* determinations "would undermine the general rule

that religious controversies are not the proper subject of civil court inquiry." *Milivojevich*, 426 U.S. at 713.

## C. Plaintiffs Cannot Challenge Purported Misrepresentations Regarding the Meaning and Use of Church Tithing Funds.

Plaintiffs also claim they "would not have tithed had they not believed in LDS doctrine," and, had they known about the Church's "misrepresentations," they would have "changed their belief and practice with respect to the LDS Church." Opening Br. 51. While most of the asserted misrepresentations on this issue relate to matters of church history and scripture—and are not cognizable for the reasons detailed above—Plaintiffs also point to various statements ostensibly made by the Church or its leaders as to how tithes would be spent. App. Vol. 4 at 285; *see id.* at 286 n.314. The district court properly rejected Plaintiffs' RICO theory insofar is it rested on these statements. *Id.* at 281–86. But *amicus* and the Church offer an additional reason that dismissal was proper: because tithing is a "matter[] of faith and doctrine" and the use of tithing funds is a "matter[] of internal [church] government," such claims are barred by the First Amendment. *Our Lady*, 140 S. Ct. at 2061; *see* Resp. Br. 41–45.

1. *Tithing is inherently religious.*

Tithing is the ancient religious practice of giving a portion of one's income (often one-tenth) as an act not only of charity, but also of faith, trust, and obedience.[4] Tithing, therefore, is not akin to a business transaction or even financial support for a religious organization. Rather, for millennia, religious adherents across many denominations and religious traditions have contributed tithes as a sign of their willingness to submit their will to, and put their trust in, God.

This understanding of tithing as an act of devotion and trust in God is shared across Christian denominations. For example, Southern Baptists treat tithing as an act of faithful stewardship that demonstrates "trusting [God] to take care of their needs" and relinquishing control over their possessions, which are themselves gifts from God.[5] Members of the

---

[4] A common reading of the Bible defines tithing as giving ten percent of one's increase. *See Gen.* 28:22; *Lev.* 27:30–32; *Deut.* 14:22–29. The word "tithe" is derived from the Old English word for "one tenth." Oliver B. Pollak, *"Be Just Before You're Generous": Tithing and Charitable Contributions in Bankruptcy*, 29 Creighton L. Rev. 527, 530 (1996).

[5] Ken Walker, *Tithing: What should the church teach its members about giving?*, Baptist Press (July 11, 2003), https://perma.cc/5C9R-JA4T; *see also* Southern Baptist Convention, *Baptist Faith & Message 2000* § XIII, https://perma.cc/S629-WJEX (last accessed on Mar. 5, 2024).

United Methodist Church tithe in order to "reflect[] [their] trust in God and [their] belief that God truly knows what is best for [them]."[6] For Seventh-day Adventists, tithing is a faithful "act of worship"—the "practice" of showing "faithfulness [to] God's requirements."[7]

Many Jews likewise follow the examples of Abraham, who gave away a tenth of his earnings to Melchizedek, the "priest of God Most High,"[8] and Jacob, who proclaimed "This stone which I have set up as a pillar shall become a House of God, and whatever you will give me, I shall repeatedly tithe to you."[9] This practice of *maaser kesafim* is closely related to the general injunctions of *tzedakah* (charity or righteousness) and *gemiluth chasadim* (doing good deeds).[10]

---

[6] *Trust and Obey*, Discipleship Ministries of the United Methodist Church (Oct. 24, 2006), https://perma.cc/F59T-92LZ.

[7] *Tithing Principles and Guidelines* 15, 20 (General Conference of Seventh-day Adventists) (1990) (capitalization altered), https://perma.cc/285S-2RLG; *see Use of Tithe*, Seventh-day Adventist Church (Oct. 14, 1985), https://perma.cc/2PEG-TGCT.

[8] *Gen.* 14:18.

[9] *Gen.* 28:22.

[10] *See* Adam S. Chodorow, *Maaser Kesafim and the Development of Tax Law*, 8 Fla. Tax Rev. 153, 155, 163–164 (2007); *see also generally* Maaser Kesafim: On Giving a Tenth to Charity (Cyril Domb, ed., 1982) 18–40.

Other religious traditions engage in analogous practices. In the Muslim tradition, adherents must pay yearly *zakat*, a charity payment made to the "poor, vulnerable, and deserving" that is one of the five pillars of Islam.[11] Hindus and Buddhists seek to detach themselves from worldly possessions by practicing giving and generosity with whatever they own.[12] For these religious traditions, their contributions are also profoundly spiritual and inherently tied to religious doctrine and teaching.

Members of The Church of Jesus Christ of Latter-day Saints are no different. The Church teaches that tithing is "a commandment of God" and that its members have an obligation to "give one-tenth of their income back to God through His Church."[13] Tithing is how "Church members show their gratitude to God for their blessings and their resolve

---

[11] *What is Zakat?*, Zakat Foundation of America, https://perma.cc/4B7N-CC84 (last accessed on Mar. 5, 2024).

[12] Diana L. Eck, *The Religious Gift: Hindu, Buddhist, and Jain Perspectives on Dana*, 80 Social Research 359, 370, 375 (2013).

[13] *What Is Tithing?*, The Church of Jesus Christ of Latter-day Saints, https://perma.cc/5WSA-ZKVA (last accessed on Mar. 5, 2024).

to trust in the Lord rather than in material things."[14] "Tithing is about faith"[15] and "[o]bedience,"[16] not just financial support for the Church. Because tithes are given in faith and "appropriated in the manner set forth by the Lord Himself," using the tithe is a "sacred" duty.[17]

      2.    *Tithing involves matters of internal church governance.*

Lawsuits over tithing challenge both a "matter[] … of faith and doctrine" as well as one "of church government." *Hosanna-Tabor*, 565 U.S. at 186. For religious organizations that collect tithes, determining how to encourage and spend these funds is a matter of immense religious significance—often involving prayer, internal deliberation among religious authorities, and adherence to guidance from sacred texts. These decisions are driven not just by faith and doctrine, as shown above, but

---

[14] *Tithing*, The Church of Jesus Christ of Latter-day Saints, https://perma.cc/4TDL-5YC6 (last accessed on Mar. 5, 2024).

[15] *Viewpoint: Make a Payment of Faith*, The Church of Jesus Christ of Latter-day Saints (July 19, 2015), https://perma.cc/L2TE-PQNV.

[16] "Chapter 31: Obedience to the Law of Tithing," *Teachings of the Church: Joseph F. Smith*, The Church of Jesus Christ of Latter-day Saints, https://perma.cc/E2MR-X9XB (last accessed on Mar. 5, 2024).

[17] Gordon B. Hinckley, *The Times in Which We Live*, The Church of Jesus Christ of Latter-day Saints (Oct. 2001), https://perma.cc/3LRS-BRV6.

the manner in which they are made is often dictated by rules of church governance and polity.

For example, because local Southern Baptist Convention churches function and govern themselves "autonomous[ly]," each congregation has wide discretion in using tithing funds as the congregation sees fit.[18]  By contrast, more hierarchical bodies govern their tithing decisions in different ways.  For instance, in the Presbyterian Church (U.S.A.), local churches pay a set annual "per capita" amount that is passed along to their presbytery, synod, and the General Assembly, each of which makes decisions on how their portions of those funds will be used.[19]  Local Seventh-day Adventist churches, for their part, send "all of the tithe given at the local church … to the local conference or mission."[20]  From there, the church—"acting collectively through the General Conference

---

[18] *See* Morris H. Chapman, *Local Church Autonomy*, SBC Life (Dec. 1, 1997), https://perma.cc/6EQ8-TQ7E.

[19] *Per Capita*, Presbyterian Church (U.S.A.) Office of the General Assembly, https://perma.cc/H35N-FNBE (last accessed on Mar. 5, 2024).

[20] Juan R. Prestol, *Tithing, the Church, and Mission*, Dynamic Steward 11(Oct.–Dec. 2010) (publication of Stewardship Department of the General Conference of Seventh-day Adventists), https://perma.cc/Y3TP-UB82 (last accessed on Mar. 4, 2024).

Session and the Annual Council of the General Conference Committee" and "in harmony with Scripture and Spirit of Prophecy principles"— determines how the funds will be administered.[21]

The Church follows similar procedures. Members give tithes either directly to Church headquarters or to their local church leaders, who in turn give those funds to the Church headquarters.[22] There, a "council" of Church leaders determines how the "sacred funds" are used.[23] Tithes are "always used for the Lord's purposes—to build and maintain temples and meetinghouses, to sustain missionary work, to educate Church members, and to carry on the work of the Lord throughout the world."[24]

3. *Plaintiffs' tithing theory requires religious entanglement.*

Given all of the above, it is perhaps not surprising that courts have repeatedly barred lawsuits challenging how houses of worship "expend funds raised by the church for religious purposes," concluding that such

---

[21] *Use of Tithe, supra* n.7.

[22] *Tithing, supra* n.14.

[23] *Id.*

[24] *Id.*

decisions "fall[] within the ecclesiastical sphere that the First Amendment protects from civil court intervention." *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 332–33 (4th Cir. 1997).[25] There is good reason for this consistent conclusion: permitting suits by "any one aggrieved" by a religious community's use of his or her tithe would "lead to the total subversion" of those bodies' ability "to decide for themselves, free from state interference," matters both "of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 114, 116.

Plaintiffs' general and specific challenges to the Church's representations regarding its use of tithing funds are of a piece with those courts have routinely turned aside. *First*, Plaintiffs generally challenge

---

[25] *See, e.g., Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 80 (D.D.C. 2019) (concluding that "[h]ow a church spends worshippers' contributions is … central to the exercise of religion" and permitting challenge to those decisions "would constitute an impermissible judicial interference"); *El Pescador Church, Inc. v. Ferrero*, 594 S.W.3d 645, 658 (Tex. Ct. App. 2019) (rejecting fraud-based tithing claim as "necessarily embroil[ing] the courts into membership, church discipline, and church governance matters"); *Hawthorne v. Couch*, 911 So. 2d 907, 910 (La. Ct. App. 2005) (rejecting fraudulent misrepresentation claim for return of tithes because "[t]he issue of tithing is at its core a purely ecclesiastical matter" outside the review of "civil courts"); *Harris v. Matthews*, 643 S.E.2d 566, 571 (N.C. 2007) (First Amendment barred determination of "whether [an] expenditure was proper in light of Saint Luke's religious doctrine and practice").

whether the Church really spent tithes "for the Lord's work," claiming that a large percentage of "annual tithing" funds were "used for investment funds" rather than, for example, "humanitarian aid."  App. Vol. 4 at 265, 287; *see* Opening Br. 22; Resp. Br. 41.  But as explained above, whether an "expenditure [is] proper in light of … religious doctrine and practice"—let alone whether that expenditure qualifies as "the Lord's work"—"is precisely the type of ecclesiastical inquiry courts are forbidden to make." *Harris*, 643 S.E.2d at 571.

*Second*, Plaintiffs specifically assert that Church leaders made "affirmative misrepresentations" regarding the use of tithing funds, particularly in connection with the purchase and development of the City Creek Mall.  Opening Br. 22, 47.  The key statement challenged by Plaintiffs—that no "tithing funds" would be used in connection with this project—was made by then-Church President Gordon B. Hinckley during a formal address at the Church's General Conference in April 2003.[26]

---

[26] While Plaintiffs cited to a handful of other statements, the district court was "skeptical" that these statements would be relevant to showing the Church's intent to defraud, noting "[f]or example" that Plaintiffs cited statements from Church-owned publications without alleging that "the Church controls [their] content."  App. Vol. 4 at 286 n.314.

App. Vol. 4 at 254–55. In the same address, he explained that the project would be financed instead by monies "from those commercial entities owned by the Church" as well as "the earnings of invested reserve funds"—funds which, as the Church has long explained, use money from tithes as principal. *Id.*[27] Hinckley's statement thus distinguished "tithing funds," which he said would not be used for the City Creek project, from the interest earned on reserve funds, which he acknowledged would be used.

The problem for Plaintiffs is that resolving the truth or falsity of President Hinckley's representations would require judicial "interpretation" of matters of "faith and doctrine"—namely, the meaning of "tithing funds"—that lies wholly beyond the competence of secular courts. *Milivojevich*, 426 U.S. at 721–22 (citation omitted); *cf. Our Lady*, 140 S. Ct. at 2068–69 (rejecting court competency to define "co-

---

[27] As early as 1991, Church leadership explained in General Conference that "reserves" are built with "money which comes from the tithing." Gordon B. Hinckley, *The State of the Church*, The Church of Jesus Christ of Latter-day Saints (Apr. 1991), https://perma.cc/ZEB5-FFAU; *see also* David A. Bednar, *The Windows of Heaven*, The Church of Jesus Christ of Latter-day Saints (Oct. 2013), https://perma.cc/UE3S-VDB9. As explained *infra*, these addresses are taught as Church doctrine.

religionist" without risking "judicial entanglement in religious issues").

Whether tithing funds are limited to the *principal* contributed by members (as the Church contends, Resp. Br. 34) or extend to the *earnings* on those funds once invested (as Plaintiffs appear to believe) is a determination courts are singularly ill-equipped to render. *See Milivojevich*, 426 U.S. at 714 (declining to "deprive [religious] bodies of the right of construing their own church laws" (citation omitted)).

Plaintiffs' position is further complicated by the fact the statement they challenge was made during an address by the Church's President at General Conference. The General Conference is a biannual religious event that replaces regular Sunday worship services, as the addresses delivered by church leaders are considered prophetic instruction "of equal validity with the doctrines of the written word."[28] A challenge to the content of such a General Conference address thus not only conflicts with

---

[28] James E. Talmage, Articles of Faith 7 (11th ed. 1919). General Conference addresses become the topics of dedicated Sunday meetings in between conferences. The Church of Jesus Christ of Latter-day Saints, General Handbook: Serving in The Church of Jesus Christ of Latter-day Saints, §§ 8.2.1.2, 9.2.1.2 (2023), https://perma.cc/6YBY-STPW. As a key tenet of the Church, tithing is a proper matter for such addresses. *See, e.g.*, Dallin H. Oaks, *Tithing*, The Church of Jesus Christ of Latter-day Saints (Apr. 1994), https://perma.cc/J2EW-3TC2.

the longstanding bar on courts' power to "disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings," *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953), but would in fact require the judiciary to weigh in directly on a "matter[] of faith and doctrine," *Our Lady*, 140 S. Ct. at 2061.[29]  That would violate a core purpose of the "church autonomy doctrine"—the "protection of the First Amendment rights of the church to discuss church doctrine and policy freely"—which is why this Court has long refused to "insert itself into a theological discussion" taking place within a church.  *Bryce*, 289 F.3d at 651, 658.

---

[29] In addressing another challenge to Hinckley's statement about the City Creek project, the U.S. Court of Appeals for the Ninth Circuit reached a different outcome.  *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 76 F.4th 962, 969, 972 (9th Cir. 2023) (deeming the questions "secular" and thus outside the church autonomy doctrine).  But that decision was recently vacated.  *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, No. 21-56056, 2024 WL 878088 (9th Cir. Mar. 1, 2024) (granting en banc rehearing and vacating panel decision).  A church's view that tithes are what members contribute, and not its investment earnings, is an inherently religious definition.

## II.     No Exception to the Church Autonomy Doctrine Applies.

Perhaps recognizing that their suit would otherwise be barred by longstanding precedent, Plaintiffs invoke two purported limits on the church autonomy doctrine. Neither has merit here.

### A.     There Is No "Uninformed Adherent" Exception to the Church Autonomy Doctrine.

On appeal, Plaintiffs assert that because Church leaders did not secure their "informed consent" before they joined the Church, the church autonomy doctrine cannot apply. Opening Br. 17, 33–34. To the extent this argument is preserved, it appears to duplicate the argument that a court can dictate a "standard of care" to religious leaders that would govern how they educate adherents and proselytize their faith—an endeavor that, as the district court recognized, would plainly run afoul of the First Amendment. App. Vol. 4 at 278 (explaining that it is as "impossible as it is unconstitutional" to pronounce "the training, skill, and standards applicable for members of the clergy … in a diversity of religions professing widely varying beliefs").

But even if such a standard could be crafted in a manner consistent with the Religion Clauses, it would be impossible to apply in practice: how could a secular court determine whether a religious adherent was

sufficiently "informed" to submit herself to a church's teachings and authority without "becom[ing] entangled in essentially religious controversies"? *Milivojevich*, 426 U.S. at 709. In any event, the Supreme Court has held that the "implied consent" of voluntary affiliation suffices in other contexts where the church autonomy doctrine applies (*i.e.*, whether a litigant is bound by the determinations of church tribunals or hierarchical authorities). *Kedroff*, 344 U.S. at 114 ("All who unite themselves to such a [religious association] do so with an *implied consent* to [its] government, and are bound to submit to it." (emphasis added)).

Regardless, Plaintiffs' reliance on consent in *this* context is a red herring. Where the question does not involve submission to "internal church disciplinary procedures," "[t]he applicability of the [church autonomy] doctrine does not focus upon the relationship between the church and [the plaintiff]," but the *subject matter* of the dispute. *Bryce*, 289 F.3d at 658 (addressing a church's right "to engage freely in ecclesiastical discussions," even with "non-members" who engage "voluntarily" with the church); *supra* Part I.A; *cf. Our Lady*, 140 S. Ct. at 2068–69 (rejecting view that minister must be found to be a "co-religionist" for the ministerial exception to apply). And for good reason.

To hold otherwise would mean that a litigant need only claim that he was not sufficiently "informed" about the tenets of his faith and—voilà—the church autonomy defense would vanish, allowing secular courts to decide undeniably religious controversies. That cannot be the law.

## B. No Fraud-Based Exception to the Church Autonomy Doctrine Applies Here.

Plaintiffs alternatively argue that because the Supreme Court has "historically exempted fraudulent conduct" from the church autonomy doctrine, their allegations that Church leadership made intentional "misrepresentations about LDS history and its founding prophet's character" renders the doctrine inapplicable. Opening Br. 15, 32–33. Not so. This is wrong twice over.

First, no court has ever allowed such an exception, which would quickly swallow the rule. The basis for Plaintiff's purported loophole is the Supreme Court's century-old observation that religious tribunals have power over "purely ecclesiastical" matters "[i]n the absence of fraud, collusion, or arbitrariness." *Gonzalez v. Roman Cath. Archbishop of Manila*, 280 U.S. 1, 16 (1929). In *Milivojevich*, however, the Court subsequently confirmed that this language was "dictum only," which had never been "given concrete content" or "appli[cation]." 426 U.S. at 712.

The Court then went on to reject the "arbitrariness" prong of that dictum, explaining that reviewing a religious decision for arbitrariness would "inherently entail inquiry" into religious matters—"exactly the inquiry the First Amendment prohibits." *Id.* at 713.

While *Milivojevich* found it unnecessary to address "whether or not" the fraud or collusion *dictum* has any validity, *id.*, other "courts have refused to find such an exception either viable or applicable," *Anderson v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 2007 WL 161035, at *16 (Tenn. Ct. App. Jan. 19, 2007) (citing cases and finding "no case in which a court has attempted to adjudicate a religious dispute on the basis of that exception"); *cf. Van Osdol v. Vogt*, 908 P.2d 1122, 1134 (Colo. 1996) ("The inherently ecclesiastical nature of the choice of a minister is logically inconsistent with a fraud or collusion exception."). Indeed, for all the reasons the Court identified in *Milivojevich*, it is "likely to be as impossible to apply as the 'arbitrariness' portion" of *Gonzalez*'s dictum. *Heard v. Johnson*, 810 A.2d 871, 881 (D.C. 2002). Perhaps for that reason, "Plaintiff fails to cite (and [*amicus*] has been unable to identify) a single case applying the 'fraud or collusion' exception" to the church

autonomy doctrine. *Moon v. Moon*, 431 F. Supp. 3d 394, 414 n.28 (S.D.N.Y. 2019).

Second, even if a fraud exception applied where a religious organization acts in "bad faith for secular purposes," Opening Br. 33 (citation omitted), such a hypothetical exception would not apply here, where the alleged fraud concerns the teaching of age-old religious doctrine in addresses delivered by the ecclesiastical leadership of a bona fide church. This is not the stuff of "purely secular disputes" that are neither "rooted in religious belief" nor concern the "church's spiritual functions." *Bryce*, 289 F.3d at 657 (quoting *Bell*, 126 F.3d at 331; *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)). The bar on judicial inquiry thus plainly applies. *Id.*; *see also Kaufmann v. Sheehan*, 707 F.2d 355, 358–59 (8th Cir. 1983) (even though complaint "arguably state[d] a claim for fraud or collusion," claim was barred as "the proposed amendments … deal only with matters of religion"); *Moon*, 431 F. Supp. 3d at 414 ("To the extent the 'narrow exception' that plaintiff invokes exists in the first instance, it would only apply where, unlike here, 'no ecclesiastical determinations are necessary.'" (citation

omitted)).[30]  Put another way, Plaintiff's argument simply "misses the point" of church autonomy, which recognizes that the formulation and transmission of religious doctrine within the church is "a matter 'strictly ecclesiastical'" and "the church's alone" to decide.  *Hosanna-Tabor*, 565 U.S. at 194–95 (quoting *Kedroff*, 344 U.S. at 119).

## CONCLUSION

For these reasons, the Court should affirm the judgment below.

Dated: March 7, 2024                              Respectfully submitted,

                                        /s/ *Noel J. Francisco*

---

[30] *Knuth v. Lutheran Church Mo. Synod*, 643 F. Supp. 444, 448 (D. Kan. 1986) (fraud inquiry barred where it requires "searching and impermissible inquiry" into religion (citing *Milivojevich*, 426 U.S. at 723)); *see, e.g.*, *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 2015 WL 13687326, at *7 (N.D. Ga. July 24, 2015) (same where court would have to "enter[] the religious thicket"), *aff'd*, 719 F. App'x 926 (11th Cir. 2018); *Ad Hoc Comm. of Parishioners of Our Lady of the Sun Cath. Church, Inc. v. Reiss*, 224 P.3d 1002, 1011 (Ariz. Ct. App. 2010) (similar); *see also Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 121 (3d Cir. 2018) (pretext inquiries are "forbidden" where they would entangle courts in religious matters).

Eric C. Rassbach
The Hugh and Hazel Darling
Foundation Religious Liberty Clinic
PEPPERDINE UNIVERSITY SCHOOL OF LAW
24244 Pacific Coast Hwy.
Malibu, CA 90263

Samuel V. Lioi
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939

Noel J. Francisco
*Counsel of Record*
David T. Raimer
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
nfrancisco@jonesday.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 6131 words, excluding the parts of the brief exempted by Rule 32(f) and Tenth Circuit Rule 32(B), as counted using the word-count function on Microsoft Word 365 software.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 365, in Century Schoolbook style, 14-point font.

Dated: March 7, 2024       Respectfully submitted,

*/s/ Noel J. Francisco*
Noel J. Francisco

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing Brief *Amicus Curiae* of The Becket Fund for Religious Liberty: (1) all required privacy redactions have been made per Tenth Circuit Rule 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Safety Scanner—version 1.405, updated March 7, 2024, and according to the program is free of viruses.

Dated: March 7, 2024                Respectfully submitted,

*/s/ Noel J. Francisco*
Noel J. Francisco